NO. 24-3387

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

*In re*: GOOGLE LOCATION HISTORY LITIGATION

NAPOLEON PATACSIL, *et al.*,
*Plaintiffs-Appellees*,

JOHN ANDREN, MATTHEW LILLEY, JOSEPH S. ST. JOHN,
*Objectors-Appellants*,

v.

GOOGLE LLC, *et al.*,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California at San Jose
No. 5:18-cv-5062-EJD, District Judge Edward J. Davila

Opening Brief of Appellants Andren, Lilley, and St. John

HAMILTON LINCOLN LAW CENTER
CENTER FOR CLASS ACTION FAIRNESS
Theodore H. Frank
Anna St. John
1629 K Street NW, Suite 300
Washington, D.C. 20006
(703) 203-3848
ted.frank@hlli.org
*Attorneys for Objectors-Appellants*

# Table of Contents

Table of Contents ............................................................................................ i

Table of Authorities ..................................................................................... iii

Statutes and Rules ......................................................................................... x

Statement of Subject Matter and Appellate Jurisdiction ........................... 1

Statement of the Issues ................................................................................. 1

Standard of Review ....................................................................................... 3

Statement of the Case ................................................................................... 4

    A.    In a 2010 privacy case against Google, the Supreme Court vacates approval of a small all-*cy pres* settlement and, on remand, Judge Davila approves a modified settlement that successfully distributes a $23 million fund to a class of almost 200 million Google users ............ 4

    B.    Google allegedly tracks location data of users against their expressed wishes and settles with attorneys general from over forty states. ........................................................................................................ 5

    C.    Google and plaintiffs settle a class action, but structure the settlement so no money will go to class members. ................................... 7

    D.    The proposed *cy pres* recipients include organizations that do or wish funding for highly controversial work. ............................................ 10

    E.    The Andren class members object. ........................................................... 13

    F.    The district court overrules Andren's objections and approves the Settlement, moving millions of dollars around in *cy pres* allocations. ...... 15

Summary of Argument ................................................................................ 19

Argument ..................................................................................................... 22

I.    The district court committed reversible error by failing to apply Rule 23(e)(2) correctly. But regardless, Rule 23(e)(2)(C)(ii) precludes approval of a *cy-pres*-only settlement when it is feasible to make distributions to some class members .................................................................................. 22

    A.    The district court legally erred by failing to perform the analysis Rule 23(e)(2) requires. .................................................................................. 24

B.    Rule 23(e)(2)(C)(ii)'s plain language requires a court to reject this settlement. ................................................................................. 25

C.    Along with the plain language of Rule 23(e)(2)(C)(ii), there are sound public-policy reasons to emphasize class counsel's obligation for effective distribution of class settlement funds. ................... 30

D.    The district court also committed reversible legal error by contradicting Rule 23(e)(2) in incorrectly applying "a strong presumption" of fairness. ............................................................. 34

II.    Many of the *cy pres* recipients should be disqualified as flunking Ninth Circuit standards. ................................................................. 36

III.    The settlement and approval order unconstitutionally exceeds the judiciary's Article III power. ................................................................. 43

IV.    This should not be a close case, and the Court should grant *en banc* review to overturn decisions that would otherwise permit approval of settlements without marginal consideration to class members or settlements where class counsel uses *cy pres* to engage in self-dealing. ......................... 46

Conclusion ................................................................................ 49

Statement of Related Cases  Under Circuit Rule 28-2.6 .................... 50

Certificate of Compliance  with Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1 ........ 51

Certificate of Service ................................................................ 52

# Table of Authorities

<u>Cases</u>

*Abdullah v. U.S. Sec. Assocs.*,
    731 F.3d 952 (9th Cir. 2013) ....................................................................... 3

*In re Agent Orange Prods. Liab. Litig.*,
    818 F.2d 145 (2d Cir. 1987) ...................................................................... 42

*Allen v. Bedolla*,
    787 F.3d 1218 (9th Cir. 2015) ......................................................... 2, 19, 22

*American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC*,
    103 F.4th 765 (11th Cir. 2024) ................................................................. 38

*In re Apple Inc. Device Perf. Litig.*,
    50 F.4th 769 (9th Cir. 2022) ..................................................... 20-21, 34, 36

*In re Baby Products Antitrust Litig.*,
    708 F.3d 163 (3d Cir. 2013) .............................................................. 28-29, 31

*In re BankAmerica Corp. Sec. Litig.*,
    775 F.3d 1060 (8th Cir. 2015) ......................................................... 24, 28, 31

*In re Bluetooth Headset Prod. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) .................................................................. 24, 31

*Board of Educ. v. Pico*,
    457 U.S. 853 (1982) .................................................................................. 42

*Briseño v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) .................................................................... 27

*Briseño v. Henderson*,
    996 F.3d 1014 (9th Cir. 2021) ........................................... 2, 20, 22, 34-35

*Brown v. Google LLC*,
    525 F. Supp. 3d 1049 (N.D. Cal. 2021) ...................................................... 4

*Caplin & Drysdale, Chartered v. U.S.*,
    491 U.S. 617 (1989) .................................................................................. 33

*In re Carrier IQ, Inc., Consumer Privacy Litig.*,
  2016 WL 4474366 (N.D. Cal. Aug. 25, 2016)...................................................27-28

*Churchill Village, L.L.C. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004).............................................................2, 24-25, 34-35

*In re Citigroup Sec. Litig.*,
  199 F. Supp. 3d 845 (S.D.N.Y. 2016) .................................................................. 34

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
  236 F.R.D. 48 (D. Me. 2006) ............................................................................... 44

*In re Corrugated Container Antitrust Litig.*,
  643 F.2d 195 (5th Cir. 1981) ............................................................................... 35

*Dennis v. Kellogg Co.*,
  697 F.3d 858 (9th Cir. 2012) .............................................................3-4, 21, 25, 39, 41

*Devlin v. Scardelletti*,
  536 U.S. 1 (2002) ................................................................................................... 1

*In re Dry Max Pampers Litig.*,
  724 F.3d 713 (6th Cir. 2013) ............................................................................... 35

*Frank v. Gaos*,
  139 S. Ct. 1041 (2019)........................................................ 5, 22, 26, 31, 47

*Frankel v. Regents of U. of Cal.*,
  No. 2:24-cv-04702 (Dkt. 89) (C.D. Cal. Aug. 13, 2024)...................................... 43

*In re Google Buzz Privacy Litig.*,
  2011 WL 7460099 (N.D. Cal. Jun. 2, 2011)..................................................4, 34, 45

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
  934 F.3d 316 (3d Cir. 2019) ..........................................................................4, 24, 48

*In re Google Inc. Street View Elec. Comm. Litig.*,
  21 F.4th 1102 (9th Cir. 2021).................................... 4, 15, 17, 22-23, 26, 29, 46-48

*In re Google Plus Profile Litig.*,
  No. 5:18-cv-06164-EJD (N.D. Cal.) ....................................................................... 4

*In re Google Referrer Header Privacy Litig.*,
    869 F.3d 737 (9th Cir. 2017),
    *vacated on other grounds, Frank v. Gaos*,
    139 S. Ct. 1041 (2019)........................................................... 4, 22-23, 26, 30-31, 47-48

*In re Google Referrer Header Privacy Litig.*,
    2023 WL 6812545 (N.D. Cal. Oct. 16, 2023) .............................5, 13, 15, 23, 26-28

*Guar. Tr. Co. of N.Y. v. York*,
    326 U.S. 99 (1945) ................................................................................................ 45

*Hawes v. Macy's*,
    2023 WL 8811499,
    2023 U.S. Dist. LEXIS 226617 (S.D. Ohio Dec. 20, 2023)...........................42-43

*Ira Holtzman, C.P.A. & Assocs. v. Turza*,
    728 F.3d 682 (7th Cir. 2013) .............................................................................. 31

*Juliana v. U.S.*,
    947 F.3d 1159 (9th Cir. 2020) ............................................................................ 45

*Keepseagle v. Perdue*,
    856 F.3d 1039 (D.C. Cir. 2017) .......................................................................... 44

*Klier v. Elf Atochem N.A., Inc.*,
    658 F.3d 468 (5th Cir. 2011) .........................................................................24, 33

*Koby v. ARS Nat'l Servs.*,
    846 F.3d 1071 (9th Cir. 2017) ............................................................................ 39

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012)....................................................22-23, 27, 29, 32, 46-48

*Lane v. Facebook, Inc.*,
    709 F.3d 791 (9th Cir. 2013) .........................................................................32, 48

*Marek v. Lane*,
    571 U.S. 1003, 134 S.Ct. 8 (2013) ...................................................................... 30

*McDonough v. Toys 'R' Us*,
    No. 06-cv-00242 (E.D. Pa.) ................................................................................ 29

*Mecinas v. Hobbs,*
    30 F.4th 890 (9th Cir. 2022) ................................................................. 45

*Mirfasihi v. Fleet Mortg. Corp.,*
    356 F.3d 781 (7th Cir. 2004) ................................................................. 33

*Missouri v. Jenkins,*
    515 U.S. 70 (1995) ................................................................................. 3

*Nachshin v. AOL, LLC,*
    663 F.3d 1034 (9th Cir. 2011) ................................................. 2, 3, 21, 36

*NewGen, LLC v. Safe Cig, LLC,*
    840 F.3d 606 (9th Cir. 2016) ................................................................... 3

*Pearson v. NBTY, Inc.,*
    772 F.3d 778 (7th Cir. 2014) ........................................................... 24, 29

*Perkins v. Am. Nat'l Ins. Co.,*
    No. 3:05-CV-100 (CDL), 2012 WL 2839788 (M.D. Ga. July 10, 2012) ....... 44-45

*Redman v. RadioShack Corp.,*
    768 F.3d 622 (7th Cir. 2014) ................................................................. 35

*Roes v. SFBSC Mgmt., LLC,*
    944 F.3d 1035 (9th Cir. 2019) ....................................... 2, 19-20, 22, 34

*Rucho v. Common Cause,*
    588 U.S. 684 (2019) .............................................................................. 45

*Sakamoto v. Duty Free Shoppers, Ltd.,*
    764 F.2d 1285 (9th Cir. 1985) ............................................................... 27

*Six Mexican Workers v. Ariz. Citrus Growers,*
    904 F.2d 1301 (9th Cir. 1990) ................................................... 2, 21, 36

*Tyson Foods Inc. v. Bouaphakeo,*
    136 S. Ct. 1036 (2016) ......................................................................... 43

*United States v. Kimsey,*
    668 F.3d 691 (9th Cir. 2012) ................................................................. 27

*Williams v. Reckitt Benckiser LLC,*
    65 F.4th 1243 (11th Cir. 2023) ................................................................... 24


Rules, Statutes, and Constitutional Provisions

26 U.S.C. § 501(c)(3) ...................................................................................... 8

28 U.S.C. § 1291 ............................................................................................. 1

28 U.S.C. § 1332(d) ........................................................................................ 1

28 U.S.C. § 1332(d)(10) .................................................................................. 1

28 U.S.C. § 2072(b) ................................................................................. 33, 48

42 U.S.C. § 1981 ................................................................................... 2, 19, 38

Fed. R. App. Proc. 4(a)(1)(A) ........................................................................ 1

Fed. R. Civ. Proc. 23 ........................................ 1, 5, 10, 16, 23, 24, 33, 47

Fed. R. Civ. Proc. 23(b)(3) .......................................................................... 19

Fed. R. Civ. Proc. 23(e) ........................................................................... 5, 24

Fed. R. Civ. Proc. 23(e)(1)(B) ..................................................................... 10

Fed. R. Civ. Proc. 23(e)(2) .............................. 2, 19, 22, 24-25, 29, 34

Fed. R. Civ. Proc. 23(e)(2)(B) ..................................................................... 34

Fed. R. Civ. Proc. 23(e)(2)(C) ..................................................................... 24

Fed. R. Civ. Proc. 23(e)(2)(C)(i) .................................................................. 25

Fed. R. Civ. Proc. 23(e)(2)(C)(ii) .......................... 1-2, 13, 17, 19-20, 22-27, 29-30, 34, 41

Fed. R. Civ. Proc. 23(e)(2)(D) ..................................................................... 43

Fed. R. Civ. Proc. 54(b) ................................................................................ 1

U.S. Const., Am. I ....................................................................................... 48

U.S. Const., Art. III.................................................................4, 19, 21, 43, 46-47


Other Authorities

AMERICAN LAW INSTITUTE,
 PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.07 *comment* (b)
 (2010) ................................................................................................ 33

Chasin, Chris J.,
 *Modernizing Class Action Cy Pres Through Democratic Inputs*,
 163 U. PENN. L. REV. 1463 (2015)........................................................ 30

Erichson, Howard,
 *Aggregation as Disempowerment: Red Flags in Class Action Settlements*,
 92 NOTRE DAME L. REV. 859 (2016).................................................... 44

Gold, Russell M.,
 *Compensation's Role in Deterrence*,
 91 NOTRE DAME L. REV. 1997 (2016) ................................................. 32

Google LLC,
 Assurance of Voluntary Compliance, *State of Pennsylvania v. Google LLC*,
 No. 221101371 (Phila. Ct. Com. Pl. Nov. 4, 2022)......................... 6, 9, 14

Liptak, Adam,
 *Doling Out Other People's Money*,
 N.Y. TIMES (Nov. 26, 2007) ............................................................... 44

Mem. in Support of Mot. For Prelim. Approval of Settlement,
 *Pearson v. Target Corp.*,
 No. 1:11-cv-07972 (Dkt. 213) (N.D. Ill. May 14, 2015)..................... 29

Parloff, Roger,
 *Google and Facebook's new tactic in the tech wars*,
 FORTUNE (Jul. 30, 2012)...................................................................... 32

Pidluzny, Jonathan,
 *The Campus Antisemitism Complex at Elite U.S. Universities* (2024).......................... 40

Redish, Martin H. *et al.*,
  *Cy Pres Relief & the Pathologies of the Modern Class Action:*
  *A Normative and Empirical Analysis,*
  62 FLA. L. REV. 617 (2010) ........................................................................ 31

Settlement Agreement,
  *State of Arizona v. Google LLC,*
  No. CV2020-006219 (Ariz. Sup. Ct. Oct. 3, 2022) ............................... 6-7

Smith, D. Brooks,
  *Class Action and Aggregate Litigation: A Comparative International Analysis,*
  124 PENN ST. L. REV. 303 (2020) ........................................................... 42

Vogel, Kenneth P.,
  *Google Critic Ousted From Think Tank Funded by the Tech Giant,*
  N.Y. TIMES (Aug. 30, 2017) ...................................................................... 32

Wasserman, Rhonda,
  *Cy Pres in Class Action Settlements,*
  88 U.S.C. L. REV. 97 (2014) ..................................................................... 34

**Statutes and Rules**

**Federal Rule of Civil Procedure 23. Class Actions.**

**(e) Settlement, Voluntary Dismissal, or Compromise.**

The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

…

(2) Approval of the Proposal. If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

…

(C) the relief provided for the class is adequate, taking into account: …

…

(ii) the effectiveness of any proposed method of distributing relief to the class;

… and

(D) the proposal treats class members equitably relative to each other.

…

(5) Class-Member Objections.

(A) In General. Any class member may object to the proposal if it requires court approval under this subdivision (e). …

…

## Statement of Subject Matter and Appellate Jurisdiction

The district court had federal question jurisdiction under 28 U.S.C. § 1332(d), because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from defendant. Dkt. 131 ¶ 32.[1] For example, class member and named plaintiff Michael Childs is a citizen of Florida (*Id.* ¶ 15), and defendant Google LLC is a citizen of California and Delaware under 28 U.S.C. § 1332(d)(10). No party disputed Article III jurisdiction.

This Court has appellate jurisdiction under 28 U.S.C. § 1291. The court's final judgment under Fed. R. Civ. Proc. 54(b) issued on May 3, 2024. 1-ER-2. Objectors-Appellants John Andren, Matthew Lilley, and Joseph S. St. John filed a notice of appeal on May 20, 2024. 4-ER-666. This notice is timely under Fed. R. App. Proc. 4(a)(1)(A). The Andren Objectors, as class members who objected to settlement approval below, have standing to appeal a final approval of a class action settlement without the need to intervene formally in the case. *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

## Statement of the Issues

1. The 2018 addition of Fed. R. Civ. Proc. 23(e)(2)(C)(ii) requires analyzing "the effectiveness of any proposed method of distributing relief to the class" when deciding whether to approve a settlement. This Circuit recognizes that Rule 23 requires a district court to investigate the "economic reality" of the settlement relief provided to

---

[1] "Dkt." refers to docket entries in the district court below.

class members in a class-action settlement. *Allen v. Bedolla*, 787 F.3d 1218, 1224 & n.4 (9th Cir. 2015); *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049, 1052-55 (9th Cir. 2019). And the amended "Rule 23(e)(2) assumes that a class action settlement is invalid." *Briseño v. Henderson*, 998 F.3d 1014, 1030 (9th Cir. 2021) (citing *Roes*, 944 F.3d at 1049 n.12). Did the district court commit reversible error when it approved a class-action settlement where (a) it failed to do a Rule 23(e)(2)(C)(ii) analysis and consider the ineffectiveness of the distribution method; (b) the settlement fund consisted solely of *cy pres* of tens of millions of dollars when there is no dispute that similar settlements in this Circuit have successfully distributed even smaller sums to similarly sized classes through a claims process; and (c) it misapplied Rule 23(e)(2) to instead hold that a single *Churchill* factor creates a "strong presumption" of fairness? (Raised at 3-ER-385–392; decided at 1-ER-15, 1-ER-18, 1-ER-20–21.)

2.     A *cy pres* award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members," *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011), and must not benefit a group "too remote from the plaintiff class," *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 1990). Is it reversible error for a court, without a reasoned response to substantive objections, to approve *cy pres* recipients for a national U.S. class where a recipient: (a) promises to distribute funds internationally or to focus funding on a small number of students; (b) promises to distribute funds in a racially discriminatory manner in violation of 42 U.S.C. § 1981; (c) promises to use funds to engage in ideological work at odds with the desires of a substantial portion, and perhaps a majority, of the class; (d) is a civil defendant in credible pending litigation over discrimination on the basis of

race or religion; or (e) has not complied with court-ordered disclosure requirements to permit class members a fair opportunity to object? (Raised at 3-ER-395–401, 2-ER-52–61; decided *sub silentio* at 1-ER-23–26.)

3. "Federal judges cannot make the fundamentally political decisions as to which priorities are to receive funds and staff… [U]ndertak[ing] such local, day-to-day tasks … detract[s] from the independence and dignity of the federal courts and intrude[s] into areas in which they have little expertise." *Missouri v. Jenkins*, 515 U.S. 70, 133 (1995) (Thomas, J., concurring). Can a class-action settlement give a district judge the power to act as a grant administrator over a $42 million pot of money? (Raised at 3-ER-400–401; decided at 1-ER-16.)

4. Should this Court engage in *en banc* review of its decisions that permit approval of class-action settlements that (a) provide no marginal benefit to class members beyond what opt-outs and non-class members receive or (b) divert millions of dollars of settlement funds to organizations with which class counsel or defendants have significant prior affiliations?

## Standard of Review

"We review a district court's approval of a proposed class action settlement, including a proposed *cy pres* settlement distribution, for abuse of discretion." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011). An error of law is a *per se* abuse of discretion. *Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 956 (9th Cir. 2013). A district court's interpretation of the Federal Rules of Civil Procedure is reviewed *de novo*. *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 612 n.2 (9th Cir. 2016). "To survive

appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012).

## Statement of the Case

This is an appeal of a district court's approval of a class-action settlement that pays $62 million to the attorneys and to third-party *cy pres* beneficiaries (some of whom engage in political activism contrary to the interests of many class members, including the objectors), but nothing to class members except injunctive relief equally applicable to class members and non-class members alike.

**A.    In a 2010 privacy case against Google, the Supreme Court vacates approval of a small all-*cy pres* settlement and, on remand, Judge Davila approves a modified settlement that successfully distributes a $23 million fund to a class of almost 200 million Google users.**

Often, third parties expose or government officials sue Google for privacy violations, and civil class actions involving tens or hundreds of millions of Google customers follow. *E.g.*, *In re Google Inc. Street View Elec. Comm. Litig.*, 21 F.4th 1102 (9th Cir. 2021); *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316 (3d Cir. 2019); *Brown v. Google LLC*, 525 F. Supp. 3d 1049 (N.D. Cal. 2021); *In re Google Plus Profile Litig.*, No. 5:18-cv-06164-EJD (N.D. Cal.); *In re Google Buzz Privacy Litig.*, No. C 10-00672 JW (N.D. Cal.). In one such case, Google settled a privacy class action with hundreds of millions of class members with an all-*cy pres* settlement that the district court approved; this Court affirmed the approval in a divided opinion. *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737 (2017). It was, this Court held in a decision

predating the 2018 amendments to Rule 23, "infeasible" to distribute a few million dollars to a class of 129 million people. *Id.* at 742. The Supreme Court granted *certiorari* "to decide whether a class action settlement that provides a cy pres award but no direct relief to class members satisfies the requirement that a settlement binding class members be 'fair, reasonable, and adequate'" under Fed. Rule Civ. Proc. 23(e)(2). *Frank v. Gaos*, 139 S. Ct. 2041, 2045. *Frank* did not reach that question, but vacated and remanded for a determination of Article III standing. *Id.* at 1046.

On remand to the Northern District of California, the parties ultimately abandoned attempting to justify *cy pres* relief to the class. They reached a new settlement that used a claims process to distribute a $23 million fund to over two million class members in what was now described as a class of almost 200 million Google users. In October 2023, Judge Davila, the district court judge in this case, found that settlement fair, reasonable, and adequate under Rule 23(e). 3-ER-388 (discussing *Google Referrer*, 2023 WL 6812545 (N.D. Cal. Oct. 16, 2023)); 2-ER-77 (same).

**B.  Google allegedly tracks location data of users against their expressed wishes and settles with attorneys general from over forty states.**

To use certain of its software products, Google requires users to provide certain personal information and to consent to Google's collection of data, including data about the users' location. Google collects such data through account settings that apply to data collected from any device signed into a Google account. In August 2018, the press reported Google was recording historical location data sufficient to map out a user's movements throughout the day even when he had disabled Google's "Location History" setting. *See* Dkt. 131. Following these reports, plaintiffs filed a class action

complaint against Google, alleging that Google had surreptitiously tracked the location data of millions of mobile phone users, even when users had attempted to protect their location privacy by disabling Google's "Location History" feature on their mobile devices, and despite Google telling users that if the feature was set to off, then "the places you go are no longer stored." Dkt. 1 at 1. Plaintiffs sought damages and declaratory and injunctive relief under California statutory law, common law, and the California's constitutional right to privacy. Dkt. 1 at 15-16. After the action was consolidated with others and following two rounds of motions to dismiss, the district court found that plaintiffs had adequately pleaded claims for intrusion upon seclusion, violation of the California Constitution's right to privacy, and unjust enrichment. Dkt. 162; 1-ER-5.

Plaintiffs' suit was not the only legal action Google faced for its alleged location privacy violations. Several state attorneys general filed enforcement actions against Google arising from the same general conduct alleged in plaintiffs' complaint. These actions resulted in settlements—years before the one at issue—that required Google to pay substantial monetary sums and agree to take certain action to correct privacy violations involving its storage and use of users' location data. In the largest such settlement, Google's Assurance of Voluntary Compliance ("AVC") with 40 state attorneys general required it to pay $391.5 million and commit to several compliance and disclosure provisions for five years. *State of Pennsylvania v. Google LLC*, AVC, No. 221101371 (Phila. Ct. Com. Pl. Nov. 4, 2022);[2] *see also, e.g.*, *State of Arizona v. Google*

---

[2] Assurance of voluntary compliance online at: https://tinyurl.com/tccp67e3.

*LLC*, Settlement Agreement, No. CV2020-006219 (Ariz. Sup. Ct. Oct. 3, 2022) ($85 million settlement).[3] Google agreed not to make misrepresentations to users regarding an individual user's location information and web and app activity; to issue a pop-up notification and email to users who had relevant account settings enabled notifying them of whether their settings collect location information and instructing them how to disable the settings; to maintain a webpage disclosing its policies and practices as to its collection and use of location information; to provide links to the webpage in various communications with users who enable a location-related account setting; to refrain from sharing a user's precise location information with a third-party advertiser without a user's express affirmative consent; and to automatically delete location information within thirty days of collection. *Id.*

C.     Google **and plaintiffs settle a class action, but structure the settlement so no money will go to class members.**

After Google's settlements with the state attorneys general, the private parties settled. In September 2023, plaintiffs moved for preliminary approval for a settlement class comprising "all natural persons residing in the United States who used one or more mobile devices and whose Location Information was stored by Google while 'Location History' was disabled at any time during the Class Period [January 1, 2014 through December 4, 2023]." Dkt. 327; 4-ER-467. The class totaled about 247.7 million members. 1-ER-5.

---

[3] Settlement agreement online at: https://tinyurl.com/cbb2z7z3.

The agreement required Google to pay $62 million into a settlement fund, but did not provide for payment of any of that money to unnamed class members. Instead, the settlement provided that the entire settlement fund—net of costs for notice and administration, attorneys' fees, and service awards—would be distributed to *cy pres* recipients. 4-ER-469–470. The settlement required recipients to be 501(c)(3) organizations with a track record of addressing privacy concerns on the internet. 4-ER-470. The parties mutually agreed upon proposed recipients set forth in an exhibit to the settlement agreement, with the district court charged with ultimately approved individual *cy pres* recipients and the amount of settlement funds each would receive. *Id.* The parties chose the proposed recipients by reaching out to organizations with which they were familiar and asking them to return a questionnaire. 4-ER-606–607. The settlement required all approved *cy pres* recipients to provide a proposal committing to their use of the funds to promote protection of internet privacy and to provide a report to the court and the parties every six months describing how they had used, and intended to use, settlement funds. 4-ER-470.

Google's only other obligations involved certain non-monetary relief whose bulk was materially identical to requirements in Google's settlements with state attorneys general or had been implemented years earlier. 4-ER-581. For example, Google "confirm[ed] that on or about August 16, 2018"—over five years before the settlement—"it removed from its website" the statement that "[w]ith Location History off, the places you go are no longer stored," and further agreed not to make this statement for at least three years after the settlement effective date. *Id.* (Notably, the three-year period largely coincides with the five-year period of compliance in the 2022

Pennsylvania AVC.) Google also "confirm[ed]" that "on or before June 24, 2020"—over three years before the settlement—it had "implemented a policy whereby (i) LOCATION INFORMATION stored through LOCATION HISTORY ('LH') and WEB & APP ACTIVITY ('WAA') is automatically deleted by default after a period of 18 months when users opt into these settings for the first time and (ii) users can set their own auto-delete periods, starting at a minimum period of three (3) months," and further agreed not to lengthen the time periods in this policy for three years from the effective date of the settlement. 4-ER-581. Materially similar to the Pennsylvania AVC, Google also agreed to provide notice to users explaining its practices of collecting location information and how to locate the applicable settings, link to a webpage containing this information in certain emails and webpages, and not to make any attempts in the ordinary course of business to re-identify anonymous location information collected up to three years after the settlement effective date without the user's consent. 4-ER-583–584. Google also agreed to inform users if it changed its practice of not sharing users' precise location information with third parties other than for valid legal reasons such as law enforcement, public safety, and fraud/abuse investigations. 4-ER-584. The provisions applied to class members and non-class-members alike.

The parties did not provide class members with direct notice; instead, the publication notice plan used internet advertising, press releases, and a settlement website. 4-ER-515; 1-ER-8.

The district court authorized notice of the settlement. 3-ER-432.[4] Class counsel requested service awards of $5,000 for each of the three representative class members and $18.6 million in fees (30% of the $62 million), as well as nearly $152,000 in expenses, uncontested by Google. Dkt. 351 at 1. Class counsel's fee request was percentage-based, seeking 30% of the $62 million size of the settlement fund and not on any purported value of non-monetary relief, which they did not attempt to value. Dkt. 351.

**D.    The proposed *cy pres* recipients include organizations that do or wish funding for highly controversial work.**

Before moving for final approval of the settlement, the parties expanded the list of 17 proposed *cy pres* recipients to include 21 proposed recipients: ACLU Speech, Privacy, and Technology Project; ACLU of Northern California Technology and Civil Liberties Program; Harvard's Berkman Klein Center for Internet & Society; MIT Internet Policy Research Initiative; New York University's Information Law Institute; Yale Law School's Information Society Project; Fordham University Center on Law and Information Policy; Center on Privacy & Technology at Georgetown Law; UCLA Institute for Technology, Law & Policy; The Markup; Internet Archive; Center for Democracy & Technology; ConnectSafely; Electronic Frontier Foundation; FPF

---

[4] Perhaps because the settling parties misnamed their motion (Dkt. 327), the order is misnamed "preliminary approval." *Id.* The 2018 amendments to Rule 23 abolished the confusing concept of "preliminary approval," replacing it with a Rule 23(e)(1)(B) "decision to give notice." The order does not mention this rule.

Education & Innovation Foundation; Free Press;[5] Privacy Rights Clearinghouse; Data & Society Research Institute; National Cybersecurity Alliance; Electronic Privacy Information Center; and Rose Foundation. 4-ER-586; Dkt. 356-1. The parties proposed percentages ranging from one to seven percent for each of the proposed recipients, except ACLU Speech, Privacy, and Technology Project (14%); Electronic Frontier Foundation (14%); and Rose Foundation (13%). Dkt. 356-1.

The proposed recipients provided the parties with proposals describing the organizations and their intended use of the *cy pres* funds. Plaintiff's counsel posted the proposals to the settlement website and later filed them with the district court as part of their motion seeking final approval of the settlement. Dkt. 356. These proposals revealed that many of the organizations engage in highly controversial work, including work to support abortion access and "DEI" (Diversity, Equity, and Inclusion) endeavors. For example, the ACLU of Northern California's proposal described its privacy law work to include "new and creative ways to utilize constitutional privacy law" to counter "attack[s on] reproductive and LGBTQ rights" and "build greater connection with racial justice, economic justice, and other issues." 2-ER-71. Meanwhile, Georgetown's Center on Privacy and Technology declared that it "bring[s] a civil rights and racial justice lens to legal and policy debates." 2-ER-230. It claimed that two if its "most active projects" involve "the impact of … surveillance on [grocery store workers'] ability to organize" and "hold[ing] corporations accountable for discrimination in algorithmic decision making systems," and it proposed using *cy pres*

---

[5] Free Press, a Washington, DC-based activist nonprofit, 2-ER-217, should not be confused with the better-known publication created by Bari Weiss, *The Free Press*.

funds on producing guidance on algorithmic technologies. 2-ER-232. Free Press has selectively focused on the deletion of location data for those visiting abortion clinics and declared its intent to "advance racial justice" and "empower grassroots groups led by people of color to set the agenda in the[] policy debates" that it intends to engage in before Congress and the Federal Trade Commission on controversial topics such as net neutrality and "discriminatory algorithms." 2-ER-219–224. Their "Stop Hate for Profit" advertiser-boycott campaign demanded that Facebook censor legitimate criticism of violence associated with Black Lives Matter protests. 2-ER-73.

The parties also filed notices describing several connections between the proposed recipients and themselves and their counsel. For example, multiple attorneys for both plaintiff and defendant as well as Google employees are alumni of universities slated to receive millions of dollars in funds and which have multi-billion dollar endowments, including Harvard, Yale, Fordham, MIT, UCLA, and Georgetown. 3-ER-428; 3-ER-422. Multiple attorneys from the law firms litigating the case sit on the boards of the proposed recipients. *See* 4-ER-457; 4-ER-444; 3-ER-429 (disclosing at least six attorneys and Google employees who serve or have served on recipients' boards). Both defense counsel and plaintiffs' counsel also have deep ties with the proposed ACLU recipients. They have provided pro bono services and served as co-counsel with the ACLU and its affiliates in several matters, and plaintiffs' counsel was considering a "potential collaboration" with the ACLU to again jointly pursue other litigation. 4-ER-457; 4-ER-444; 3-ER-429. Indeed, one of the attorneys who appeared for the class acknowledged that he expected to join the board for one of the ACLU recipients. 3-ER-429. In addition, Google and its counsel admittedly provide funding

to several of the recipients, including the EFF, ACLU, Berkman Center at Harvard, Center for Democracy and Technology, and at least three others. 4-ER-458–459. The parties did not disclose whether or which third-party organizations sought *cy pres* funding but were not submitted to the court.

## E.  The Andren class members object.

Three class members, the Andren Objectors—John Andren, Matthew Lilley, and Joseph St. John—represented by the nonprofit HLLI's Center for Class Action Fairness, objected to the proposed settlement. 3-ER-373. The Center has won tens of millions of dollars for class members by successfully contesting premature *cy pres* settlement provisions. 2-ER-82–83. Andren argued that the settlement flunks Rule 23(e)(2)(C)(ii) by improperly favoring third-party nonprofits over class members through its *cy pres* provision. Rule 23(e)(2)(C)(ii) requires that courts evaluate class-action settlements with regard to the effectiveness of any proposed method of distributing relief to the class, but here, the settlement did not even seek to distribute any relief directly to the class.

The settlement had resorted to *cy pres* prematurely when it was feasible to distribute the $62 million settlement fund to the class through a claims process. While the $62 million settlement reflected less than a dollar per class member, the Andren Objectors identified dozens of settlements that had a similar or even smaller ratios of settlement funds to class members than the present one, but where class members received cash payments through a claims process—including the *Google Referrer* $23 million settlement approved by Judge Davila. 2-ER-77–80. Andren demonstrated that

claims rates in class actions, especially those without direct notice such as this one, are typically very low and thus enable direct distribution to the class. 3-ER-388–391. The Andren Objectors also argued that without class members' affirmative election, *cy pres* constitutes compelled speech—in the form of compulsion by court order to engage in expressive and associational activity through the donation of their settlement funds— in violation of the First Amendment. And even aside from this constitutional question, *cy pres* recipients who advocate for or engage in work that is controversial, ideological, or political are not appropriate recipients under existing circuit precedent. Further, the many preexisting relationships between the recipients and class counsel are improper because of the incentives to pursue their own interests over those of the class. And even without those relationships, the selection process was improper, opaque, and included potential recipients who were mismatched to the class, including through geographic mismatch and benefits for people otherwise unrelated to the class, and who had failed to meet the settlement's disclosure requirements. In particular, the settlement created at a minimum an appearance of a conflict of interest because it made the court a grant administrator who would determine which proposed *cy pres* recipients would receive money and how much.

The Andren Objectors preemptively rebutted any assertion by the parties that the settlement could be justified by its supposed injunctive benefits. 3-ER-393. They pointed out that the injunctive relief was illusory because it duplicated Google's preexisting voluntary actions or obligations imposed by its 2022 consent decree resolving enforcement actions with dozens of states. Settlement relief that replicates the *status quo ante* is not valuable consideration for the waiver of class members' claims.

Moreover, none of the injunctive relief was unique to class members subject to releases; opt-outs and non-class members would receive the same benefits.

The Andren Objectors also argued that if the district court granted class certification and settlement approval it should decline to grant the $18.6 million attorneys' fee request because *cy pres* is not a direct benefit to the class and, regardless, an above-benchmark fee of 30% is excessive. 3-ER-403.

Andren made other objections that he acknowledged were foreclosed by circuit precedent in *Google Street View*, but preserved them for future appellate review.

Each of the objectors filed a declaration with the objection in which they stated their opposition to funding, subsidizing, or being associated with the *cy pres* recipients, as their work and views were contrary to objectors' interests and values. 3-ER-413; 3-ER-417; 3-ER-420–421.

After plaintiffs moved for final approval, disclosing for the first time the final list of recipients and proposed allocation of funds (Dkt. 356), the Andren Objectors filed a supplemental objection to address the proposed *cy pres* distribution, including a chart specifying objections to individual *cy pres* recipients. 2-ER-52; 2-ER-55–56.

## F. The district court overrules Andren's objections and approves the Settlement, moving millions of dollars around in *cy pres* allocations.

The district court held a fairness hearing on April 18, 2024. 4-ER-600.[6] The Andren Objectors appeared at the hearing through counsel. *Id.* The settling parties did not dispute that *Google Referrer* and other cases demonstrated that it was possible to

---

[6] The transcript is incorrectly dated April 18, 2023. *Compare* Dkt. 360 (Minute Entry for April 18, 2024 proceedings). 4-ER-721.

distribute the settlement fund to class members through a claims process, but argued that Ninth Circuit precedent allowed them to choose not to do so. 4-ER-615.

On May 3, 2024, the district court approved the settlement and attorneys' fee request. 1-ER-4. In doing so, the court reallocated nearly $5 million dollars in proposed *cy pres* funds to increase the amounts awarded to Fordham, Center for Democracy & Technology, Free Press, Data & Society Research Institute, National Cybersecurity Alliance, and the Rose Foundation, and decrease the amounts awarded to Harvard, UCLA, Georgetown, the ACLU of Northern California, EFF, and EPIC. *Compare* 1-ER-34 *with* 2-ER-67. At the fairness hearing, the court noted that it was reallocating *cy pres* funds, and provided commentary on its decisions. The court granted Yale's $1.5 million allocation because it was "for two fellowships at that center," 1-ER-41; the court was "impressed with Fordham's presentation as they seek to educate youth," *id.*; the court doubled the National Cyber Security Alliance's proposed amount because it was particularly impressed with their "partnering with Women in Cyber Security and they seem to have an outreach towards advancing women's presence in cyber security and privacy issues," 1-ER-44; and, for the Rose Foundation, "the purpose is to fund those other individuals who I'll just say are not the usual suspects." *Id.* It held that Free Press should have the settling parties' proposed allocation augmented by $500,000 plus any leftover funds as a reward for having a representative attend the fairness hearing. 1-ER-49; 1-ER-43; 2-ER-67.

Finding that the Rule 23 requirements for class certification had been met, the district court reaffirmed its preliminary class certification for purposes of the settlement agreement. 1-ER-10. The district court also found that the settlement was fair,

reasonable, and adequate. 1-ER-11. The court held that the *cy pres* distribution was appropriate because, if one considered distribution to the entire class as a whole, rather than through the typical claims process, each class member's recovery would be *de minimis* and no more than twenty-five cents. 1-ER-14–15; 1-ER-20. Though reallocating the percentages, the court approved all of the proposed *cy pres* recipients because it was "satisfied that the *cy pres* distribution bears a substantial nexus" to the interests of the class in the "specific areas of data privacy that were raised in this case." 1-ER-16.

The district court overruled Andren's objections. It held that the Ninth Circuit rejected "nearly all" of their arguments about *cy pres* settlements in *Google Street View*, 21 F.4th at 1113. 1-ER-20. The court reiterated that "[w]hether distribution would be feasible to only *some* of the class through a claims-based or lottery system is simply not the proper inquiry." 1-ER-21. But it did not address or mention Rule 23(e)(2)(C)(ii), much less try to reconcile its position with the rule's text.

The district court further found that the *cy pres* recipients met the substantial nexus test, stating it was analyzing "whether the *cy pres* distribution bears a substantial nexus to the interests of the class members," accounting "for the nature of the lawsuit, the objectives of the underlying statutes, and the interests of the silent class members." 1-ER-23. The court found that the relationships among counsel, the parties, and the recipients and Google's past funding of certain recipients did not raise "substantial questions" about whether any recipient was proposed "based on the recipient's merits." 1-ER-21. Iin any event, the parties had agreed they would not "exercise control or influence over any recipient's expenditure of *cy pres* funds," and Google had agreed that any distributions would be in addition to its "ordinary charitable giving." *Id.* The court

believed that its review of the required bi-annual reports would allow it to effectively police the organizations' use of funds outside the "perimeters assigned in their Court-approved proposals." 1-ER-25. The court did not address that many of the organizations' proposals specifically stated their intent to use the funds for highly controversial and political work that a substantial part, and perhaps a majority, of the class opposes and even believes to be immoral, unethical, or unlawful. Nor did it substantively address Andren's complaint that many proposals expressly sought to use money for matters without a substantial nexus to the class.

The district court granted class counsel's fee and expense request in full: because of the "hard-fought" litigation, contested discovery, and well-funded defendants, an above-benchmark 30% award plus expenses of $151,756.23 was appropriate "in these circumstances." 1-ER-27. The court overruled the Andren Objectors' argument that fees should be reduced if not rejected because the premise that *cy pres* distributions do not benefit the class was "mistaken." 1-ER-30. The court also asserted that the injunctive relief was "meaningful" and went beyond the agreements with state attorneys general by "requiring a default auto-deletion period for Location Information; prohibiting Google from 'mak[ing] any attempts or efforts to re-identify … pseudonymous anonymous, or de-identified' location information; and requiring an annual email notice" and giving class members enforcement authority. 1-ER-31 (quoting Settlement Agreement Ex. C). It did not address the fact that non-class members or opt-outs received the same injunctive relief.

The district court concurrently entered judgment on May 3, 2024. 1-ER-2.

The Andren Objectors filed a timely notice of appeal on May 20, 2024. 4-ER-666.

## Summary of Argument

In the settlement at issue here, the attorneys receive over $18.75 million, and class members releasing Rule 23(b)(3) damages claims receive nothing more than they would if they opted out. The main "relief" is *cy pres* of about $42.6 million, with an Article III court acting as a grant administrator supervising the spending over several years. To add insult to injury, millions of dollars of *cy pres* are not even going to organizations representing "the interests of the silent class members." Instead, the money goes to organizations affiliated with Google and with class counsel; to organizations promising to spend grant money on international offices that cannot benefit the United States class; to organizations promising to use the grant in a manner that violates 42 U.S.C. § 1981; to organizations currently being sued for racial or religious discrimination; and to organizations promising to use the grant money for political causes offensive to much of, and perhaps the majority of, the class.

While the Ninth Circuit has affirmed settlement approvals with large *cy pres* distributions, it has never addressed whether such settlements satisfy the new Rule 23(e)(2)(C)(ii), adopted in 2018. A district court must evaluate a settlement by "the effectiveness of any proposed method of distributing relief to the class." But the district court never did that here, for *any* of the Rule 23(e)(2) factors. This was legal error by itself requiring remand, *see* Section I.A, but the Court can and should go further.

The Ninth Circuit has been among the leaders in recognizing that courts evaluating class-action settlements must focus on the "economic reality" of the settlement, and finding it reversible error when courts fail to do that and protect absent class members. *E.g.*, *Allen v. Bedolla*, 787 F.3d 1218, 1224 & n.4 (9th Cir. 2015); *Roes v.*

*SFBSC Mgmt., LLC*, 944 F.3d 1035, 1052-55 (9th Cir. 2019). It is reversible error under Rule 23(e)(2)(C)(ii) to look at hypothetical recovery to the class: what is important is what the class *actually* receives in reality. *Briseño v. Henderson*, 998 F.3d 1014, 1026 & n.3 (9th Cir. 2021). In *Briseño*, it was a "red flag" that the class received less than $1 million to the attorneys' $7 million, even though tens of millions were hypothetically available. *Id.* The $0 to $18.75 million ratio here is even worse. The district court committed reversible legal error in failing to apply Rule 23(e)(2)(C)(ii).

And applying Rule 23(e)(2)(C)(ii) would doom the settlement. If it is acceptable for settling parties to tell a court "We refuse to distribute relief to the class" when it is feasible to do so, it renders that rule—and Ninth Circuit precedent regarding the rule—a nullity. After the 2018 amendments, it must be legal error for courts to permit *cy pres* when it is feasible to distribute money to some class members. *See* Section I.B.

Recognizing the need to comply with Rule 23(e)(2)(C)(ii) before resorting to *cy pres* would be good public policy and end the circuit split where this circuit stands alone in condoning *cy pres* as a first choice and conflicts of interest in *cy pres. See* Section I.C.

Regrettably, the district court committed another independent reversible error applying the Federal Rules. Ninth Circuit law notes that the 2018 amendments to Rule 23(e)(2) create a presumption of settlement invalidity. *Briseño*, 998 F.3d at 1030 (citing *Roes*, 944 F.3d at 1049 n.12). The district court turned this on its head by relying on a pre-2018 district court decision to hold that the small number of objections creates a "strong presumption of validity." 1-ER-18. This is legal error. Every settlement—especially one without direct notice—has few objections, including the *Briseño* and *Roes* settlements. *Apple Device* is directly on point, and remand is required to apply the correct

legal standard. *In re Apple Inc. Device Perf. Litig.*, 50 F.4th 769, 776, 782-83 (9th Cir. 2022). *See* Section I.D.

Moreover, even under existing Ninth Circuit law, the settlement approval cannot stand because of who the recipients are and what they've promised to use the money for. A *cy pres* award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members," *Nachshin*, 663 F.3d at 1039, and must not benefit a group "too remote from the plaintiff class," *Six Mexican Workers*, 904 F.2d at 1308; *see* 1-ER-16 (stating test). Many of the *cy pres* recipients expressly promised to benefit groups remote from the plaintiff class or the objectives of the underlying privacy statute; others contradicted "the interests of the silent class members." The Andren Objectors raised substantive objections to the stated purposes of many of the beneficiaries to whom the district court awarded money, but the district court did not address those in its decision. But this is reversible error: objectors are entitled a "reasoned response" to substantive objections. *Dennis v. Kellogg*, 697 F.3d 858, 864 (9th Cir. 2012). And Andren's opposition to several *cy pres* recipients was not just non-frivolous, but correct under Ninth Circuit law. *See* Section II below.

The settlement here differs from other Ninth Circuit-approved *cy pres* settlements in another critical dimension. It assigns the role of grant administrator to an Article III court, with the sole power to take a fund of more than $42 million and dictate which of twenty-one recipients will receive how much, monitoring and evaluating and perhaps micro-managing their work for years. This not only creates a conflict of interest in this and future cases, but exercising this executive power exceeds judicial authority. The

Ninth Circuit has not yet countenanced this expansion of the judicial power, and should reject it. *See* Section III.

There are other independent problems with this settlement that would require reversal in every other circuit but this one. Appellants recognize that *Google Street View* and other cases have decided these issues, but preserve them for further review if necessary. 21 F.4th at 1122-25 (Bade, J., concurring) (calling for reconsideration of Court's precedents); Section IV.

The Court should vacate and reverse the settlement approval.

## Argument

**I.  The district court committed reversible error by failing to apply Rule 23(e)(2) correctly. But regardless, Rule 23(e)(2)(C)(ii) precludes approval of a *cy-pres*-only settlement when it is feasible to make distributions to some class members.**

The Ninth Circuit has been among the leaders in recognizing that courts evaluating class-action settlements must focus on the "economic reality" of the settlement, and finding it reversible error when courts fail to do that and protect absent class members. *E.g.*, *Allen v. Bedolla*, 787 F.3d 1218, 1224 & n.4 (9th Cir. 2015); *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1052-55 (9th Cir. 2019); *Briseño v. Henderson*, 996 F.3d 1014 (9th Cir. 2021).

This Court has previously approved *cy pres* settlements that pay nothing to the class. *E.g.*, *In re Google Inc. Street View Elec. Communs. Litig.*, 21 F.4th 1102, 1107 (9th Cir. 2021); *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737 (9th Cir. 2017), *vacated on other grounds*, *Frank v. Gaos*, 139 S. Ct. 1041 (2019); *Lane v. Facebook, Inc.*, 696 F.3d 811

(9th Cir. 2012). But this case is distinguishable in two important ways. *First*, the objectors in *Lane* "conceded" that monetary payments to the class were "infeasible." 696 F.3d at 821. Likewise, in *Google Street View*, the claims process was infeasible because class membership turned on whether data had been collected by Google, which neither class members nor the administrator could reasonably ascertain: "self-identification would be pure speculation, and any meaningful forensic verification of claims would be prohibitively costly and time-consuming." 21 F.4th at 1114-15. Here, however, Andren showed the feasibility of payments to some of the class through the same sort of claims process that dozens of class actions in this circuit regularly use. That included the remand of *Google Referrer*, where a fund less than half the size of $62 million was successfully distributed to a class of hundreds of millions of Google users. Same defendant; same judge; materially identical class size; relying solely on self-identification. Andren's evidence was uncontested.

*Second*, and more importantly, Ninth Circuit *cy pres* decisions have never addressed the 2018 amendments to Rule 23. *Lane* and *Google Referrer* predate the amendments. *Google Street View* did not discuss Rule 23(e)(2)(C)(ii), and those class members could not even file claims through self-identification. No such obstacle exists here. The new Rule 23(e)(2)(C)(ii) requires courts to consider "the effectiveness of any proposed method of distributing relief to the class." If it were acceptable for settling parties to tell a court "We refuse to distribute relief to the class" when it is feasible to do so, it renders the rule a nullity. It must be legal error for courts to permit *cy pres* when it is feasible to distribute money to class members through a claims process.

So holding would be both good public policy and would resolve a circuit split where every other circuit to decide the issue has rejected *cy pres* when it is feasible to distribute money to a (b)(3) class. *E.g.*, *Pearson v. NBTY, Inc.*, 772 F.3d 778, 784 (7th Cir. 2014) (Posner, J.) (rejecting $1.1 million *cy pres* residual in class with over 10 million members); *In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1063-66 (8th Cir. 2015); *Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468, 475 (5th Cir. 2011); *but cf. Google Cookie*, 934 F.3d 316 (dicta that such settlements may be appropriate in (b)(2) settlements where there is no release of damages claims).

Regrettably, the district court did not grapple with these questions, and failed to consider Rule 23(e)(2)(C)(ii).

## A. The district court legally erred by failing to perform the analysis Rule 23(e)(2) requires.

The 2018 amendments to Rule 23 rewrote Rule 23(e)(2), requiring district courts to "consider" many issues when determining whether a settlement is fair, reasonable, and adequate. The district court counted through this Court's *Churchill Village* factors. 1-ER-11–18 (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)). But "consideration of these eight *Churchill* factors alone is not enough to survive appellate review." *In re Bluetooth Prod. Headset Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). In particular, the Federal Rules must be followed. *See Briseño*, 998 F.3d at 1021 (reversing when district court "stopped short of conducting a Rule 23(e) inquiry"); *see also Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243, 1261 (11th Cir. 2023) (vacating final approval in part for court's failure to consider "Congress' 2018 amendments to Rule 23(e)(2)(C)"). While a few of the *Churchill* factors map onto

Rule 23(e)(2)(C)(i), the eight *Churchill* factors do not include the other factors that must be considered under Rule 23(e)(2)—in particular, Rule 23(e)(2)(C)(ii), which Andren highlighted in his objection. 3-ER-385; 4-ER-628.

This by itself is reversible legal error requiring remand. "To survive appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Dennis*, 697 F.3d at 864 (internal quotations omitted). The district court applied the wrong legal standard, and thus did not "explore[] comprehensively all factors." Nor did it give a reasoned response to Andren's protest that the settlement flunked Rule 23(e)(2)(C)(ii).

## B. Rule 23(e)(2)(C)(ii)'s plain language requires a court to reject this settlement.

Rule 23(e)(2)(C)(ii) instructs courts to consider the "effectiveness of any proposed method of distributing relief to the class." If, for example, a settlement required class members to submit an original poem written in Aramaic before they could recover, Rule 23(e)(2)(C)(ii) would require the rejection of the settlement when inevitably very few class members hurdled the bar to recovery.

It would be absurd if parties could short-circuit Rule 23(e)(2)(C)(ii)'s analysis by simply making it impossible instead of especially difficult for class members to obtain any distribution. If that is acceptable, Rule 23(e)(2)(C)(ii) becomes a nullity. And parties could then evade the protections the Ninth Circuit has created under Rule 23(e)(2) simply by allocating funds to the preferred nonprofits of defendants and class counsel and calling it *cy pres*.

True, this settlement had a $62 million fund to be split among over 200 million class members. But many class-action settlements in this circuit have similar—or even smaller—ratios of dollars to class size, and nearly all successfully distribute money to class members through a claims process. For example, on the remand of *Frank v. Gaos* and *Google Referrer*, the parties created a new settlement with a $23 million fund distributed to a similarly sized class of hundreds of millions Google search-engine users. 2-ER-77. Andren offered into evidence a list of dozens such settlements, including ones approved by the same district court here. 2-ER-78–80. The settling parties, by contrast, provided no evidence that a similar *pro rata* claims process by self-identifying class members paying somewhere between $5 to $30 per claimant could not have distributed the $42 million in the settlement fund to the class. Instead, the settling parties asserted that Ninth Circuit law did not require them to distribute money to the class, or that they could not identify *every* class member. 4-ER-615; Dkt. 356. But no Ninth Circuit decision holds that a *cy pres* settlement need not comply with Rule 23(e)(2)(C)(ii). The rule applies to all class-action settlements.

*Google Street View*, which did not discuss Rule 23(e)(2)(C)(ii), is distinguishable, because it relied on a finding that a claims process was infeasible on the premise that "self-identification would be pure speculation, and any meaningful forensic verification of claims would be prohibitively costly and time-consuming." 21 F.4th at 1114-15. No such claim of speculation is made here; Google did not dispute that the class representatives were class members, nor did the settling parties dispute the class membership of the three Andren Objectors.

The divided panel in *Lane* signed off on an all-*cy-pres* settlement, but the appellants there focused on the *cy pres* selection process and the adequacy of the settlement, and "concede[d] that direct monetary payments to the class of remaining settlement funds would be infeasible." 696 F.3d at 821. Andren made no such concession here. "Unstated assumptions on non-litigated issues are not precedential holdings binding future decisions." *United States v. Kimsey*, 668 F.3d 691, 699 (9th Cir. 2012) (cleaned up); *see also Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985) (citing cases). And *Lane* did not have the benefit of Rule 23(e)(2)(C)(ii).

The only reference the district court made to effectiveness of distribution—without mention of the rule—was an oral ruling that "an actual monetary distribution" would "be excessive, cumbersome." 1-ER-40. Even if this counts as a factual finding, it is completely unsupported by the record. The only evidence was Andren's list of successful distributions of both smaller funds and smaller *per capita* funds—most notably, in *Google Referrer*, where a settlement successfully distributed a $23 million fund from the same defendant to about 200 million class members in the very same district court. 2-ER-77–80.

The district court's implicit reasoning that it's better for 100% of the class to get indirect benefit (that benefits non-class members and opt-outs equally) than for 100% of the class to get the opportunity to get direct benefit because it will cost money to make the distribution proves too much. As this Court has recognized many consumer class action settlements leave over 90% of the class uncompensated. *Briseno v. Conagra Foods, Inc.*, 844 F.3d 1121, 1130 (9th Cir. 2017). And that figure is optimistic: the median claims rate of a claims-made class-action settlement without direct notice is less

than 1%. *In re Carrier iQ, Inc., Consumer Privacy Litig.*, No. 12-md-02330-EMC, 2016 WL 4474366 at *4 (N.D. Cal. Aug. 25, 2016) (citing authorities). The district court's argument suggests that settling parties should prefer to refuse paying class members in virtually every consumer class-action settlement and instead negotiate an all-*cy pres* settlement, essentially destroying the village in order to save it. No appellate court has ever so much as implied that if some class members fail to make claims, it would be unfair to directly compensate *any* class members. Trial courts engage in "judicially impermissible misappropriation" when they conclude that class members are less deserving than a charity. *BankAmerica*, 775 F.3d at 1065.[7]

The post-remand *Google Referrer* settlement successfully distributed a fund of barely a dime per class member to a 200-million-member class. And that case—where attorneys attempted to defend an all-*cy-pres* settlement all the way to the Supreme Court—isn't the only one that demonstrates that settling parties suddenly discover resourcefulness when class counsel's fees depend on class recovery. For example, in *In re Baby Products Antitrust Litigation*, the settling parties unsuccessfully attempted to defend a settlement with a claims process that paid less than $3 million of its $35.5 million settlement fund to the class, where over $15 million would have gone to *cy pres*. 708 F.3d 163, 169-70 (3d Cir. 2013). On remand, the restructured settlement identified hundreds of thousands of class members who could be issued checks so that there

---

[7] The district court's complaint about a waste of "judicial resources" (1-ER-40) is ironic and clearly erroneous, given the district court's enthusiasm to act as a grant administrator reviewing dozens of semi-annual reports each year for several years for compliance with the grant proposals. *See* Section III below.

would no longer be a multi-million dollar remainder. *McDonough v. Toys 'R' Us,* 80 F. Supp. 3d 626 (E.D. Pa. 2015). The remand of *Pearson* after the Seventh Circuit reversed settlement approval also resulted in a new settlement with millions of dollars of direct distribution to class members instead of $0.9 million in claims and $1.1 million in *cy pres. Pearson v. Target Corp.*, No. 1:11-cv-07972, Mem. in Support of Mot. For Prelim. Approval of Settlement (Dkt. 213) (N.D. Ill. May 14, 2015).

Google might protest that issuing $5 to $10 checks to class members would have made this a different settlement, and that it would prefer to pay money to Harvard's multi-billion-dollar endowment than to class members. If so, this just supports Andren's argument below that the settlement was structured to create the *illusion* of relief rather than actual relief to class members, and should not be considered more than a $19 million settlement with 100% of the benefit to the attorneys.

By explicitly adopting the presumption in favor of class distributions, this Court can cabin unfettered use of *cy pres* and again make class members the "foremost beneficiaries" of class settlements. *Baby Prods.*, 708 F.3d at 179. Any other result would contradict the text of Rule 23(e)(2)(C)(ii), this Court's Rule 23(e)(2) jurisprudence, and continue a circuit split where this Court stands alone. Even if *Lane* or *Google Street View* were correct when they created unacknowledged circuit splits, they would contradict Rule 23(e)(2)(C)(ii) if applied to this settlement. Settlement approval must be reversed.

**C.    Along with the plain language of Rule 23(e)(2)(C)(ii), there are sound public-policy reasons to emphasize class counsel's obligation for effective distribution of class settlement funds.**

As the Chief Justice recognized in *Marek v. Lane*, *cy pres* settlements raise "fundamental concerns." 134 S. Ct. 8, 9 (2013) (Roberts, C.J., respecting denial of certiorari). There are at least five specific concerns about the type of *cy pres* award upheld here.

1. When courts award attorneys' fees based on the size of the *cy pres* fund rather than on the amount the class actually directly received, class attorneys can receive substantial fees regardless of the actual benefit to the class. As a result, class attorneys are financially indifferent as to whether a settlement is structured to compensate their clients or direct settlement proceeds to third parties. When *cy pres* can be used to facilitate settlement with a more profitable fee award by expanding the apparent size of the settlement, those attorneys are encouraged to sell their putative class clients down the river.

*Cy pres* can also be an enticing settlement feature for lawyers interested in promoting their own personal political or charitable preferences. It is not uncommon to see publicity photographs of attorneys handing oversized checks to their selected *cy pres* recipients or to see recipients issue public statements of gratitude to the class attorneys. *E.g.*, Chris J. Chasin, *Modernizing Class Action Cy Pres Through Democratic Inputs*, 163 U. Penn. L. Rev. 1463, 1484 (2015). Class attorneys have used *cy pres* awards to fund the development of future litigation and to make sizable donations to their *alma mater*. *See, e.g., Google Referrer*, 869 F.3d at 748 (Wallace, J., dissenting), *vacated on other*

*grounds by Frank.* The same thing happened here, including double-dipping by favoring a non-class client and co-counsel, the ACLU, over the class itself.

"By disincentivizing class attorneys from vigorously pursuing individualized compensation for absent class members, cy pres threatens the due process rights of those class members." Martin H. Redish *et al.*, *Cy Pres Relief & the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617, 650 (2010). Class attorneys are tempted to shirk their constitutional duties to adequately defend class members' legal rights because their compensation is no longer tied to such advocacy. *Id.* When courts treat a dollar of *cy pres* as equivalent to a dollar of direct class recovery, class counsels' all-too-human predilection will prefer to fund their favorite charities or causes over thousands or millions of anonymous and likely ungrateful class members.

Moreover, class counsel has a fiduciary obligation to its clients. *E.g., Bluetooth*, 654 F.3d at 946. Counsel has "responsibility to seek an award that adequately prioritizes direct benefit to the class." *Baby Prods.*, 708 F.3d at 178-79. Class counsel cannot choose to favor third-party non-class members over the class—even if those third parties are "worthy" charities. *BankAmerica,* 775 F.3d at 1065, 1067; *Ira Holtzman, C.P.A. & Assocs. v. Turza*, 728 F.3d 682, 689 (7th Cir. 2013). The conflicts of interest that *cy pres* awards can create are easily eliminated by restricting such awards to those narrow circumstances in which additional pecuniary relief to the class is truly infeasible. Class counsel may claim noble intent in wishing that settlement funds go to their favorite nonprofit, but class counsel should fulfill their good intentions with their own money, rather than that of their clients. Feasible compensation to class members legally trumps *cy pres* payments that do not directly benefit the class.

2. Defendants, facing no resistance from class attorneys, use *cy pres* awards to structure settlements to minimize costs or even benefit themselves. The *Lane* settlement, for example, directed all of its *cy pres* to a new charity "to be funded by Facebook, partially controlled by Facebook, and advised by a legal team consisting of Facebook's counsel and their own purported counsel." 696 F.3d 811, 829, 835 (9th Cir. 2012) (Kleinfeld, J., dissenting); *see also Lane v. Facebook, Inc.*, 709 F.3d 791 (9th Cir. 2013) (Smith, J., dissenting from denial of rehearing *en banc*).

Google and Facebook have directed *cy pres* awards here and in other privacy-breach cases to the Electronic Frontier Foundation, a nonprofit that "is often an ally of Google and Facebook when it comes to staving off liability to rights holders over user-generated infringing content" and on other public policy issues. Roger Parloff, *Google and Facebook's New Tactic in the Tech Wars*, Fortune (July 30, 2012). At the same time, those companies have apparently vetoed awards to privacy-focused nonprofits that they view as "too aggressively devoted to combatting the wrongs that allegedly harmed the class." *Id.* Respondent Google, in particular, has been sharply criticized for using its funding decisions to influence the research and advocacy of nonprofits. *See* Kenneth P. Vogel, *Google Critic Ousted From Think Tank Funded by the Tech Giant*, N.Y. Times (Aug. 30, 2017).

Even if class-action defendants like Google and Facebook ultimately receive no direct benefit from *cy pres* awards, they have reasons to prefer giving money to *cy pres* to reduce the chances of having their customers learn that they have paid money to resolve claims of wrongdoing. Russell M. Gold, *Compensation's Role in Deterrence*, 91 Notre Dame L. Rev. 1997 (2016).

3. As in this case, *cy pres* awards typically fail to redress class members' alleged injuries for which they are waiving their rights. The Seventh Circuit stated the problem plainly: "There is no indirect benefit to the class from the defendant's giving the money to someone else." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004). "[S]ettlement-fund proceeds, having been generated by the value of the class members' claims, belong solely to the class members." *Klier*, 658 F.3d at 474 (citing AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.07 *comment* (b) (2010)). This ownership would unquestionably be the case had class members pursued individual litigation under the same substantive law. Rule 23 cannot operate to "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). Neither lower courts nor class attorneys should have the discretion to distribute that property to third parties before class members have been compensated and, more generally, to certify classes structured so as to stymie or preclude class members' recovery. *Cf. Caplin & Drysdale, Chartered v. U.S.*, 491 U.S. 617, 628 (1989) ("There is no constitutional principle that gives one person the right to give another's property to a third party.").

Even worse was a settlement resolving challenges to Google's unauthorized disclosure of its users' email contacts when it launched its "Buzz" social network. Class members—some of whom had suffered disclosures that aided stalkers, jeopardized confidential journalist sources, or hinted at affairs—received no part of the $8.5 million settlement. Instead, class counsel received over $2 million and the remainder was divided among fourteen charities, including the local YMCA and the Brookings Institution—and, by the *sua sponte* order of the district court, a center at a university

where the judge taught as a visiting law professor. *In re Google Buzz Privacy Litig.*, 2011 WL 7460099, at *3 (N.D. Cal. Jun. 2, 2011); Rhonda Wasserman, *Cy Pres in Class Action Settlements*, 88 U.S.C. L. REV. 97, 124-25 n. 119 (2014).

4. As discussed in Section II below, many *cy pres* recipients, including some here, have political valence sympathetic to the preferences of class counsel or the defendant, but contrary or offensive to a substantial proportion, or even the majority, of class members. *E.g.*, *In re Citigroup Sec. Litig.*, 199 F. Supp. 3d 845, 853-54 (S.D.N.Y. 2016).

5. Finally, *cy pres* awards often create the appearance or reality of judicial conflicts of interest, as in the *Google Buzz* settlement discussed above, and as discussed in Section III below.

There are thus good reasons in addition to the text of Rule 23(e)(2)(C)(ii) for making *cy pres* a last, rather than first, resort.

## D. The district court also committed reversible legal error by contradicting Rule 23(e)(2) in incorrectly applying "a strong presumption" of fairness.

The district court not only ignored Rule 23(e)(2)(C)(ii), but ignored this Court's precedents for applying the amended Rule 23(e)(2). Under the 2018 amendments to Rule 23(e)(2), there is a presumption of settlement invalidity. *Briseño*, 998 F.3d at 1030 (citing *Roes*, 944 F.3d at 1049 n.12); *Apple Device*, 50 F.4th at 776, 782-83. The district court turned this on its head by relying on a pre-2018 district court case to hold that the small number of objections—a single *Churchill* factor—creates a "strong presumption of validity."

This is legal error. In *Roes* and *Briseño*, the Court correctly noted that satisfying Rule 23(e)(2)(B) doesn't relieve settling parties from satisfying other factors and doesn't

shift the burden. So too with a single *Churchill* factor—*especially* when that factor, as applied by the court, is just as applicable to almost every single class-action settlement, fair or unfair.

Indeed, it's an abuse of discretion to look only to the number of objections—especially in a settlement without direct notice—while disregarding the *substance* of the objections. Frank's objection was substantive and raised important statutes, Rules, precedents, and issues that the settling parties failed to identify to the court (and the court ultimately neglected to give a reasoned response to). A meritorious objection doesn't become less meritorious because it's made by a single objector. *E.g.*, *Briseño* (one objector at fairness hearing); *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) (same).

While an outpouring of objections is a factor suggesting widespread dissatisfaction with a settlement, the inverse is not true. It is neither surprising nor probative that only a public-interest law firm filed a substantive objection and appeared at the fairness hearing, given the burdens of objection compared to the benefits in a zero-dollar privacy settlement. (If it is probative, it should weigh against approval that a public-interest firm devoted scarce resources to objecting to a particular settlement. 2-ER-81–83.) No class member would have had the financial incentive to pay for *postage* to file a *pro se* objection, much less hire an attorney to investigate whether to produce a substantive objection. Indifference or silence cannot be considered support for the settlement. *Redman v. RadioShack Corp.*, 768 F.3d 622, 628 (7th Cir. 2014) (Posner, J.) (one objector; reversing settlement approval); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217-18 (5th Cir. 1981).

As this Court has previously held, the district court's "written order explicitly states that the court applied a presumption that the settlement was fair and reasonable. Because the district court cited the wrong legal standard, we vacate and remand for it to reconsider settlement approval under the correct standard." *In re Apple Inc. Device Perf. Litig.*, 50 F.4th 769, 776 (9th Cir. 2022); *see also id.* at 782-83 (cited by Andren at 3-ER-385).

The district court applied the wrong standard of law, and committed reversible error as a result.

## II. Many of the *cy pres* recipients should be disqualified as flunking Ninth Circuit standards.

A *cy pres* award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members," *Nachshin*, 663 F.3d at 1039, and must not benefit a group "too remote from the plaintiff class," *Six Mexican Workers*, 904 F.2d at 1308; *see* 1-ER-16 (stating test). Many of the *cy pres* recipients here expressly promised to benefit groups remote from the plaintiff class or the objectives of the underlying privacy statute; others contradicted "the interests of the silent class members."

Applying a "substantial nexus" test to the *cy pres* proposals and the interest of the class members in data privacy raised in the case, the district court concluded that the recipients had "documented their commitment to use their portion of the Settlement Fund solely to fund their efforts to advocate for the protection of data privacy, as well as enhancing public knowledge of internet data privacy issues." 1-ER-16. The district court's conclusion, however, contradicted the proposals' descriptions revealing blatant mismatches between both the class and the data privacy issues.

*First*, multiple groups expressly promised to benefit groups "too remote" from the U.S. Google-user plaintiff class. In particular:

- MIT, a university with a $23.5 billion endowment, said they would use a $2.467 million *cy pres* grant to target its "computer science undergraduates." 2-ER-74; 2-ER-280.

- Fordham University emphasizes its spending in support of Fordham Law students and students in New York City, 2-ER-194, and identifies a target population to include "visiting researchers" and "local communities and populations in the Global South." 2-ER-206.

- EFF identifies its target population as "tech users the world over." 2-ER-173.

- The Center for Democracy & Technology, in describing the "target population" for its proposed project, identifies "historically marginalized communities" and states that it "prioritizes this lens of equity and justice across our work," giving examples of its focus on "communities of color" and "LGBTQ+ students, disabled students, and students of color." 2-ER-137.

- Similarly, the Rose Foundation—which seeks *cy pres* solely as a *de facto* slush fund to make its own grants that will be unreviewable by the class—boasts that it has DEI as "core organizational values that are expressed in all grantmaking" and that it racially discriminates by giving "preference" to applicants that will "specifically benefit[]" "BIPOC communities." 3-ER-356.

- EPIC identifies no target population for its proposal. *See* 2-ER-177.
- The Internet Archive's target population is "global in scope" and gives examples of its "multinational" efforts. 2-ER-242–243.

The Andren Objectors identified these and other mismatches to the district court, but the district court gave them little to no consideration. *See* 1-ER-16; 1-ER-25 (finding funds would enhance "public knowledge" of data privacy but making no finding of specific benefit to the class); 2-ER-71–76; 3-ER-395–398. None of the class is in "the Global South." Very few will have the privilege to be a computer science undergraduate at MIT.

Moreover, the Rose Foundation's promise to target money on the basis of race or color violates federal civil rights law. *American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765 (11th Cir. 2024) (42 U.S.C. § 1981).

*Second*, the district court should have rejected many of the *cy pres* recipients as contrary to "the interests of the silent class members" or the objectives of the underlying claims. The class consists of approximately 247 million U.S. Google users— a class that necessarily spans across all our country's diverse viewpoints, religions, political affiliations, races, socio-economic statuses, geographics, and the like. As a result, a substantial portion, if not a majority, oppose the use of their settlement funds for the one-sided ideological work that an unseemly number of the recipients engage in—much of which is far removed from the location tracking at the heart of the case. Many recipients propose using their *cy pres* awards directly for this work, but even if they don't, money is fungible and the deposit of the awards into their bank accounts frees up funds to allow the recipients to devote more time and resources to their controversial

work. Moreover, the live claims at the time of settlement were for intrusion upon seclusion, violation of the California Constitution's right to privacy, and unjust enrichment. The district court did not address how the recipients' work furthered the objectives of these claims at all. *Contra Dennis*, 697 F.3d at 869 (reversing where there was "no assurance that the charities to whom the [*cy pres*] will be distributed will bear any nexus to the plaintiff class or to their false advertising claims"); *Koby v. ARS Nat'l Servs.*, 846 F.3d 1071, 1080 (9th Cir. 2017) (reversing where "there was no showing that the work performed by the designated [Veterans] charity would protect consumers from unfair debt collection practices, the objective of the FDCPA").

The one-sided ideological work that extends beyond location tracking includes the following:

- The ACLU Foundation of Northern California proposes using the *cy pres* funds for privacy law work that will, among other things, (1) develop "litigation and other legal work to utilize California state constitutional privacy and statutory law" to protect against "attack[s]" on "reproductive and LGBTQ rights" "in the aftermath of the Supreme Court decision in *Dobbs*"; (2) "create more public awareness and build greater connection with racial justice, economic justice, and other issues to … strengthen intersectional and collaborative work"; and (3) investigate "the internet privacy implications of targeted advertising on communities, with a emphasis on discussing how Black and Brown communities, immigrant communities, people with fewer economic resources, and people seeking

reproductive and gender-affirming care can be disproportionately affected." 2-ER-95; 2-ER-99.

- The Center for Democracy & Technology's proposal trumpets its work supporting "reproductive rights" and goal of advancing "equity … considerations in the use of technology in education and government services." "Equity" has proven to be a codeword for support for racial discrimination and anti-Semitic policies establishing quotas limiting Jewish participation that would otherwise be "disproportionate" relative to "people of color." 2-ER-129; 2-ER-137. Jonathan Pidluzny, *The Campus Antisemitism Complex at Elite U.S. Universities* (2024).

- The Information Society Project at Yale, which "draft[s] legislation, produc[es] comments for administrative agencies, draft[s] amicus briefs, and litigat[es]," acts as "an incubator of novel litigation strategies and legal theories designed to advance reproductive rights and justice," and would use the funding to focus on "algorithmic justice." 3-ER-369–370.

- And, as previously mentioned, the Rose Foundation boasts that it uses DEI as "core organizational values that are expressed in all grantmaking." 3-ER-356.

The district court seemed to believe that it could "effectively police" the recipients' use of funds only for protecting data privacy after the fact by reviewing their bi-annual reports (1-ER-25), and found it "hard to imagine any *cy pres* recipient which could possibly meet Objectors' standard of only engaging in 'universally agreed upon' policy work." Yet the court failed to engage with how the overtly ideological purposes

expressly set forth in some of the proposals could square with the interests of the class members; that the Andren Objectors had not objected to the ideological nature of every recipient because not all of them engaged in such work; or how the recipients would realize the objectives of the underlying claims—or even the data privacy issues motivating the lawsuit beyond generalized conclusory remarks.

This is error. Again: "To survive appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Dennis*, 697 F.3d at 864. As with Andren's Rule 23(e)(2)(C)(ii) objection, the district court did not give a reasoned response to the non-frivolous— indeed meritorious—objections made here. The district court gave no explanation at all to support its conclusion that the recipients bore a substantial nexus to the class members' interests and their data privacy claims, given the overtly political descriptions of their work in the *cy pres* proposals. And the Andren Objectors identified grave concerns with the recipients' ability to steward the funds for the benefit of the class. In short, the district court's conclusory rejection of the Andren Objectors' arguments that the *cy pres* recipients failed this Court's *cy pres* standard was legally insufficient. At a minimum, this Court should vacate and remand with instructions for the district court to more closely scrutinize the *cy pres* recipients and their proposals.

But, again, the Court can go further and give more guidance. To posit a hypothetical: can the Heritage Foundation's Project 2025—a tax-exempt 501(c)(3)— be an appropriate *cy pres* recipient under Ninth Circuit law? The question answers itself. In any widescale class, Project 2025's positions will be so abhorrent to so many class members that making it a *cy pres* beneficiary cannot be in the "interests of silent class

members," even if millions of other class members or class counsel or the district court might agree with its aims. The same goes for a settlement that proposes to give the class's money to any controversial or partisan nonprofit from the Flat Earth Society to Act Blue; a substantial fraction of any broad class would oppose their recovery being used this way. *Cf. Bd. of Educ. v. Pico,* 457 U.S. 853, 870-71 (1982) (plurality op.) ("few would doubt" that a school board "motivated by party affiliation" could not constitutionally decree that the school library only contain books expressing its favored political views); *id.* at 907 (Rehnquist, J., dissenting, joined by Burger, C.J., and Powell, J.) ("cheerfully conced[ing]" the same).

The legal *principle* underlying these hypotheticals is that there is a dividing line past which a recipient cannot meet the "interests of silent class members" test. While the litmus test for qualification as a recipient is not whether an organization is beloved, whether a recipient is controversial, polarizing, or political should suffice for *disqualification. See In re Agent Orange Prods. Liab. Litig.,* 818 F.2d 145, 186 (2d Cir. 1987) (refusing to allow funds be spent on "political advocacy" as "inconsistent with the judicial function"); *Hawes v. Macy's,* 2023 WL 8811499, 2023 U.S. Dist. LEXIS 226617, at *43 (S.D. Ohio Dec. 20, 2023); *see generally* D. Brooks Smith*, Class Action and Aggregate Litigation: A Comparative International Analysis,* 124 PENN ST. L. REV. 303, 337 (2020) ("especially troubling" for *cy pres* to include "a powerful interest group…[that] conducts political activity in many fields wholly unrelated to privacy and technology."). When an organization engages in controversial activity offensive to a material portion of the class, it cannot be in the "interests of silent class members" to make them a *cy pres* recipient. Rather, it suggests that class counsel or the defendant support the controversial

position, and want to reward it at the class's expense. ((It's not a coincidence that none of the proposed recipients lean to the political right—but much of the class, including the objectors, do. Rule 23(e)(2)(D) requires treating them equitably relative to ACLU supporters.) *Cy pres* recipients should be apolitical. *Cf. Hawes*, 2023 WL 8811499, 2023 U.S. Dist. LEXIS 226617, at *43. And recipients should not be, like UCLA, subject to a current injunction forbidding them from helping anti-Semitic activists target Jews. *Frankel v. Regents of U. of Cal.*, No. 2:24-cv-04702 (Dkt. 89) (C.D. Cal. Aug. 13, 2024). And when a proposed grant recipient promises to violate civil rights law, as the Rose Foundation does, it should not be receiving class settlement funds.

At a minimum, the Andren Objectors are entitled to a reasoned response to their complaints about racial discrimination, anti-Semitism, and mismatch of intended grant goals with the interests of the class.

## III. The settlement and approval order unconstitutionally exceeds the judiciary's Article III power.

The settlement here has an independent problem: it makes the district court into a grant administrator, with unbridled discretion to choose recipients and their rewards within a set of grant applications, giving it the executive power of monitoring forty-two semi-annual reports a year and overseeing their use of *cy pres* money for several years. This is incompatible with the judicial role, which "is limited to providing relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm." *Tyson Foods Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, J., concurring) (cleaned up). If it is untenable to compensate non-injured class members, it is all the more untenable to compensate non-injured third parties, who do not even

fall within the zone of risk of injury. "Federal judges are not generally equipped to be charitable foundations…" *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 236 F.R.D. 48, 53 (D. Me. 2006); *accord Keepseagle v. Perdue*, 856 F.3d 1039, 1071 (D.C. Cir. 2017) (Brown, J., dissenting).

New York University Law School professor Samuel Issacharoff described such *cy pres* relief as "an invitation to wild corruption of the judicial process." Adam Liptak, *Doling Out Other People's Money*, N.Y. TIMES (Nov. 26, 2007). It puts courts in the awkward position of being lobbied by nonprofits for a cut of the proceeds in class-action settlements, *id.*, as Free Press successfully did here by flattering the court simply by attending a fairness hearing. 4-ER-464–468; 4-ER-658. (That a few hours of attendance merited over half a million dollars will surely incentivize future potential *cy pres* recipients to populate fairness hearings.) *See also* Howard Erichson, *Aggregation as Disempowerment: Red Flags in Class Action Settlements*, 92 NOTRE DAME L. REV. 859, 885 (2016).

Allowing a district court to control and administer a giant pot of money leads to conflicts of interest along a non-obvious dimension as well. A judge with the potential opportunity to have control of tens of millions of dollars with which to play philanthropist will have the incentive to make plaintiff-friendly rulings that encourage larger settlements—as well as to make factual findings that a fund is infeasible to distribute and that the class should not receive the money. Erichson, 92 NOTRE DAME L. REV. at 885-86. Sometimes it doesn't stop at allocating funds. One district judge proudly micromanaged the name of the scholarship program for the $1.5 million grant to his *alma mater. Perkins v. Am. Nat'l Ins. Co.*, No. 3:05-CV-100 (CDL), 2012

WL 2839788, at *5-*6 (M.D. Ga. July 10, 2012) (approving *cy pres* that distributed more than 80% of a nationwide class's remaining funds to local Georgia institutions). The *Google Buzz cy pres* settlement similarly had a judge reject objections and *sua sponte* order *cy pres* funding to the local law school where he was teaching.

In the context of gerrymandering, the Supreme Court held that separations of powers meant that a court has "no commission to allocate political power and influence in the absence of a constitutional directive or legal standards." *Rucho v. Common Cause*, 588 U.S. 684, 721 (2019). Without "discernible" legal standards, wading in to the morass of legislating nonpartisan district-drawing would be an impermissible "expansion of judicial authority" "unlimited in scope and duration." *Id.* at 707, 718-19.

This Court agreed when it explained why it could not provide a remedy to plaintiffs suing the government in an environmental law case. *Juliana v. U.S.*, 947 F.3d 1159 (9th Cir. 2020). Any plan would "entail a broad range of policymaking," with a proposed standard "too difficult for the judiciary to manage." *Id.* at 1172-73. Asking courts to develop "comprehensive schemes" departs from the limited remedial authority of federal courts sitting in equity. *Mecinas v. Hobbs,* 30 F.4th 890, 901 n.6 (9th Cir. 2022); *see also Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 105 (1945).

In short, "Federal judges cannot make the fundamentally political decisions as to which priorities are to receive funds and staff… [U]ndertak[ing] such local, day-to-day tasks … detract[s] from the independence and dignity of the federal courts and intrude[s] into areas in which they have little expertise." *Missouri v. Jenkins*, 515 U.S. 70, 133 (1995) (Thomas, J., concurring).

Asking a court to act as a discretionary grant administrator is outside of its Article III authority and competence to resolve cases and controversies. It exposes courts to conflicts of interest and should not be countenanced. The district court erred by confusing Andren's objection as to appropriateness and potential conflicts with one about judicial efficiency. 1-ER-40. And, again, the district court failed to give a reasoned response to Andren's objection to the Settlement's involvement of the Court. The settlement approval here must be reversed for this independent reason.

## IV. This should not be a close case, and the Court should grant *en banc* review to overturn decisions that would otherwise permit approval of settlements without marginal consideration to class members or settlements where class counsel uses *cy pres* to engage in self-dealing.

This settlement would almost certainly be a dead letter in any other circuit because of the substantial prior affiliations between class counsel and the recipients; the tremendous size of the *cy pres* fund with no effort to distribute to the class; and the fact that the settlement "provide[s] no unique consideration to class members because they receive the same generalized benefits as non-class-members and opt-outs." *Google Street View*, 21 F.4th at 1124 (Bade, J., concurring). But *Google Street View* and *Lane* preclude these obvious arguments against settlement approval.

Other reasons for reversal remain. As discussed in Sections I and II, the district court committed multiple reversible errors under the Federal Rules of Civil Procedure and existing Ninth Circuit law; and, as Section III discusses, the Ninth Circuit has not yet condoned judges appointing themselves grant administrators. So the Court should

reverse. But Andren uses this section to expressly preserve issues precluded by current Ninth Circuit law.

The Supreme Court granted review on the issue of *cy pres* settlements as decided by this Court in *Google Referrer*, 869 F.3d 737 (9th Cir. 2017), and ultimately vacated and remanded on jurisdictional grounds. *Frank v. Gaos*, 139 S. Ct. 1041 (2019). One Justice reached the merits and concluded that *Google Referrer*'s approach to *cy pres* contravened Rule 23 in several ways. *Id.* at 1046-48 (Thomas, J., dissenting). Andren preserves for future review the legal arguments raised by Justice Thomas in his dissent but precluded by existing Ninth Circuit law.

In her concurrence in *Google Street View*, Judge Bade acknowledged doubts about the direction Circuit law had taken, finding "a compelling argument that class members receive no benefit" from *cy pres* distributions and that the *cy pres* settlement arguably benefited opt-outs and non-class members more than members. 21 F.4th at 1124 (Bade, J., concurring). As a practical matter, "[i]t is hard to imagine a real client saying to his lawyer, 'I have no objection to the defendant paying you a lot of money in exchange for agreement to seek nothing for me.'" *Id.* at 1124 (Bade, J., concurring) (internal quotation of *Lane*, 696 F.3d at 830 (Klieinfeld, J., dissenting) omitted).

Judge Bade's concurrence recognized the many concerns with *cy pres* that jurists and commentators have written about extensively, including, "conflicts of interest between class counsel and absent class members"; "incentives for collusion between defendants and class counsel"; "the role of the court and the parties in shaping a *cy pres* remedy and the potential appearance of impropriety"; "the use of Rule 23 of the Federal Rules of Civil Procedure, 'a wholly procedural device,' to shape substantive rights,

arguably in violation of Article III, the Rules Enabling Act, and the separation of powers doctrine"; "'whether a *cy pres* award can ever be used as a substitute for actual damages'"; "the propriety of importing a doctrine originating in trust law into the context of a class action litigation"; and "whether class action litigation is superior to other methods of adjudicating if parties must resort to *cy pres* relief." *Google Street View*, 21 F.4th at 1123 (Bade, J., concurring). Ultimately, Judge Bade was "not convinced that *cy pres* awards … should qualify as an indirect benefit" and was "concerned that they were "purely punitive," acting as "essentially civil fines to class counsel and third parties while providing no compensation to injured class members." *Id.* at 1125. Because of her suspicion that "*cy pres* awards are inherently unfair when the class receives no meaningful relief in exchange for their claims," and "the serious ethical, procedural, and constitutional problems" with *cy pres*, Judge Bade recommended that the full Court "reconsider the practice of *cy pres* awards." *Id. See also Lane*, 709 F.3d 791 (Smith, J., dissenting from denial of rehearing *en banc*).

While precluded by *Lane* and *Google Street View*, Andren preserves for future review the arguments for undoing these circuit splits over *cy pres* law, including the "significant prior affiliation" standard for evaluating conflicts of interest in the *cy pres* context. *See Google Cookie*, 934 F.3d 316, 331 (3d Cir. 2019); *see also Google Referrer*, 869 F.3d at 749 (Wallace, J., concurring in part and dissenting in part). Andren preserves for future review the circuit split over the valuation of *cy pres* in determining attorneys' fees currently precluded by *Google Street View*, and the First Amendment and Rules Enabling Act arguments rejected by that case.

## Conclusion

This Court should vacate and reverse this settlement approval. At a minimum, remand is required to review the settlement under the appropriate legal standards and to give a reasoned response to substantive objections. And at a minimum, even if the parties can withhold the settlement fund from the class, many of the *cy pres* recipients are inappropriate under existing Ninth Circuit law, and they should not receive funding.

In the alternative, the Court should grant *en banc* review to end its idiosyncratic treatment of fundamentally unfair *cy pres* settlements.

Dated: September 13, 2024          Respectfully submitted,

                          */s/ Theodore H. Frank*
                          Theodore H. Frank
                          Anna St. John
                          HAMILTON LINCOLN LAW INSTITUTE
                          CENTER FOR CLASS ACTION FAIRNESS
                          1629 K St., NW, Suite 300
                          Washington, DC 20006
                          Telephone: (703) 203-3848
                          Email: ted.frank@hlli.org

                          *Attorneys for Objectors-Appellants*

**Statement of Related Cases**
**Under Circuit Rule 28-2.6**

As Ninth Circuit Rule 28-2.6 requires, Objectors-Appellants state they are not aware of any related cases pending in this court.

Executed on September 13, 2024          */s/ Theodore H. Frank*
                                         Theodore H. Frank

**Certificate of Compliance**
**with Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1**

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 13,484 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Garamond font.

Executed on September 13, 2024.

*/s/ Theodore H. Frank*
Theodore H. Frank

**Certificate of Service**

I hereby certify that on September 13, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which will provide notification of such filing to all who are ECF-registered filers.

*/s/ Theodore H. Frank*
Theodore H. Frank