No. 24-3387

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

*In re:* GOOGLE LOCATION HISTORY LITIGATION

NAPOLEON PATACSIL, *et al.*,

*Plaintiffs-Appellees,*

JOHN ANDREN, MATTHEW LILLEY, JOSEPH S. ST. JOHN,

*Objectors-Appellants,*

v.

*Google LLC, et al.,*

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Northern District of California at San Jose
No. 5:18-cv-05062-EJD
The Honorable Edward J. Davila, U.S. District Judge

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

Michael W. Sobol
Melissa Gardner
Michael Levin-Gesundheit
Michael K. Sheen
Jallé H. Dafa
John D. Maher
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000
Facsimile: 415.956.1008
msobol@lchb.com
mgardner@lchb.com
mlevin@lchb.com
msheen@lchb.com
jdafa@lchb.com
jmaher@lchb.com

Tina Wolfson
Theodore Maya
Bradley K. King
Henry J. Kelston
AHDOOT & WOLFSON, PC
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Tel: 310.474.9111
Fax: 310.474.8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
bking@ahdootwolfson.com
hkelston@ahdootwolfson.com

*Co-Lead Class Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................. 1

II. STATEMENT OF THE ISSUES ......................................................... 4

III. COUNTER-STATEMENT OF THE CASE .......................................... 4

    A. The Claims in this Litigation .......................................................... 4

    B. Procedural History of the Litigation ............................................... 6

    C. Discovery and Settlement Negotiations .......................................... 7

    D. The Settlement Agreement ............................................................. 7

        1. The Settlement Class .............................................................. 7

        2. The Class-Wide Relief ............................................................ 8

            a. Monetary Relief for Distribution via *Cy Pres* ..................... 8

            b. Injunctive Relief and Business Practice Changes ................. 8

        3. The Class-Wide Release .......................................................... 9

        4. Preliminary Approval and Settlement Notice ........................... 10

    E. The Proposed *Cy Pres* Recipients ................................................ 10

    F. Appellants' Objections .................................................................. 11

    G. Final Approval of the Settlement .................................................. 11

        1. The Legal Standards Applied in the Final Approval Order ...... 12

        2. The District Court's Extensive Analysis of the Proposed Method of Distributing Relief to the Class ........................................................ 13

        3. The District Court's Reasoned Response to the Andren Objections ....... 15

IV. SUMMARY OF ARGUMENT ............................................................ 17

V. STANDARD OF REVIEW ................................................................. 19

VI. ARGUMENT ...................................................................................... 20

    A. The District Court's Analysis Was Legally Sound and Supported by the Record ............................................................................................ 20

        1. The District Court Applied the Correct Legal Standards ........... 20

        2. The Record Supports the District Court's Findings on Distributability .. 23

        3. Rule 23(e)(2)(C)(ii) Does Not Prohibit *Cy Pres* Relief to the Class .......... 25

        4. Other Safeguards Address Appellants' Policy Arguments ........ 26

5. The District Court Appropriately Considered the Reaction of the Class and Did Presume the Settlement Is Valid ..................................................31

B. The District Court's Approval of the *Cy Pres* Recipients Was an Appropriate Exercise of Discretion..................................................32

    1. Appellants Do Not Appeal the District Court's Findings that Nine *Cy Pres* Recipients Have a Substantial Nexus to the Class ..............................34

        a. ACLU Speech, Privacy, and Technology ("SPT") Project ..................35

        b. Berkman Klein Center for Internet & Society at Harvard University ("BKC")....................................................................................36

        c. ConnectSafely ..................................................................................36

        d. Data & Society Research Institute......................................................36

        e. The Future of Privacy Forum Education & Innovation Foundation ("FPF")....................................................................................36

        f. The Markup………… ..........................................................................36

        g. National Cybersecurity Alliance ("NCA") ........................................38

        h. New York University Information Law Institute ("ILI")....................38

        i. Privacy Rights Clearinghouse ("PRC")............................................38

    2. Appellants' Argument that Seven *Cy Pres* Recipients Will Not Target the Settlement Class is Unsupported by the Record ..................................39

        a. MIT Internet Policy Research Initiative ("IPRI")............................40

        b. Fordham University Center on Law and Information Policy ("CLIP")....................................................................................41

        c. Electronic Frontier Foundation ("EFF")............................................42

        d. Center for Democracy & Technology ("CDT") .................................43

        e. The Rose Foundation for Communities and the Environment ..........44

        f. Electronic Privacy Information Center (EPIC) .................................45

        g. The Internet Archive ........................................................................46

    3. Appellants' Argument that Five *Cy Pres* Recipients Will Misdirect Funding is Unsupported by the Record ..................................................46

        a. ACLU of Northern California (Technology and Civil Liberties Program)....................................................................................48

        b. Yale Law School Information Society Project....................................49

        c. Center on Privacy & Technology at Georgetown Law........................49

        d.  Free Press...................................................................50

        e.  UCLA Institute for Technology, Law & Policy ....................................51

    4.  The District Court's Finding that No *Cy Pres* Recipient Had a Disqualifying Conflict of Interest was Supported by the Record .............52

  C.  The District Court Properly Exercised Its Article III Power ..........................55

  D.  The Court Should Not Order a Hearing *En Banc* to Overrule this Circuit's Law Regarding *Cy Pres* Distributions ................................................................56

VII.  CONCLUSION ............................................................................................57

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997) ...........................................................................29

*Ashok Babu v. Wilkins,*
   No. 22-15275, 2023 WL 6532647 (9th Cir. Oct. 6, 2023) ...........................................21

*Briseño v. Henderson,*
   998 F.3d 1014 (9th Cir. 2021) ...........................................................................21

*Carpenter v. United States,*
   138 S. Ct. 2206 (2018) ...........................................................................5, 35

*Churchill Village, L.L.C. v. Gen. Elec.,*
   361 F.3d 566 (9th Cir. 2004).........................................................12, 21, 31, 32

*Clark v. Time Warner Cable,*
   523 F.3d 1110 (9th Cir. 2008) ...........................................................................34

*Frank v. Gaos,*
   139 S. Ct. 1041 (2019) ...........................................................................13, 17

*Hughes v. Kore of Indiana Enter., Inc.,*
   731 F.3d 672 (7th Cir. 2013)...........................................................................28, 29

*Hyland v. Navient Corp.,*
   48 F.4th 110 (2d Cir. 2022)...........................................................................25

*In re Bluetooth Headset Prod. Liab. Litig.,*
   654 F.3d 935 (9th Cir. 2011)...........................................................................12, 20, 32

*In re Easysaver Rewards Litig.,*
   906 F.3d 747 (9th Cir. 2018)...........................................................................13, 21, 41

*In re Facebook Biometric Info. Priv. Litig.,*
   522 F. Supp. 3d 617 (N.D. Cal. 2021) ...........................................................................23

*In re Facebook Consumer Privacy User Profile Litig.*,
No. 18-md-02843 (N.D. Cal.) ........................................................23

*In re Google Buzz Privacy Litigation*,
No. C 10-00672, 2011 WL 7460099 (N.D. Cal. June 2, 2011)....................31

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
934 F.3d 316 (3d Cir. 2019) ........................................................25

*In re Google Inc. St. View Elec. Commc'ns Litig.*,
21 F.4th 1102 (9th Cir. 2021) ....................................1, 3, 15, 17, 21, 24, 25, 54

*In re Google Referrer Header Priv. Litig.*,
869 F.3d 737 (9th Cir. 2017)................................13, 17, 26, 27, 29

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019)........................4, 12, 20, 24, 39, 54

*In re Lupron Mktg. & Sales Pracs. Litig.*,
677 F.3d 21 (1st Cir. 2012) ........................................25, 29

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ........................................32

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015)........................................53

*Juliana v. United States*,
947 F.3d 1159 (9th Cir. 2020) ........................................55

*Klier v. Elf Atochem North America, Inc.*,
658 F.3d 468 (5th Cir. 2011)........................................29, 30

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012)........................18, 21, 27, 29, 54

*Linney v. Cellular Alaska P'ship*,
151 F.3d 1234 (9th Cir. 1998) ........................................4, 20, 39

*Maldonado v. Morales*,
556 F.3d 1037 (9th Cir. 2009) ........................................34, 52

*McKinney-Drobnis v. Oreshack*,
16 F.4th 594 (9th Cir. 2021) ...................................................................21

*Mecinas v. Hobbs*,
30 F.4th 890 (9th Cir. 2022) ..................................................................55

*Mirfasihi v. Fleet Mortg. Corp.*,
356 F.3d 781 (7th Cir. 2004)...................................................................28

*Moran v. Screening Pros, LLC*,
25 F.4th 722 (9th Cir. 2022) ............................................................ 15, 34

*Nachshin v. AOL, LLC*,
663 F.3d 1034 (9th Cir. 2011) ................................................................29

*Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of San Francisco*,
688 F.2d 615 (9th Cir. 1982)...................................................................19

*Powell v. Ga.-Pac. Corp.*,
119 F.3d 703 (8th Cir. 1997)...................................................................25

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
944 F.3d 1035 (9th Cir. 2019) ................................................................12

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
904 F.2d 1301 (9th Cir. 1990) ...................................................13, 23, 56

*United States v. Cooley*,
947 F.3d 1215 (9th Cir. 2020) ................................................................57

*Williams v. Reckitt Benckiser LLC*,
65 F.4th 1243 (11th Cir. 2023) ...............................................................22

## Other Authorities

Chris J. Chasin,
*Modernizing Class Action Cy Pres Through Democratic Inputs*,
163 U. Pa. L. Rev. 1463 (2015) ..............................................................26

Rhonda Wasserman,
*Cy Pres in Class Action Settlements*,
88 U.S.C. L. Rev. 97 (2014) ...................................................................31

**Rules**

Fed. R. App. P. 40 ............................................................................ 56, 57

Fed. R. Civ. P. 23 ................................. 2, 4, 12, 15, 17, 18, 20, 21, 22, 25, 26, 29

Fed. R. Civ. P. 23 Adv. Comm. Notes (2018) .................................................21

## I. __INTRODUCTION__

The district court properly applied the law, based on its deep experience with the facts and claims—which were litigated before it for nearly six years—when it approved the class settlement at issue. That settlement provides non-monetary relief as well as monetary relief in the form of *cy pres* distributions, which Appellants wrongly assert are improper. While Appellants contend the district court misapplied the law, their focus actually is on changing the governing law that the district court correctly applied. Appellants fail to show that the district court abused its discretion by applying the principles and standards for class action settlement approval set forth in the Federal Rules and reflected in sound jurisprudence from this Circuit and elsewhere, rather than applying different rules that Appellants would prefer.

More specifically, Appellants take issue with the principle, as enunciated by this and other Circuits, that if a settlement fund is effectively non-distributable because the large number of class members means that direct distribution is likely to result in *de minimis* per-person monetary payments, such funds may be distributed to charitable organizations to do work bearing a substantial nexus to the claims at issue, through the *cy pres* doctrine, because those distributions represent the next best means of delivering the benefits of a settlement to the Class. *See, e.g., In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1116 (9th Cir. 2021) ("*Google Street View*"). Contrary to Appellants' assertions, these *cy pres* distributions represent valuable and meaningful relief to class members that is closely aligned with their interests in this action.

- 1 -

Appellants dispute the court's factual finding that the settlement fund is non-distributable, but their argument is based on speculation that a claims process would result in a low claims rate, and contradicts the applicable legal standards, under which the lower court should compare the size of the settlement fund to the size of the entire settlement class to determine distributability, as the court did here, rather than presume a low claims rate that hypothetically might offer larger per-claimant recoveries to a small fraction of the class. Appellants also ignore the fact that the court, in making its determination that the settlement fund is non-distributable, weighed evidence—including evidence from Google suggesting that it would not be technologically feasible to determine whether claimants were included in the class by virtue of Google's collection of their location information.

Appellants wrongly argue that 2018 amendments to Rule 23, and specifically the addition of Rule 23(e)(2)(C)(ii), nullifies decades of jurisprudence on *cy pres* distributions, requiring that any class settlement distribute relief via cash payments to individual Class members. This is a wrong-headed reading of the amendment, which only confirms that a district court must consider the effectiveness of any plan for distribution. If Rule 23(e)(2)(C)(ii) required class settlements to include direct financial payments, as Appellants suggest, then not only would it prohibit approval of settlements including *cy pres* relief, but it also would prohibit settlements that provide only injunctive relief, as well as a variety of other types of class settlements providing

- 2 -

fair, adequate, and appropriately-tailored relief that may not fit in Appellants' cramped reading.

Appellants further argue, again wrongly, that the *cy pres* awards approved here bear an insufficient nexus to the claims Plaintiffs advanced in the action, and that those awards will not benefit the settlement class. In this vein, Appellants wrongly label the *cy pres* recipients as, among other things, racist and anti-Semitic abortionists. The record reveals, however, that the court had before it copious evidence including detailed proposals from each *cy pres* recipient describing how each would spend any funds allocated to it, which are summarized in Section VII.B, *infra*. The court awarded funds to each *cy pres* recipient based on its careful review of each organization's track record of charitable work in service to the goals of this litigation and the claims raised therein, each organization's proposal, and each organization's commitment to use the funds to serve the interests of the class.

Appellants go so far as to argue that the district court lacked Article III authority to distribute the settlement's monetary component to *cy pres* recipients. There is no authority for this proposition whatsoever, and Appellants' argument is based on a strained reading of a concurring opinion in an entirely inapposite Supreme Court case concerning a court's equitable authority under a school desegregation order.

"Appellants recognize that *Google Street View* and other cases have decided these issues" against them (AOB 22), but they nonetheless press on with their appeal,

- 3 -

suggesting that the Court should hear this matter *en banc* to overrule the precedent on which the district court relied. There is no basis to hear this matter *en banc* and there is no reason for this Court now to overrule the decisions on which the court below relied in order to take this Circuit in the unprecedented, ill-advised direction urged by Appellants and the attorneys general who appear as *amici* in support of Appellants' position.

Ultimately, none of Appellants' arguments come close to making a "strong showing" that the district court "clearly abused its discretion," or failed to explore all relevant factors comprehensively, as would be required to reverse the order and judgment at issue. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998)). Accordingly, this Court should affirm the district court's order and judgment.

## II.    STATEMENT OF THE ISSUES

Did the district court abuse its discretion when it approved the class settlement at issue, which included monetary and injunctive relief and provided for distribution of the monetary component via *cy pres* distributions, which the Court scrutinized for compliance with Rule 23(e) and this Circuit's nexus requirements?

## III.    COUNTER-STATEMENT OF THE CASE

### A.    The Claims in this Litigation

Plaintiffs alleged that Google violated its express promises, and reasonable privacy expectations, by amassing comprehensive records of its users' movements over

- 4 -

time. As set forth in Plaintiffs' Amended Consolidated Class Action Complaint (5-SER-1147), Google assured users of both its apps and mobile devices that they could control whether Google retained their location data through a "Location History" feature in their privacy settings. Google's support page on the subject stated: "You can turn off Location History at any time. With Location History off, the places you go are no longer stored." 5-SER-1162. As alleged, turning Location History off did not stop Google's data collection or storage. Google's apps and other services continued to "gather location data on their users almost incessantly." 5-SER-1166. As reported in 2018 by the Associated Press, corroborated by researchers at Princeton University and others, "Google wants to know where you go so badly that it records your movements even when you explicitly tell it not to." 5-SER-1150.

Consistent with the United States Supreme Court's discussion of geolocation data privacy in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), Plaintiffs alleged that Google's dossiers of class members' location information provided "an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." 5-SER-1152. As examples of some of the inferences and associations made possible by such "comprehensive" surveillance, the Complaint cited *New York Times* investigations into the smartphone tracking industry which, in just three cities, found "hundreds of pings in mosques and churches, abortion clinics, queer spaces and other sensitive areas." 6-

- 5 -

SER-1346. In another analysis, the cited reports showed that stored location data revealed "hints of faltering marriages, evidence of drug addiction, [and] records of visits to psychological facilities," among other things. 6-SER-1340.

Plaintiffs alleged injury from the "deceptive and unethical" nature of Google's Location History setting, Google's continuous surveillance, and Google's unjust enrichment from amassing their location information, which is "particularly rich and personal," and a "particularly valuable currency." 5-SER-1152, 1170. Plaintiffs pursued claims for (a) intrusion upon seclusion; (b) violation of the California Constitution's right to privacy, Art. 1, § 1; and (c) unjust enrichment. 5-SER-1207-09.

## B.    Procedural History of the Litigation

This case was filed on August 16, 2018, and ultimately consolidated with several related class actions before Judge Edward Davila in the Northern District of California. 7-SER-1511. In April 2019, the district court appointed Interim Class Counsel. *Id.* In December 2019, the district court granted Defendant's first motion to dismiss Plaintiffs' claims, in full. 6-SER-1453-55. Plaintiffs amended their complaint to include more detailed allegations regarding Google's services and its data collection (5-SER-1167-69) and, in January 2021, prevailed against Google's second motion to dismiss based on the district court's finding that "continuous and comprehensive" tracking and storage were adequately alleged. 5-SER-1217.

### C.   Discovery and Settlement Negotiations

Discovery was hard-fought and contentious.  All told, the parties engaged in approximately 26 months of discovery, litigating roughly 20 discovery disputes and submitting joint reports concerning the parties' numerous disputes to the magistrate judge overseeing discovery on a weekly, then biweekly, basis.  7-SER-1617 at Dkts. 187, 204, 229; 3-SER-473.  Plaintiffs reviewed hundreds of thousands of pages of documents produced by Google.  3-SER-473.

Negotiating the Settlement was a similarly hard-fought process.  Following several months of negotiations overseen by experienced mediator Professor Eric D. Green, Esq., including three full-day mediation sessions, the parties reached an agreement in principle on September 12, 2022.  5-SER-1144.  The parties did not reach agreement on all material terms for another six months (i.e., until April 2023), and then only after discussions facilitated by the mediator, a settlement conference with Magistrate Judge Joseph C. Spero on January 19, 2023, and strenuous arms'-length negotiations.  3-SER-482. On September 14, 2023, shortly after finalizing all terms of the Settlement, Plaintiffs moved for preliminary approval.  7-SER-1633.

### D.   The Settlement Agreement

#### 1.   The Settlement Class

The Settlement Class is defined as "all natural persons residing in the United States who used one or more mobile devices and whose Location Information was stored by Google while 'Location History' was disabled at any time during the Class

Period (January 1, 2014 through the Notice Date [December 4, 2023]).” ER-434; 3-SER-650. Approximately 247.7 million individuals are Settlement Class Members. ER-15.

### 2. The Class-Wide Relief

#### a. Monetary Relief for Distribution via *Cy Pres*

The Settlement requires Google to create a non-reversionary $62 million settlement fund to be distributed, after deducting notice and settlement administration costs, any court-awarded attorneys’ fees and expenses, and class representative service awards, to Court-approved *cy pres* recipients. ER-469-70 at ¶¶ 32, 39-42. Such recipients must be “independent 501(c)(3) organizations with a track record of addressing privacy concerns on the Internet (either directly or through grants).” ER-470 at ¶ 41.2. Under the Settlement, the court, not the parties, ultimately designates the Approved *Cy Pres* Recipients and allocates the Net Settlement Fund between them. ER-470 at ¶ 41.1.

#### b. Injunctive Relief and Business Practice Changes

The Settlement requires Google to implement several business practice changes for a period of at least three years. ER-580-84. Certain provisions this relief are consistent with provisions negotiated in other settlements with Google due to overlapping claims and concurrent negotiations. By way of background, the attorney general of Arizona filed suit approximately two years after this litigation commenced, advancing similar claims against Google. 3-SER-466 at ¶ 32. That action settled in

October 2022. Thereafter, other states announced their own investigations and entered into similar settlements. Although those settlements were finalized before the one here, the protracted negotiations here that led to this Settlement's non-monetary terms were underway concurrently. 2-SER-74 ¶ 17. Terms that are similar to Google's obligations under other consent decrees include:

- Sending a notification to all users with location sharing settings enabled that explains how these features work and instructing users how to disable them; and

- Publishing a Location Technologies Page negotiated at length with Class Counsel explaining, among other things, how and to what extent users can limit Google's use of their location information, while also making clear that users cannot prevent Google's use of their location data for advertising;

Terms that are exclusive to this Settlement include:

- Including, in Google's annual "Privacy Check-Up" email, a reference and link to the Location Technologies Page;

- Establishing an 18-month auto-deletion period by default for user location data and allow users to set their own auto-deletion periods; and

- Prohibiting Google from attempting to re-identify pseudonymous, anonymous, or de-identified location data.

ER-581-84 at ¶¶ 1, 2, 8, & 11.

### 3. The Class-Wide Release

In exchange for the Settlement's benefits, settlement class members release any claims against the Released Parties that are based on, or arise from, one or more of the same factual predicates or theories of liability as alleged in the Consolidated Action. *Id.* ¶¶ 50-57.

### 4.     Preliminary Approval and Settlement Notice

In November 2023, the Court preliminarily certified the Settlement Class and preliminarily approved the Settlement. 3-SER-640. In September 2023, the Settlement Administrator disseminated notice of the Settlement to class members and sent notices to the Attorneys General of each state (including those appearing for the first time as *amici* now), the District of Columbia, and the United States Territories, in accordance with the Class Action Fairness Act ("CAFA"). 3-SER-367.

### E.     <u>The Proposed *Cy Pres* Recipients</u>

The parties proposed 21 organizations as Proposed *Cy Pres* Recipients. 2-SER-72-73. In addition to possessing 501(c)(3) status and the requisite track record of addressing internet privacy concerns, each organization was required to submit a proposal "demonstrating and committing that they shall use the funds to promote the protection of internet privacy" as a condition of receiving any award. *Id.* These robust submissions describe the history of each proposed *Cy Pres* Recipient, its current programs and goals, prior *cy pres* awards, and ratings. 2-SER-77-365. They describe how each organization would use the *cy pres* award, including the issue or opportunity addressed, any specific project objectives, anticipated activities, and a timeline. *Id.* In addition, they discuss how each organization will evaluate its success in enhancing or promoting the protection of internet privacy, and include a commitment to provide semiannual reports to the Court and the parties about how the award has been used and how any remaining funds will be used. *Id.*

Each proposal was posted to the Settlement Website during the notice period, and the parties filed notices (which also were posted to the website) disclosing any potentially relevant relationships the parties or their counsel had with proposed recipients. 2-SER-72; 4-SER-463, 633-39, 930; 5-SER-957.

### F. **Appellants' Objections**

Appellants filed their objection and supplemental objection to the Settlement on March 4, 2024, and April 8, 2024, respectively. ER-373, 52. Appellants made the same (or very similar) arguments to those which their counsel, the Hamilton Lincoln Law Institute, have pressed unsuccessfully in prior appeals over the past several years, including the argument that "settlements distributing all monetary relief to *cy pres* recipients are unlawful." ER-19.

### G. **Final Approval of the Settlement**

The court held a final approval hearing on April 18, 2024, during which it heard argument from counsel for both parties, for Appellants, and from the CEO of one *cy pres* recipient, Free Press. 1-SER-48. As the transcript of that lengthy hearing makes clear, the court read and was familiar with all the voluminous materials that had been submitted to it, including the Settlement and the briefing supporting it, Appellants' objections, and the detailed proposals received from potential *cy pres* recipients. The district court issued its Order Granting Final Settlement Approval; Granting Motion for Attorneys' Fees, Expenses, and Service Awards ("Final Approval Order") on May 3, 2024. ER-4.

1.      **The Legal Standards Applied in the Final Approval Order**

In the Final Approval Order, the district court began its assessment of the Settlement with the recognition that it must conduct a "rigorous" analysis regarding certification of the settlement class, and a "heightened fairness inquiry" with respect to the Settlement. ER-8-9, quoting *Hyundai*, 926 F.3d at 556; *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019). The district court understood that it may "approve a proposed class action settlement only 'after a hearing and only on finding that it is fair, reasonable, and adequate.'" ER-8, quoting Fed. R. Civ. P. 23(e)(2). The court understood that in reviewing the Settlement, it "must balance several factors to gauge fairness and adequacy, including" the eight *Churchill Village* factors. ER-9, citing *Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). And it understood that it must also "look[] for and scrutinize[] any subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations." ER-9, citing *Roes*, 944 F.3d at 1043.

After finding that the Settlement Class met the criteria for certification, and that the notice program satisfied due process, the district court applied the eight *Churchill* factors, extensively supplementing its discussion of the fourth factor with analysis of the proposed *cy pres* method of distribution. ER-11-18. Next, it carefully scrutinized the Settlement for each of the "subtle signs" of collusion identified in *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). ER-18. The district court considered and addressed the objections throughout its heightened fairness inquiry and,

after making relevant factual findings supported by the record, explained the reasons why each objection would be overruled. *See* ER-10 n.1, ER-15 n.2, ER-19-26; ER-30-31.

## 2. The District Court's Extensive Analysis of the Proposed Method of Distributing Relief to the Class

The district court thoroughly evaluated the proposed method of distributing relief to the class, concluding that "*cy pres* distribution appropriate in this case" based upon its findings that direct distribution payments were not economically feasible on the record before it. ER-15. The court reasoned:

> The relevant 'recovery' for this assessment is determined with respect to the class as a whole, and courts in this Circuit use each class member's pro rata share of the settlement fund as a key metric in evaluating the fairness of distributing settlement funds by *cy pres*. *See, e.g.*, *In re Google Referrer Header Priv. Litig.*, 869 F.3d 737, 742 (9th Cir. 2017), *vacated and remanded on other grounds*, *Frank v. Gaos*, 139 S. Ct. 1041 (2019) (affirming finding of non-distributability where net settlement fund could provide only four cents in recovery to each settlement class member); *In re Easysaver Rewards Litig.*, 906 F.3d 747 (9th Cir. 2018) (finding a second distribution to be de minimis when there were over one million potential class members, but only three million dollars in available funds (i.e., approximately $3 per class member)); *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990) ('When a class action involves a large number of class members but only a small individual recovery, the cost of separately proving and distributing each class member's damages may so outweigh the potential recovery that the class action becomes unfeasible . . . . '[C]y pres' distribution avoids these difficulties.').
>
> . . . . Given the approximate 247.7 [million] Settlement Class Members, the resulting pro rata recovery per Class Member could be no more than twenty-five cents, assuming the Court awards no attorneys' fees, service awards, or administration costs. This *de minimis* recovery would be further diminished when considering the additional administrative costs associated with distributing funds to a class of this magnitude.

- 13 -

ER-14-15.  It concluded that "[t]his 25 cent distribution, considered in combination with the exorbitant costs this distribution would entail, is 'non-distributable' . . . ." *Id.* at 15.

The district court next evaluated whether the proposed *Cy Pres* Recipients were appropriate vehicles to deliver the class-wide relief by applying the "substantial nexus test," which "requires the Court to analyze whether the *cy pres* distribution bears a substantial nexus to the interests of the class members, accounting for the nature of the lawsuit, the objectives of the underlying statutes, and the interests of the silent class members." ER-16.  The district court found that the *Cy Pres* Recipients had commited to use any *cy pres* award accounting for the nature of the class members' alleged common injury—breach of data privacy—"such that the Settlement Class will ultimately enjoy greater data privacy protections as a result." ER-16-17.  The district court analyzed the parties' and counsel's disclosures and found no evidence of conflicts of interest or collusion.  ER-19.

The parties proposed allocations for each *cy pres* recipient (ER-67), but the district court did its own work in this regard, carefully considering each recipient's proposal, and making its own decisions and adjustments to the amounts it ultimately awarded to each.  ER-16, 24, 1-SER-57-60.

### 3. The District Court's Reasoned Response to the Andren Objections

The district court carefully considered and addressed each of Appellants' objections. The court rejected "the falsehood that *cy pres* distribution is not a benefit to the class," on which Appellants' sweeping objection that *cy pres* relief inherently "flunks" Rule 23(e)(2)(C)(ii) and "has no place in Rule 23 settlements" was based. ER-21; ER-23. The court explained that there is no "blanket rule" against approving *cy pres* distributions, which "are an acceptable solution when settlement funds are not distributable." ER-20 (quoting *Google Street View*, 21 F.4th at 1113).

The district court correctly observed that "this is not, as Objectors represent, an 'all-*cy pres*' settlement; the Settlement Agreement also calls for meaningful injunctive relief." ER-28. The district court rejected Appellants' objections that the injunctive relief is "'illusory' because it is consistent with Google's obligations under 2022 agreements with the State Attorneys General." ER-31. The district court observed that the injunctive relief secured by the Settlement goes beyond that required under state settlements and also provides class members the ability to enforce the injunctive relief "here in this Court." *Id.*[1]

---

[1] Although Appellants describe their objections to the injunctive relief in the background section of their Opening Brief, they do not appear to be appealing approval on this basis. *See, e.g.*, AOB 1-4 (omitting any reference to this argument from Appellants' statement of issues). Therefore, any arguments as to injunctive relief are waived and, in any event, are meritless for the reasons described by the district court. *Moran*, 25 F.4th at 728 n.6.

In response to Appellants' objections based on their arguments that a low claims rate or a lottery system could render the settlement fund distributable, the district court explained that its discretion was not limited to asking "only whether *some* members could receive a payment through claims-based distribution," which was "simply not the proper inquiry." ER-20. Rather, the district court determined the fund to be non-distributable in light of the class size, the size of the fund, and the challenge and expense of identifying and distributing funds. ER-21. It further explained that, even applying the wrong standard, as the objectors urged, "distribution to some of the class may very well still be infeasible," citing evidence before the court. *Id.*

The remainder of Appellants' objections concerned arguments that the *cy pres* recipients do not align with the interests of the class because of relationships with counsel, because Appellants disagreed with protecting privacy rights in some circumstances, or because the recipients might flout their obligation to use the funds for the protection of internet privacy. The district court considered the objections, including relationships disclosed in advance of final approval (4-SER-463, 633-39, 930; 5-SER-957), and found that nothing in the record "raise[d] substantial questions about whether any particular recipient was proposed based on the recipient's merits," reiterating that the court had reviewed the proposals and found a substantial nexus with the interests of the settlement class. ER-24. It further explained that it was satisfied "by the *cy pres* recipients' proposals documenting their commitment to use

- 16 -

their portion of the Settlement Fund solely to fund their efforts to advocate for the protection of data privacy, as well as enhance public knowledge of the issues impacting data privacy." ER-25. And the court expressed its confidence "in its abilities to review the required bi-annual reports and effectively police the grants that the Court itself authorizes to ensure that funds are not being used outside of the perimeters assigned in their Court-approved proposals." *Id.*

Ultimately, the court considered and overruled all objections, based on a careful analysis described during the final approval hearing and in the Final Approval Order.

## IV.  **SUMMARY OF ARGUMENT**

As the district court observed, "[t]he Ninth Circuit has expressly rejected nearly all of Objectors' arguments regarding *cy pres* settlements in . . . *Google Street View*[], where Objectors' same counsel appeared on behalf of the objectors to the *Google Street View* settlement." ER-20 (citing *Google Street View*, 21 F.4th at 1113). This Court likewise rejected many of these same arguments when brought by the same counsel in *In re Google Referrer Header Priv. Litig.*, 869 F.3d 737 (9th Cir. 2017), *vacated and remanded on other grounds*, *Frank v. Gaos*, 139 S. Ct. 1041 (2019).

The district court scrutinized all necessary factors during the "heightened fairness inquiry" it conducted before approving the Settlement. ER-9. Appellants focus their complaints on one particular subpart of Rule 23—Rule 23(e)(2)(C)(ii), which requires that the court consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member

- 17 -

claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). They assert that the district court failed to consider "the distribution method" (AOB 2), but the court spent a significant portion of its opinion doing just that, examining (a) whether *cy pres* relief was appropriate given the size of the fund and of the settlement class, and (b) "whether the *cy pres* distribution bears a substantial nexus to the interests of the class members, accounting for the nature of the lawsuit, the objectives of the underlying statutes, and the interests of the silent class members." ER 16 (citing *Lane*, 696 F.3d at 820–21). The court's thoughtful analysis on both counts was based on its careful consideration of the facts before it. It more than satisfied all requirements of Rule 23, including subpart (e)(2)(C)(ii), to the extent that it applies at all where the settlement does not include a claims process but, rather, provides indirect monetary relief to class members through *cy pres* payments.

Appellants dispute the district court's factual findings regarding the *cy pres* recipients, arguing that certain recipients are improper based on limited, preexisting relationships between some of them and one or the other party's counsel; but all of those relationships were disclosed to and considered by the district court, which conducted its own analysis concerning how the organizations would use any *cy pres* funds awarded to them. The district court also considered, and properly rejected, arguments that *cy pres* recipients would use funding from this settlement for any purpose other than to fulfill their obligations to the settlement class. After a rigorous analysis of robust information about each proposed organization, guided by this

Court's extensive precedents, the district court correctly concluded that all of the *cy pres* awards it made were warranted, satisfied the nexus requirement, and were untainted by conflicts of interest or otherwise such that they are appropriate vehicles to effectively deliver the class-wide relief.

The Final Approval Order and the transcript of the final approval hearing, when the court engaged at length directly with Appellants' counsel, make plain that the court fully considered Appellants' objections before overruling them.

The district court carefully considered, applied, and followed the law governing class action settlements and *cy pres* distributions when it approved the Settlement. The lower court's decision in this regard was based on its familiarity with the facts and the claims litigated by the parties before it over nearly six years. No part of that order can be considered legal error or an abuse of discretion, and the court's approval order should be affirmed.

## V. <u>STANDARD OF REVIEW</u>

"The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." *Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). "'Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly.'" *Id.* at 626 (citation omitted).

Accordingly, this Court performs "an 'extremely limited' review of a district court's approval of a class settlement." *Hyundai*, 926 F.3d at 556 (quoting *Bluetooth*, 654 F.3d at 940). Likewise, this Court "review[s] for abuse of discretion the district court's award of attorney's fees and costs to class counsel as well as its method of calculating the fees." *Hyundai*, 926 F.3d at 556.

"As long as the district court applied the correct legal standard to findings that are not clearly erroneous, [this Court] will affirm." *Id.* "Parties seeking to overturn the settlement approval must make a 'strong showing' that the district court clearly abused its discretion." *Id.* (quoting *Linney*, 151 F.3d at 1238).

## VI. ARGUMENT

### A. The District Court's Analysis Was Legally Sound and Supported by the Record

#### 1. The District Court Applied the Correct Legal Standards

Appellants' primary argument concerning "legal error" by the district court is that it "fail[ed] to perform the analysis" required by Federal Rule of Civil Procedure 23(e)(2)(C)(ii), as amended in 2018, to evaluate "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." AOB 24; Fed. R. Civ. Proc. 23(e)(2)(C)(ii).

Whether Rule 23(e)(2)(C)(ii), which by its terms applies where there are "class-member claims," is triggered when the proposed method of distributing monetary relief is via *cy pres*, the requirement only reflects existing standards in this Circuit, which have

held *cy pres* distributions to strict standards for fairness and effectiveness since long before the Rule 23(e) 2018 amendments. Applying those standards, the district court here thoroughly scrutinized the proposed method of distributing relief to the class. It understood that *cy pres* distributions may be approved only if the court first finds that the settlement fund is non-distributable, and that it could only approve awards to organizations with a "'substantial nexus to the interests of the class members.'" *Easysaver*, 906 F.3d at 762 (quoting *Lane v. Facebook, Inc.*, 696 F.3d 811, 821 (9th Cir. 2012) ("[A] *cy pres* remedy must be the 'next best distribution' of settlement funds")); *Google Street View*, 21 F.4th at 1116 (quoting same and reasoning that *cy pres* award with the requisite substantial nexus "necessarily prioritizes class members' interests, even if it also provides a diffuse benefit to society at large").

Indeed, the court's approach is consistent with this Circuit's guidance concerning the 2018 Amendments to Rule 23(e). *See Ashok Babu v. Wilkins*, No. 22-15275, 2023 WL 6532647, at *3 (9th Cir. Oct. 6, 2023); *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 609 n.4 (9th Cir. 2021) ("[As amended, t]he Rule 23(e) factors supplement, rather than displace, the [*Churchill*] factors."); Fed. R. Civ. P. 23 Adv. Comm. Notes (2018) ("The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."). Appellants' reliance on *Briseño v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021), where the district court failed to

- 21 -

scrutinize attorneys' fees in direct contradiction of the 2018 amendments, is therefore misplaced.

Similarly, *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243 (11th Cir. 2023), does not suggest that the district court here committed any error. In *Williams*, the court vacated settlement approval because the plaintiffs lacked standing to pursue injunctive relief that formed a substantial part of the benefits of that settlement, not for failure to consider the 2018 amendments. *Id.* at 1253. The order merely instructed that, on remand, "the district court should consider the impact of Congress' 2018 amendments to Rule 23(e)(2)(C) on its analysis." *Id.* at 1261.

The district court also provided a reasoned response to the objections concerning effectiveness under Rule 23(e)(2)(C)(ii) and governing precedents. Making factual findings before it approved "the *cy pres* distribution method" ER-15-17, the district court specifically responded to the objectors' arguments that a claims process would be more effective, finding that the fund was not distributable, and rejecting the argument that *cy pres* relief provides no class-wide benefit. ER-386; ER-20-21. It applied the "substantial nexus" test, concluding that the specific distributions it approved would effectively deliver benefits to the class, *i.e.*, "that the *cy pres* recipients will appropriately use the Settlement Fund to further their advocacy for data privacy nationwide such that the Settlement Class will ultimately enjoy greater data privacy protections as a result." ER-15-17. Whether this evaluation was required by Rule

- 22 -

23(e)(2)(C)(ii), or only by Circuit precedent, the district court performed it and committed no legal error.

## 2. The Record Supports the District Court's Findings on Distributability

Appellants wrongly contend that the district court ignored their objections and the "economic reality" of the Settlement when it made its findings on distributability, because Appellants claim to have "demonstrated" that the claims rate in a claims process would be low. AOB 13-14, 20. The district court provided a reasoned response to Appellants' arguments, which amount to nothing more than speculation. ER-20.

In addition to the low *pro rata* amount available to each class member, the district court considered evidence that a 1% claims rate would consume $1.9 million of the common fund in administrative costs; a 3% claims rate $4 million, and a 7% claims rate, matching that in a comparable case (*In re Facebook Consumer Privacy User Profile Litig.*, No. 18-md-02843, Dkt. 327 at 14 (N.D. Cal.)), would consume $8.2 million. 3-SER-367; ER-15; *see also In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617, 622 (N.D. Cal. 2021) (granting final approval to $650 million settlement that generated "a claims rate of approximately 22%"). The district court's findings also rested on its evaluation of evidence from Google suggesting it would be technologically "'infeasible to identify the individuals who fit this class definition.'" ER-21 (quoting 5-SER-962). *See also Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990) ("[F]ederal courts have frequently approved [*cy pres*] in the settlement of class actions

- 23 -

where the proof of individual claims would be burdensome or distribution of damages costly.").

Given the relative sizes of the settlement class and the settlement fund, the economic reality is that implementing a claims process here likely would still result, after costs of administration, in *de minimis* per-claimant recoveries. Direct payments would still be infeasible, and the fund would *still* be non-distributable and ultimately go to *cy pres* recipients instead of to claimants, but only after a massive expenditure of class funds, time, and judicial effort. As this Court previously has held, the district court was not required to deny settlement approval because Appellants posed a hypothetical in which some class members might receive a non-*de minimis* monetary payment. *See Google Street View*, 21 F.4th at 1114 (rejecting argument that standard for distributability focuses on "the ability of *some* class members to make a claim"). And Appellants provide no reason why the district court should have presumed that this case, concerning a product most Americans use, would have yielded a low claims rate.

The district court was best positioned to judge the evidence before it, and its finding that the settlement fund was not distributable was not "clearly erroneous." *Hyundai*, 926 F.3d at 556. Appellants' speculation that a claims process would result in a low claims rate falls far short of the "strong showing" necessary to establish that the district court clearly abused its discretion and committed reversible error. *Id.*

- 24 -

### 3. Rule 23(e)(2)(C)(ii) Does Not Prohibit *Cy Pres* Relief to the Class

Appellants next argue that the district court could not have conducted the required analysis under Rule 23(e) because "Rule 23(e)(2)(C)(ii)'s plain language requires a court to reject this settlement." AOB 20, 25. Appellants misunderstand the Rule. If, as Appellants claim, the Rule required that all settlements distribute relief in the form of direct monetary payments, then any class settlement providing for other forms of relief, such as injunctive relief, would automatically "flunk" the inquiry. There is no indication in Rule 23(e)(2)(C)(ii), or the Advisory Committee Notes to the 2018 Amendments, that it was intended to prohibit all class settlements that do not provide for direct distributions of money.

Appellants' argument that the district court's analysis of the distributions here renders Rule 23(e)(2)(C)(ii) a "nullity" (AOB 23) rests on the false proposition that *cy pres* payments present no benefit to class members. Contrary to Appellants' claims, the court thoroughly discussed their objections (ER-20-25), and correctly rejected arguments founded on "the falsehood that *cy pres* distribution is not a benefit to the class." ER-21-22 (citing *Google Street View*, 21 F.4th at 1113-14; *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 934 F.3d 316, 326 (3d Cir. 2019); *In re Lupron Mktg. & Sales Pracs. Litig.*, 677 F.3d 21, 31-34 (1st Cir. 2012); *Powell v. Ga.-Pac. Corp.*, 119 F.3d 703, 706-07 (8th Cir. 1997); and *Hyland v. Navient Corp.*, 48 F.4th 110, 121-22 (2d Cir. 2022)).

### 4.  Other Safeguards Address Appellants' Policy Arguments

Appellants seek to support their contrived interpretation of Rule 23(e)(2)(C)(ii) by listing "concerns" that have been expressed about the *cy pres* remedy, but—to the extent Appellants faithfully describe these concerns—they overlook existing safeguards that already address them.

**First**, Appellants pretend that this Circuit permits *cy pres* distributions in any class settlement, "disincentivizing" class counsel from pursuing individualized compensation in favor of their "charitable preferences."  AOB 31.  But as the district court correctly observed, *cy pres* awards are only permitted where funds are non-distributable and the awards meet this Circuit's nexus requirements.  ER-14, 16.

Nonetheless, to illustrate the supposed incentive, Appellants argue that a Comment from a law student at the University of Pennsylvania, and Judge Wallace's 2017 dissent in *Google Referrer*, establish it is "not uncommon" for class counsel to fund other litigation with *cy pres* awards and to hand "oversized checks" to charities.  AOB 30.  Neither authority says any such thing.

The Comment does not discuss oversized checks or litigation funding.  It asserts that "[m]any law firms tout their *cy pres* victories as public service," citing one website. Chris J. Chasin, *Modernizing Class Action Cy Pres Through Democratic Inputs*, 163 U. Pa. L. Rev. 1463, 1484 (2015).  The Comment also hypothesizes a risk—not that counsel seek out *cy pres* opportunities but, rather, that when *cy pres* awards are necessary, charities knowledgeable about class action proceedings may have a systematic advantage over

others, such that they could receive awards "regardless of which entity is best suited to satisfying the nearness requirement." *Id.* at 1483-84. Judge Wallace similarly advocated to increase the burden to show that *cy pres* awards were merits-based, rather than putting the burden on objectors to show that they were not. *Google Referrer*, 869 F.3d at 749 (9th Cir. 2017) (Wallace, J., dissenting).

The concerns that Appellants' citations actually discuss were adequately addressed by the district court, which closely scrutinized the settlement for "any subtle signs" of self-interest. ER-9. It was vigilant about the risk, discussed in the Comment, that certain "usual suspects" might be favored, which plainly did not materialize because numerous organizations proposed here have never before received *cy pres* awards. ER-21, 41-44; 1-SER-61-63. The district court also found that the *cy pres* recipients were proposed for their "merits," rather than due to relationships with the parties or counsel, based on a robust showing including written proposals, discussion at the hearing, and consideration of the litigants' disclosures concerning prior relationships. ER-24; *see also* 1-SER-11-13.

**Second**, Appellants argue that *cy pres* awards allow defendants, with collusion from class counsel, "to structure settlements to minimize costs or even benefit themselves," by for instance directing *cy pres* funds "to a new charity" owned by the defendant, citing *Lane v. Facebook*, 696 F.3d 811, 829, 835 (9th Cir. 2012). AOB 32. This Circuit already requires scrutiny for collusion, conflicts of interest, and satisfaction

of the nexus requirements. Moreover, there is no distribution to a charity owned or controlled by Google here. Appellants' related argument, that Google may prefer *cy pres* over allowing their customers to learn Google paid money to resolve such claims, ignores the robust notice requirements for a release of damages claims, which apply whether relief is delivered via *cy pres* or in cash.

**Third**, Appellants and their *amici* assert that *cy pres* remedies fail to redress class members' injuries, reiterating their mistaken view that *cy pres* distributions do not deliver relief. Appellants quote from the Seventh Circuit case of *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004), for the purported rule that "[t]here is no indirect benefit to the class from the defendant's giving the money to someone else" (quoted in AOB 33), and that *cy pres* relief is "purely punitive." Judge Posner made that statement in a case where members of a subclass received nothing—there was no money going to any *cy pres* beneficiaries in *Mirfasihi*. Rather, the settlement at issue included a reversionary fund and a claims process for one of two subclasses, but nothing for the second subclass. *Mirfasihi*, 356 F.3d at 783.

Indeed, Judge Posner later opined that *cy pres* distributions to charities with "an interest parallel to that of the class" *are appropriate* if "distribution of damages to the class members would provide no meaningful relief." *Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 675 (7th Cir. 2013). The Seventh Circuit observed that many Circuits, including this one, have determined that *cy pres* distributions do benefit class members

where the recipient's "mission coincide[s] with, or at least overlap[s], the interest of the class," *i.e.*, satisfies a nexus requirement like this Circuit's. *Id.* at 676 (citing, *inter alia*, *In re Lupron*, 677 F.3d at 33. Such organizations "can use the money to do something to minimize" violations that, "as a practical matter, class members each given $3.57 cannot." *Hughes*, 731 F.3d at 676. Thus, where a nexus requirement applies to *cy pres* distributions, there is no tension between applying Rule 23(e)(2)(C)(ii) to approve *cy pres* distributions, as the district court did here, and the principle that "Rule 23 is to be 'applied with the interests of absent class members in close view.'" AGs' Amicus Br. at 5 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 629 (1997).

Appellants and their *amici* also mistakenly place great weight on *Klier v. Elf Atochem North America, Inc.*, 658 F.3d 468 (5th Cir. 2011), but the standards applied in *Klier* are consistent with the district court's order and this Circuit's case law. Nobody disputes that the "very best use" of a settlement fund, where feasible, is "benefitting the class members directly." *Id.* at 475 (quoted in AOB 5). But *Klier* and this Circuit's precedent both recognize that "[a] *cy pres* distribution puts settlement funds to their next-best use by providing an indirect benefit to the class." *Id.* at 475; ER-21; *see also In re Google Referrer Header Priv. Litig.*, 869 F.3d at 741 (reasoning that *Klier* accords with this Circuit's rules) (quoting *Lane*, 696 F.3d at 819, and *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011)). Moreover, *Klier* was "not a case where the settlement agreement itself provides that residual funds shall be distributed via *cy pres*." *Klier*, 658

F.3d at 476. The Fifth Circuit held that the lower court there erred when it re-allocated residual funds, which the settlement agreement allocated to a subclass, to *cy pres* beneficiaries instead of following the settlement agreement's terms. *Id.* at 474-77. Unlike here, the *Klier* settlement agreement did not provide for such *cy pres* relief and there was no finding that monetary relief was non-distributable to the subclass that was supposed to receive it. *Id.*

**Fourth**, Appellants assert that some *cy pres* recipients "have [a] political valence" that is offensive to class members. AOB 34. That an objector or two, in a class of approximately 250 million individuals, may take issue with some aspect of work that a *cy pres* recipient does in another context, or make generalizations about their politics, as objectors did below, is no basis to disapprove a *cy pres* award that meets the substantial nexus test. This is particularly true here, where each *Cy Pres* Recipient demonstrated its relevant experience and expressly committed to use any award to advance class members' relevant interests. The district court correctly rejected Appellants' impossible standard in favor of scrutinizing the organizations under the pragmatic substantial nexus test. ER-25 (explaining it is "hard to imagine any *cy pres* recipient which could possibly meet Objectors' standard of only engaging in 'universally agreed upon' policy work").

**Fifth**, Appellants assert that *cy pres* awards "often" create the appearance of judicial conflicts of interest, based on their interpretation of a district court's 2011 final

- 30 -

approval order in *In re Google Buzz Privacy Litigation*, No. C 10-00672, 2011 WL 7460099 (N.D. Cal. June 2, 2011). AOB 34.  Appellees are not aware of any court having ever cited *Google Buzz*, which of course is not binding on this Circuit, for such a proposition. The academic article that Appellants also cite does not support their argument.  The author of that article endorsed the process that the district court applied here, whereby the parties propose *cy pres* recipients subject to court approval, and simply observed that if no proposals were made, a judge with unlimited discretion "might choose to distribute unclaimed funds to 'favored charities, alma maters, and the like.'"  Rhonda Wasserman, *Cy Pres in Class Action Settlements*, 88 U.S.C. L. Rev. 97, 124-25 n.117 (2014). Nothing in the article or the record here indicates that the district court abused its discretion by approving the organizations proposed.

### 5. The District Court Appropriately Considered the Reaction of the Class and Did Presume the Settlement Is Valid

Appellants mis-quote the district court, arguing that it gave the Settlement a "strong presumption of validity."  AOB 20, 34.  The court never wrote or uttered those words.  Rather, the court subjected the Settlement to a "heightened fairness inquiry" which appropriately evaluated and balanced all appropriate factors as discussed above. ER-9.

To be clear, the district court did not apply a presumption of validity.  In the course of its heightened inquiry, the court evaluated the eighth *Churchill* factor—"the reaction of the class members"—observing that it had received only three objections

(*i.e.*, from Appellants, all of whom presented their objections together), and nine requests for exclusion. ER-18. It was in the context of determining whether this single *Churchill* factor favored settlement approval that the court noted the "absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." ER-18 (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008)). Put another way, the district court indicated that, in the context of analyzing this factor, the absence of any other objectors favored Settlement approval. The court did not thereafter hold that this factor overrode any other factor. Rather, this factor was one among a multitude of *Churchill* factors, supplemented with the court's distributability and nexus analyses, as well as the analysis required by *Bluetooth* looking for signs of collusion, which the court balanced before finding that "all the applicable factors weigh in favor of finding that the Settlement Agreement is fair and reasonable." ER-8, 18-26, 31.

The court did not commit reversible error when it analyzed the *Churchill* factors along with the other well-established requirements for class settlements. ER-8-9.

## B. <u>The District Court's Approval of the *Cy Pres* Recipients Was an Appropriate Exercise of Discretion</u>

Each of the 21 *Cy Pres* Recipients provided a written proposal describing their mission and how they could use funding from the Settlement to further the interests of the settlement class. 2-SER-77-365. The district court conducted a comprehensive and

careful review of these materials, heard live testimony from a representative of one organization (1-SER-48-54), and considered the objections raised below, before concluding that each of the distributions "bears a substantial nexus to the interests of the Settlement Class Members in the specific areas of data privacy that were raised in this case." ER-16.

Appellants assert that the record regarding twelve organizations "contradicted" the interests of the settlement class, because the organizations would serve non-class members or misdirect funds to unrelated "ideological" work. AOB 36. Appellants made these same arguments to the district court, which rejected them after evaluating all the evidence before it, including proposals from each recipient "demonstrating how they will commit to use the funds to promote the protection of data privacy." ER-6. The district court "careful[ly] review[ed]" their proposals, "was particularly impressed by [certain] programs," and modified some of the proposed allocation amounts based upon its review. ER-16; *see also* 1-SER-57-63 (addressing recipients' submissions one-by-one during final approval hearing).

Appellants claim that the district court failed to give their objections the requisite attention (e.g., AOB 41), but the opposite is true: The district court did indeed consider their objections; heard extensive argument from and engaged at length with their counsel at the final approval hearing (1-SER-27-64); and did not discount those objections because they were the only objections received. The record fully supports

the court's reasoning that, "[w]hile some of the *cy pres* recipient organizations also advocate for various issues outside of their data privacy work," they committed to perform work that would advance class members' interests in their proposals, and the Settlement's required reporting allows the court to "police the grants that the Court itself authorizes to ensure that funds are not being used outside of the perimeters assigned in their Court-approved proposals." ER-25; *see also* 1-SER-57-63. Appellants identify no basis to reverse the district court's order.

### 1. Appellants Do Not Appeal the District Court's Findings that Nine *Cy Pres* Recipients Have a Substantial Nexus to the Class

In their Opening Brief, Appellants make no argument concerning the district court's findings that that the following *cy pres* recipients meet the substantial nexus requirement: (1) American Civil Liberties Union ("ACLU") Foundation, Speech, Privacy, and Technology Project; (2) Berkman Klein Center for Internet & Society at Harvard University; (3) ConnectSafely; (4) the Data & Society Research Institute; (5) The Future of Privacy Forum Education & Innovation Foundation; (6) the Markup; (7) the National Cybersecurity Alliance; (8) the New York University Information Law Institute; or (9) Privacy Rights Clearinghouse. Accordingly, any such objections should be deemed waived. *See, e.g.*, *Moran v. Screening Pros, LLC*, 25 F.4th 722, 728 n.6 (9th Cir. 2022) ("This court 'will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief.'") (quoting *Clark v. Time Warner Cable*, 523 F.3d 1110, 1116 (9th Cir. 2008)); *Maldonado v. Morales*, 556 F.3d 1037,

1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived").

The work that these organizations will do on behalf of the settlement class, summarized below, strongly supports the district court's finding that the terms of the settlement are fair, reasonable, and adequate, and that the *cy pres* distributions it approved will provide meaningful benefits to the class.

### a. ACLU Speech, Privacy, and Technology ("SPT") Project

The court awarded the ACLU's SPT Project $6 million.[2] SPT is a large organization that has been successful in its work to protect digital and location privacy, and has gained recognition regarding other cutting-edge privacy issues including facial recognition, biometrics, and "big data"-driven surveillance. Among other important work it has performed, this organization successfully litigated *Carpenter v. United States*, 138 S.Ct. 2206 (2018), which was important precedent in this case. 2-SER-77. The ACLU represented it would use any *cy pres* award to support its ongoing and robust internet privacy and security work over three years, including by hiring additional technologists to work alongside lawyers to advance this work. *Id.*

---

[2] The specific dollar amounts awarded to each recipient may increase "to the extent the Net Settlement Fund accumulates interest prior to distribution." ER-34.

### b. Berkman Klein Center for Internet & Society at Harvard University ("BKC")

The court awarded BKC $1 million. BKC is an interdisciplinary community of scholars, practitioners, technologists, policy experts, and advocates devoted to studying the Internet. BKC has had a perennial focus on privacy, data autonomy and protection, and surveillance. BKC proposed to use the award to continue and expand its projects leading research, education, policy, and development work, like Privacy Tools, Youth and Media, and Digital Self Determination. For example, Youth and Media is studying privacy in the context of newer (e.g., AI and generative AI) and more immersive technologies (e.g., virtual and augmented reality) to support youth, parents, educators, and policy-makers in better understanding privacy. 2-SER-103-13.

### c. ConnectSafely

The court awarded ConnectSafely $350,000. ER-34. ConnectSafely provides educational materials and programs to parents and children through guides, videos, animations, podcasts and other media. It proposed to use the *cy pres* award over at least four years to support its goal to continue providing parents, youth, and educators with practical information on protecting young people in their use of connected technology regarding safety, security, and privacy, including location sharing. 2-SER-141-42.

### d. Data & Society Research Institute

The court awarded the Data & Society Research Institute $2 million. ER-34. Data & Society proposed to use the *cy pres* award to sustain and increase the

organization's capacity for dedicated research and engagement on internet privacy, including new research into the undertheorized area of "collective privacy," a framework that accounts for communal privacy harms. 2-SER-151.

### e. The Future of Privacy Forum Education & Innovation Foundation ("FPF")

The court awarded FPF $1.5 million. ER-34. FPF brings together experts and thought leaders to explore the challenges posed by emerging technologies and develop privacy protections, ethical norms, and best practices. FPF proposed to use the *cy pres* award to: (i) identify and analyze the privacy risks associated with the collection and use of sensitive personal data, with a particular focus on location data; (ii) identify pragmatic strategies that can mitigate those risks; and (iii) promote technical, legal, and policy tools to implement the mitigation strategies. 2-SER-226-33.

### f. The Markup

The court awarded the Markup $3 million. ER-34. The Markup is a nonprofit newsroom with the motto "Big Tech Is Watching You. We're Watching Big Tech." The Markup investigates and reports on technology and internet privacy in a time of rapid, unchecked innovation. The Markup proposed to use the *cy pres* award to investigate, report on, and create tools to address issues of internet privacy and security. 2-SER-251.

### g. National Cybersecurity Alliance ("NCA")

The court awarded NCA $700,000. In 2004, NCA partnered with the Department of Homeland Security for the first Cyber Security Awareness Month to raise public knowledge of best cyber practices. NCA expanded this initiative to Data Privacy Week in 2021. NCA now leads the United States' Data Privacy Day efforts. NCA's goal is twofold: to help citizens understand that they have the power to manage their data, and to help organizations understand why respecting their users' data is important. It proposed to use the *cy pres* award to continue and enhance the scope of its Data Privacy Week Campaign. 2-SER-278.

### h. New York University Information Law Institute ("ILI")

The court awarded ILI $404,790. ER-34. ILI is an interdisciplinary academic center for the study of law, policy, and digital technology. It proposes to use the *cy pres* award to support its core programs by offering two two-year Fellowships, with administrative support, to postdoctoral researchers who submit outstanding proposals to conduct research on personal data privacy online, and by organizing two workshops to convene privacy experts at NYU. 2-SER-292.

### i. Privacy Rights Clearinghouse ("PRC")

The court awarded PRC $350,000. PRC promotes the protection and advancement of internet privacy. It proposed using any *cy pres* award to advance three specifically described initiatives which provide access to information about data privacy

- 38 -

rights to individuals and community organizations, create data-privacy-centered resources to inform public policy and privacy research, and advance privacy rights. 2-SER-329.

### 2. Appellants' Argument that Seven *Cy Pres* Recipients Will Not Target the Settlement Class Is Contradicted by the Record

Appellants dispute the district court's findings as to seven organizations: (1) MIT Internet Policy Research Initiative; (2) Fordham University Center on Law and Information Policy; (3) Electronic Frontier Foundation; (4) Center for Democracy & Technology; (5) The Rose Foundation for Communities and the Environment; (6) Electronic Privacy Information Center; and (7) The Internet Archive, incorrectly claiming that these organizations promise to benefit groups "too remote" from the settlement class. AOB 36-38.

Appellants' arguments rest on mischaracterization of the record. All of the *cy pres* recipients are U.S. organizations and have committed to use *cy pres* awards to fund projects that are closely tied to Plaintiffs' claims and the class on whose behalf they pursued those claims in this action. As illustrated by the record pertaining to each organization, summarized below, Appellants rely on cherry-picked lines from certain recipients' proposals, while ignoring the details and central premise of those proposals. Such misleading assertions do not come close to "a 'strong showing' that the district court clearly abused its discretion." *Hyundai*, 926 F.3d at 556 (quoting *Linney*, 151 F.3d at 1238).

- 39 -

### a. MIT Internet Policy Research Initiative ("IPRI")

The court awarded IPRI $1.5 million. ER-34. IPRI has a record of technology policy leadership and government engagement on issues such as surveillance, AI governance, cybersecurity, and privacy. IPRI proposed to use the *cy pres* award for a "coordinated package of computer science research, user education and professional development" projects that aim to assure that "members of the class, and those similarly situated in the future are far less likely to be victims of privacy harm arising from deceptive collection of personal data, the inability of users to control how their data is used, and the general lack of technical tools and design patterns that encourage respectful privacy practices." 2-SER-267. Appellants focus on the "Privacy Engineering Education" component of IPRI's proposal, which states that the "target population" is consumer science undergraduates and privacy engineers. 2-SER-262; AOB 37.

IPRI's proposal supports the district court. Appellants' presentation of the "target population" provisions is not even accurate. Instead, consistent with its description of its over-arching goals of preventing privacy harms to class members, the IPRI also repeatedly identified "end users of consumer-facing services on the web" as targets. 2-SER-271, 273. Undergraduates will be "targeted," not as the beneficiaries of IPRI's work, but with education designed to prevent future privacy violations like the ones alleged here. This is a well-recognized means of delivering indirect and lasting

benefits to the class. *See, e.g.*, *Easysaver*, 906 F.3d at 760 (approving of *cy pres* distributions "to support scholarship in the area of internet privacy and data security").

### b. Fordham University Center on Law and Information Policy ("CLIP")

The court awarded CLIP $1 million. ER-34. CLIP, based out of Fordham University in New York, brings together scholars, the bar, the business community, technology experts, the policy community, students, and the public to address and assess policies and solutions for cutting-edge issues that affect the evolution of the information economy. CLIP requested over $2 million, and included four separate projects that could be funded based upon the amount of the award. These were (i) *Privacy Educators Program*: a revision and expansion of an existing curriculum designed to educate elementary and middle school students about online privacy; (ii) *Educating Educators About Privacy-by-Design*: aimed at training K-12 educators and administrators about privacy concepts as they design or purchase education and monitoring tools that may access or collect data about students; (iii) *Making Data Breach Notifications Work*: to translate complex data breach notifications into simple language, and evaluate how effective simplified notifications are in encouraging people to take remedial action; and (iv) *Global South Privacy Researcher Fellowship*: to allow CLIP to host internet privacy scholars from regions in the Global South for academic-year-long research fellowships in New York. 2-SER-198-212.

Appellants misleadingly isolate the fourth of CLIP's four projects to characterize the entire award as aiming to benefit "populations in the Global South." AOB 37. Even alone, this fourth project does not demonstrate an abuse of discretion. It would fund a research fellowship in New York pertaining to internet privacy concerns, which, as CLIP explained, "transcend national borders. Data flows, digital platforms, and technology companies operate internationally. Collaborating with researchers and experts on a global scale ensures a holistic approach to understanding privacy," and "provides an opportunity to share knowledge and learn from successful strategies implemented in diverse global contexts." 2-SER-210. Appellants also overlook that the parties did not propose, and the court did not award, enough money to CLIP to fund this fourth proposal. 2-SER-198-212.

### c. Electronic Frontier Foundation ("EFF")

The court awarded EFF $5,839,243. ER-34, 1-SER-60 (explaining how the court calculated EFF's award). The EFF conducts ground-breaking investigations into privacy-invading technology, advocates for meaningful policy change in the private and public sectors, creates privacy-enhancing tools, and educates the public on how to protect themselves from unnecessary surveillance. EFF proposed to use the *cy pres* award to promote the protection of internet privacy and for operating support for efforts over three years to (i) pass comprehensive data privacy legislation by educating the public and decision-makers; (ii) support solutions that protect individual digital privacy and human rights; (iii) push standards among technology developers that center

- 42 -

on user privacy; (iv) push for the phasing out of third-party tracking cookies, while preventing the implementation of other equally invasive technologies; (v) educate the public on vulnerabilities in electronic health records systems; (vi) call for more transparency in data collection and universal opt-out tools for internet-connected devices; and (vii) promote student privacy and access to information by addressing problematic content blockers and other tools. 2-SER-164.

All of these projects are U.S.-based, and it was not an abuse of discretion for the Court to find the nexus requirement was met, despite Appellants' out-of-context quotation of a single line from the organization's proposal to the effect that the EFF's work benefits, in addition to U.S. citizens, "tech users the world over." AOB 37.

### d. Center for Democracy & Technology ("CDT")

The court awarded CDT $3 million. ER-34. CDT "is a nonpartisan, nonprofit advocacy organization that fights to protect consumers' privacy, civil rights and civil liberties in the digital age." 2-SER-115. CDT's proposed to use the *cy pres* award over three years to scale up and expand work: (i) to secure robust privacy protections for location information and other sensitive data by advancing comprehensive privacy legislation and effective regulations; (ii) to push companies to improve their data policies, practices, and designs through direct advocacy and public interest leadership; and (iii) to support the growth & adoption of an online advertising ecosystem that moves away from pervasive tracking and respects users' privacy. 2-SER-118-22. All of CDT proposed work is tailored to the privacy interests of the settlement class, and CDT

explained: "All people deserve and benefit from increased privacy protections." 2-SER-124.

Appellants' suggestion that CDT aims to help only marginalized communities is, therefore, misleading. CDT's proposal actually explains that, with respect to privacy protections, "the needs are particularly acute for historically marginalized communities, for whom new technologies and data use can drive discrimination and deepen inequality," describing how, in its work to benefit "all people," CDT collaborates with groups representing such communities "to identify problems, develop informed solutions, and increase the big tent of voices calling for stronger protections in how technology is designed and governed." *Id.*

### e. The Rose Foundation for Communities and the Environment

The court awarded the Rose Foundation $6 million. ER-34. The Rose Foundation specializes in distributing *cy pres* funds for a wide range of charitable work that has a direct nexus with the class action settlements from which they arise. The Rose Foundation utilizes its grant-making experience and deep knowledge of privacy issues and consumer education to conduct a public, competitive, and transparent national grant-making process designed to identify appropriate recipients whose work has a direct nexus to the interests of class members and the goals of the underlying litigation, but which may be lesser-known or simply overlooked by the parties and their counsel. The Rose Foundation will use this *cy pres* award to reach out to hundreds of

privacy organizations throughout the country and to solicit proposals squarely aimed at the online privacy and data security nexus in this matter.  2-SER-340-50.

Appellants' accusations to the contrary (AOB 37), are not tethered to the organization's history or proposal, which make clear that the driving force for the Rose Foundation's assessment of grant proposals will be in service to the privacy interests of the class in this litigation.  2-SER-349.

### f.  Electronic Privacy Information Center (EPIC)

The court awarded EPIC $1 million.  ER-34.  EPIC is a public interest research center whose mission is to secure the right to privacy for all in the digital ecosystem through public education, advocacy, and expert analysis.  Its research has helped to focus discussions among policymakers and civil society about the impact of new technologies on privacy and human rights.  EPIC requested funds to support its work to secure privacy on the internet, including by hiring a technologist and a privacy violations investigator, and to support a forum for convening experts on internet privacy rights.  2-SER-179-84.

Appellants contend that EPIC "identifies no target population for its proposal," but they fail to cite the organization's actual proposal (AOB 38 (citing 2-ER-177), which identifies a target population consisting of "the general public, users of digital products and services, journalists focused on emerging privacy and civil liberties issues, state and federal lawmakers, and state and federal regulators" (2-SER-184).  Geographically, all of the work EPIC described is U.S.-focused.  2-SER-180-83.

### g. The Internet Archive

The court awarded Internet Archive $2 million for its Center for Next Generation Data Literacy. The Center for Next Generation Data Literacy works with libraries and allied organizations (*e.g.*, local governments, universities, nonprofits) to support everyday people as they navigate internet privacy challenges. In its submission, the Internet Archive proposed to use the *cy pres* award to: convene multi-sector privacy experts (e.g., academic, government, NGO, private) and community representatives to determine primary privacy challenges and opportunities; produce openly accessible, expert-informed privacy education materials and policy work; and deliver 250-300 free privacy workshops and events "throughout the United States." 2-SER-238.

Appellants quote out of context the Internet Archive's general statement that its over-arching mission (like most issues pertaining to the Internet) is "global in scope," (AOB 38; 2-SER-238), but the district court did not abuse its discretion in finding that the U.S.-focused Center for Next Generation Literacy has a substantial nexus to the settlement class.

### 3. Appellants' Argument that Five *Cy Pres* Recipients Will Misdirect Funding Is Unsupported by the Record

Appellants argue that five of the *Cy Pres* Recipients—(1) ACLU of Northern California (Technology and Civil Liberties Program); (2) Yale Law School Information Society Project; (3) Center on Privacy & Technology at Georgetown Law; (4) Free Press; and (5) UCLA Institute for Technology, Law & Policy—are inappropriate by

misleadingly suggesting they will mis-direct *cy pres* funds to support "one-sided ideological work" that is not related to the privacy issues in this litigation. AOB 11, 39-40.

*Amici* Attorneys General, who did not respond to the CAFA Notice that each received concerning the Settlement (ER-18), parrot Appellants' assertions, relying on Appellants' characterization of the *cy pres* recipients in their objection rather than on materials submitted by the organizations or anything reflecting the lower court's careful consideration of these issues. AGs' Amicus Br. at 9 (quoting Objection, ER-373, for the false assertion that the ACLU proposes to use settlement funds from this case to promote reproductive and LGBTQ rights "wholly unrelated to the class's data privacy claim").

That certain organizations publicly espouse a general interest in promoting racial, social, and environmental justice (Dkt. 354 at 16; 354-1 ¶ 11), does not eliminate the nexus between this case and the *privacy-related work* they have pledged to do with any *cy pres* awards they ultimately receive. Two of the organizations that Appellants challenge on this basis, the Center for Democracy and Technology, and the Rose Foundation, are discussed above. The record concerning the remaining challenged *cy pres* recipients similarly confirms that the district court did not abuse its discretion.

### a. ACLU of Northern California (Technology and Civil Liberties Program)

The court awarded the ACLU of Northern California's Technology and Civil Liberties Program $1.5 million.  This is the first dedicated ACLU legal program at a state affiliate to defend and promote privacy in the digital age.  The ACLU of Northern California committed to using *cy pres* funding to: continue work on important internet privacy cases and support new litigation and other legal strategies utilizing California state constitutional law (to which Google is subject) to better protect internet privacy; create more awareness and understanding about privacy issues; educate the public about how personal information is commonly collected, retained, used, and disclosed, and how people can better protect their internet privacy; and to educate businesses about internet privacy issues and safeguards that can be implemented to better protect privacy rights.  2-SER-91-100.

Appellants complain that the organization will use *cy pres* funds for privacy work that advances reproductive and LGBTQ rights and that some of its privacy work will emphasize implications for immigrant communities and people with fewer economic resources.  AOB 39.  Far from being divorced from class members' privacy interests, however, these are squarely among the concerns identified in the operative complaint in this action, which described the threat posed to class members' privacy by, for instance, the collection of location data "pings in mosques and churches, abortion clinics, queer spaces and other sensitive areas."  6-SER-1346.

### b.  Yale Law School Information Society Project

The court awarded Yale's Information Society Project ("ISP") $1.5 million.  ER-34.  The ISP is a community of interdisciplinary scholars exploring cutting-edge issues at the intersection of law, technology, and society.  The ISP proposes to support: (i) two research fellows per year who will focus on "privacy and related questions in the algorithmic society;" (ii) funding to support the "Tech Accountability Project," aimed at regulating digital platforms and their use of artificial intelligence, prediction products, data collection, and related technologies; and (iii) a clinical fellow for the project. 2-SER-361-364.

Appellants dispute that ISP meets the nexus requirements on the basis that, in addition to projects for which it sought funding, it also hosts the Program for the Study of Reproductive Justice.  AOB 40.  But the ISP's proposal does not include funding for that program.  2-SER-361.  Rather, ISP proposes to use its *cy pres* award to (i) support research fellows who will focus on privacy; and (ii) support the Tech Accountability Project which focuses on privacy issues in the context of regulation of social media companies and digital platforms.  2-SER-360.  The district court did not abuse its discretion in finding substantial nexus based on ISP's relevant work.

### c.  Center on Privacy & Technology at Georgetown Law

The court awarded the Center on Privacy & Technology at Georgetown Law ("Privacy Center") $1 million.  The Privacy Center requested *cy pres* funds (i) to support its digital privacy curriculum for middle and high school students; (ii) to expand its

fellowship program to improve the pipeline of public interest technology professionals; (iii) to support new research into the ways that bureaucracies which administer essential benefits and services require people to submit to digital surveillance; (iv) to produce guidance on algorithmic technologies for municipal policymakers, addressing the specific harms of location tracking; and (v) to support a new program regarding "Surveillance of Families." 2-SER-131-35.

Appellants make no specific argument concerning the Privacy Center on appeal, but in their Statement of the Case they mischaracterize a sentence from its proposal, in which it describes its commitment to "civil rights" in the context of "privacy, technology and surveillance," as "highly controversial." AOB 11; 2-SER-128. To the extent Appellants intended to raise an argument that the Privacy Center proposed to fund work that does not serve settlement class members' privacy interests, the argument is unsupported and waived.

### d.    Free Press

The court awarded Free Press $2 million. ER-34. Free Press has a strong track record of fighting for internet privacy, including authoring a model federal privacy policy that has been the foundation of many legislative and regulatory policy proposals. ER-219. Free Press requested $5 million to continue and expand its existing Democracy and Digital Civil Rights program aimed at protecting privacy and other civil rights online. Free Press seeks to use *cy pres* funds to produce research that informs

educational and policy interventions, launch public education campaigns, and pressure tech companies to stop using private data to target their users. 2-SER-214.

At the final approval hearing, the organization's CEO explained how Free Press "work[s] broadly on building an equitable media technology system and . . . for better online privacy protections." 1-SER-49. She also explained how the organization has advocated for regulations to limit Google and other tech companies from collecting and retaining user data." *Id.* Free Press has organized "a campaign against Google to push them to stop tracking the location data of people seeking health care services." *Id.*

Similar to Georgetown's Privacy Center, Appellants confine their complaints about Free Press's nexus to the settlement class to summarizing their objections, and make no specific argument on appeal. To the extent Appellants intend to raise arguments concerning Free Press on appeal, the cherry-picked lines they selected from the organization's proposal concerning its belief in the value of "racial justice" do not show that the district court abused its discretion where it considered all the evidence, including a record that the organization's mission and goals for this funding align with the settlement class and claims in this case. 2-SER-215; AOB 12 (selectively quoting same).

### e. UCLA Institute for Technology, Law & Policy

The district court awarded the UCLA Institute for Technology, Law & Policy ("ITLP") $1 million. ER-34. ITLP requested a larger sum to be spent over four years

to support two inter-related projects: (i) Proactive Privacy Enforcement, which involves developing new proactive enforcement models for privacy regulators; and (ii) Re-imagining Ethics for Computer Scientists, which involves establishing a new model of ethics and social responsibility for electrical and computer engineering and computer science education.  2-SER-354-57.

Appellants seemingly dispute that ITLP has a substantial nexus to the class based upon a reference to an injunction against UCLA (AOB 43), but they fail to tie that criticism to any of the privacy work that ITLP has committed to perform, let alone show that the district court abused its discretion in finding that this work lacks the requisite substantial nexus.  AOB 43.

### 4. The District Court's Finding that No *Cy Pres* Recipient Had a Disqualifying Conflict of Interest Was Supported by the Record

In their Statement of the Case, Appellants maintain that attorneys on both sides have attended "Harvard, Yale, Fordham, MIT, UCLA, and Georgetown"; have represented the Regents of the University of California, the governing body of UCLA; and have provided pro-bono services to and served as co-counsel with the ACLU and Electronic Frontier Foundation in the past.  AOB 12-13; *see also* ER-24 (addressing objectors' objections in this regard in Final Approval Order.  Appellants waived any continued objections to the Settlement on any such bases by failing to make any actual argument on these points in their Opening Brief.  *Maldonado*, 556 F.3d at 1048 n.4 ("Arguments made in passing and inadequately briefed are waived").

- 52 -

Substantively, however, the relationships that Appellants reference, which in some cases concern attorneys who work at the law firms at issue but did not work on this case, were fully disclosed to the lower court in advance of final approval, and did not require that court to disapprove the Settlement. 4-SER-463, 633-39, 930; 5-SER-957. The district court probed counsel about those relationships during the final approval hearing but understood that, given the number of attorneys associated with this case, there would inevitably be alma maters included among the *cy pres* recipients if major educational institutions (where much of the country's cutting-edge privacy work occurs) received awards. 1-SER-10-12.

The district court "independently reviewed all *cy pres* recipient proposals and found a substantial nexus between their proposed work and the Settlement Class," justifying the awards it made. ER-24. It found that the record "do[es] not raise substantial questions about whether any particular recipient was proposed based on the recipient's merits." *Id.*; *see also, e.g.*, *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (affirming approval of class settlement over objections by Mr. Frank, and reasoning that a district court does not "abuse its discretion when conflicts are trivial"; rather, an asserted conflict of interest must be "fundamental to the suit and . . . go to the heart of the litigation" to arguably support reversal). The district court's conclusion that, in light of all the evidence and discussion at the hearing, Appellants

"failed to show how counsel's relationships with the proposed *cy pres* recipients or Google's prior funding render the recipients improper," was sound. ER-24.

Nor is there any conflict or self-dealing. Both "[p]arties have also explicitly provided in the Settlement Agreement that they will not exercise control or influence over any recipient's expenditure of *cy pres* funds other than monitoring the recipients' reports to ensure compliance with the Settlement." *Id.* (citing 1-ER-21). And, as the court further observed, "the Ninth Circuit has affirmed *cy pres* provisions involving much closer relationships than those alleged here. *See, e.g.*, *Lane*, 696 F.3d at 817." ER-24. The court also acted within its discretion when it overruled Appellants' objections concerning "Google's prior funding of some recipient groups," based on its observations that "Google explicitly agreed in the Settlement Agreement that any *cy pres* distributions would be in addition to its ordinary charitable giving." ER-24-25 (citing Settlement Agreement ¶ 38). The court correctly noted that the Ninth Circuit rejected similar challenges to *cy pres* allocations in *Google Street View*, 21 F.4th at 1119.

Simply pointing to the parties' disclosures does not demonstrate that any relationship described therein renders the court's award to that organization improper. Appellants fall far short of the "strong showing" that would be required to demonstrate that the lower court "clearly abused its discretion" when it made the *cy pres* awards at issue, with the benefit of the parties' disclosures. *Hyundai*, 926 F.3d at 556.

### C.  The District Court Properly Exercised Its Article III Power

In their Opening Brief, Appellants advance a new argument not raised below,[3] that the district court's actions somehow exceeded its Article III jurisdiction.  AOB 3, 44.  Insofar as it is distinct from Appellants' central argument that *cy pres* distributions are inherently unlawful, this argument appears to be based on the premise that federal courts lack constitutional authority to distribute large awards of money damages.  *Id.*

There is no support for this position.  Appellants cite authority standing for the basic proposition that, "[t]o establish Article III redressability, the plaintiffs must show that the relief they seek is . . . within the district court's power to award."  *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020) (cited in AOB 44).  In *Juliana*, this Court "found that the plaintiffs could not satisfy the redressability element of standing because the relief sought—'a comprehensive scheme to decrease fossil fuel emissions and combat climate change'—was inconsistent with the limited remedial authority of federal courts siting in equity."  *Mecinas v. Hobbs*, 30 F.4th 890, 901 n.6 (9th Cir. 2022) (quoting *Juliana*, 947 F.3d at 1171-73).  There is no redressability concern here.

Federal courts commonly adjudicate disputes involving large sums of money damages and, under appropriate circumstances, commonly order the distribution of a

---

[3] In their Statement of Issues, Appellants assert that this argument was "Raised at 3-ER-400–401" and "decided at 1-ER-16."  A review of these portions of the record, however, fails to support the proposition that this constitutional argument was raised below.  Similarly, Appellants assert that they are preserving a "Rules Enabling Act" argument for further appeal, but no such argument was raised below.  AOB 48.

common fund to appropriate recipients. Distributing funds to *cy pres* recipients is no different. *See, e.g.*, *Six (6) Mexican Workers*, 904 F.2d at 1305.

Appellants' perplexing citation to Justice Thomas's concurring opinion in *Missouri v. Jenkins*, 515 U.S. 70 (1995) (cited in AOB 3, 45), which concerned a court's exercise of jurisdiction under a school desegregation order, has no bearing on a court's ability to administer a class action settlement that includes a *cy pres* component. The district court's approval of the settlement here did not arguably intrude on the power of "legislative or executive" branches "of state and local governments," as was Justice Thomas's concern in *Jenkins*. *Id.* at 131-33; AOB 45.

Simply put, Article III standing presents no obstacle to approval of this settlement.

### D.   The Court Should Not Order a Hearing *En Banc* to Overrule this Circuit's Law Regarding *Cy Pres* Distributions

While both Appellants and *Amici* State Attorneys General urge this Court to hear this matter *en banc*, there is no procedural basis to order such a hearing. As amended in 2024, FRAP 40(g) requires a party seeking an initial hearing *en banc* to file a petition "no later than the date when its principal brief is due." Fed. R. App. P. 40(g). Nor would there be any substantive basis for such an order, given that an "initial hearing *en banc* is not favored and ordinarily will not be ordered." *Id.*

Neither Appellants nor *Amici* have identified any split of authority in this Court's opinions concerning the issues at hand, nor have they demonstrated the existence of

- 56 -

"questions of exceptional importance" that might support a petition for rehearing *en banc*, much less an initial hearing. Fed. R. App. P. 40(b)(2). The district court's order does not threaten "dramatic effect[s] on public safety," "conflict with a Supreme Court decision," or otherwise raise a question of exceptional importance that might justify *en banc* treatment. *United States v. Cooley*, 947 F.3d 1215, 1216 (9th Cir. 2020). The request for *en banc* hearing, to the extent such a request is properly before the Court, should be denied.

## VII.  <u>CONCLUSION</u>

The district court in no way abused its discretion when it approved the Settlement. It carefully considered Appellants' objections, but correctly concluded that they were unpersuasive. The Final Approval Order and judgment below should be affirmed.


Dated: December 16, 2024

<u>/s/ Tina Wolfson</u>
Tina Wolfson
Theodore W. Maya
Bradley K. King
Henry J. Kelston
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
bking@ahdootwolfson.com
hkelston@ahdootwolfson.com

Michael W. Sobol
Melissa Gardner
Michael Levin-Gesundheit
Michael K. Sheen

- 57 -

Jallé H. Dafa
John D. Maher
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000
Facsimile: 415.956.1008
msobol@lchb.com
mgardner@lchb.com
mlevin@lchb.com
msheen@lchb.com
jdafa@lchb.com
jmaher@lchb.com

Nicholas Diamand
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
Facsimile: 212.355.9592
ndiamand@lchb.com

*Co-Lead Class Counsel for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**  | 24-3387 |

The undersigned attorney or self-represented party states the following:

(●) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

|  |
| --- |
|  |

**Signature** | s/ Tina Wolfson |   **Date** | Dec 16, 2024 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                                 *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-3387

I am the attorney or self-represented party.

**This brief contains** | 13,701 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Tina Wolfson | **Date** | 12/16/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**        *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 24-3387

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Plaintiffs-Appellees' Answering Brief

**Signature** | s/ Tina Wolfson | **Date** | Dec 16, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15** | *Rev. 12/01/2018*