No. 24–3387

# In the United States Court of Appeals for the Ninth Circuit

---

*In re:* GOOGLE LOCATION HISTORY LITIGATION

NAPOLEON PATACSIL, *et al.*,

*Plaintiffs-Appellees,*

JOHN ANDREN, *et al.*,

*Objectors-Appellants*,

v.

GOOGLE LLC, *et al.*,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Northern District of California
Case No. 5:18–cv–5062-EJD
Hon. Edward J. Davila, Judge

---

## APPELLEE GOOGLE LLC'S ANSWERING BRIEF

---

KEKER, VAN NEST & PETERS LLP

BENJAMIN BERKOWITZ
THOMAS E. GORMAN
NICHOLAS D. MARAIS
IAN KANIG
633 Battery Street
San Francisco, California 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Counsel for Defendant-Appellee GOOGLE LLC

2788638

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, defendant-appellee Google LLC discloses that it is a subsidiary of XXVI Holdings Inc., which in turn is a subsidiary of Alphabet Inc., which is a publicly traded company. No publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Dated: December 16, 2024

/s/ Benjamin Berkowitz
BENJAMIN BERKOWITZ

2788638

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT...........................................i

INTRODUCTION ................................................................... 1

ISSUE PRESENTED FOR REVIEW .......................................6

STATEMENT OF THE CASE .................................................7

    A.    The district court dismissed the initial consolidated complaint against Google for failing to state a claim..........7

    B.    The district court allowed the amended consolidated complaint to proceed in part, but fatal flaws lurked..........10

    C.    After 26 months of intense discovery, and nearly 18 months of negotiations, the parties settled..........................12

    D.    The settlement includes injunctive relief and a $62 million settlement fund that distributes *cy pres* relief to organizations that promote internet privacy........13

    E.    The district court carefully scrutinized the parties' settlement and then granted preliminary approval............16

    F.    The district court held a final fairness hearing and approved the settlement over appellants' objections, which were the only objections filed.....................................18

STANDARD OF REVIEW.......................................................21

SUMMARY OF ARGUMENT ................................................22

ARGUMENT .........................................................................29

I.    The district court did not abuse its discretion in approving the parties' settlement as fair, reasonable, and adequate. ..........29

    A.    The district court applied the correct framework for evaluating the parties' settlement under Rule 23(e)(2). .....29

1.    The district court considered each applicable
      Rule 23(e)(2) factor in approving the settlement. ...... 30

2.    The district court did not improperly apply a
      presumption that the settlement was valid. ............. 33

B.    The district court properly approved *cy pres* relief ............. 38

1.    Rule 23(e)(2) does not silently prohibit *cy pres*
      provisions in class action settlement agreements ...... 39

2.    The district court correctly determined that *cy
      pres* relief is proper here because the settlement
      fund cannot be feasibly distributed to the class ......... 45

3.    The *cy pres* recipients were correctly approved .......... 52

4.    District courts are authorized to approve,
      allocate, and supervise *cy pres* distributions ............. 61

II.   Appellants' request for hearing *en banc* is procedurally
      improper and fails to preserve their unraised arguments ......... 65

CONCLUSION ....................................................................... 67

2788638

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Apple Inc. Device Performance Litig.,*
50 F.4th 769 (9th Cir. 2022) .......................................................... 30, 38

*Atchison, Topeka & Santa Fe Ry. Co. v. Hercules Inc.,*
146 F.3d 1071 (9th Cir. 1998) ................................................................ 44

*In re BankAmerica Corp. Sec. Litig.,*
775 F.3d 1060 (8th Cir. 2015) ................................................................ 42

*In re Bluetooth Headset Prod. Liab. Litig.,*
654 F.3d 935 (9th Cir. 2011) .......................................................... 24, 35

*Briseno v. ConAgra Foods, Inc.,*
844 F.3d 1121 (9th Cir. 2017) ....................................................... 46, 47

*Briseño v. Henderson,*
998 F.3d 1014 (9th Cir. 2021) ........................................... 25, 34, 37, 38

*Churchill Vill., L.L.C. v. Gen. Elec.,*
361 F.3d 566 (9th Cir. 2004) ...................................................... *passim*

*In re Compact Disc Minim. Advertised Price Antitrust Litig.,*
236 F.R.D. 48 (D. Me. 2006) ................................................................ 64

*Crawford v. Honig,*
37 F.3d 485 (9th Cir. 1994) .................................................................. 44

*Dennis v. Kellogg Co.,*
697 F.3d 858 (9th Cir. 2012) ................................................................ 54

*In re Easysaver Rewards Litig.,*
906 F.3d 747 (9th Cir. 2018) ...................................................... *passim*

*Fraley v. Batman,*
638 F. App'x 594 (9th Cir. 2016) ......................................................... 58

iv

2788638

*Fraley v. Facebook, Inc.,*
  966 F. Supp. 2d 939 (N.D. Cal. 2013)...........................................47, 48

*In re Agent Orange Prod. Liab. Litig.,*
  818 F.2d 179 (2d Cir. 1987) ...............................................................63

*In re Google Inc. Cookie Placement Consumer Priv. Litig.,*
  934 F.3d 316 (3d Cir. 2019) .........................................................41, 43

*In re Google Inc. St. View Elec. Commc'ns Litig.,*
  21 F.4th 1102 (9th Cir. 2021) ...................................................*passim*

*In re Google LLC St. View Elec. Commc'ns Litig.,*
  611 F. Supp. 3d 872 (N.D. Cal. 2020)...........................................50, 51

*In re Google Referrer Header Priv. Litig.,*
  869 F.3d 737 (9th Cir. 2017).....................................................*passim*

*Greenwood v. F.A.A.,*
  28 F.3d 971 (9th Cir. 1994).........................................................29, 66

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998).........................................................22

*Hooks for & on Behalf of Nat'l Lab. Rels. Bd. v. Nexstar
  Broad., Inc.,*
  54 F.4th 1101 (9th Cir. 2022) ........................................................36

*Hughes v. Kore of Ind. Enter., Inc.,*
  731 F.3d 672 (7th Cir. 2013)..............................................................41

*Hyland v. Navient Corp.,*
  48 F.4th 110 (2d Cir. 2022).........................................................41, 43

*Keepseagle v. Perdue,*
  856 F.3d 1039 (D.C. Cir. 2017) .......................................................64

*Klier v. Elf Atochem N.A., Inc.,*
  658 F.3d 468 (5th Cir. 2011).......................................................41, 42

*Koby v. ARS Nat'l Servs.*, Inc.,
  846 F.3d 1071 (9th Cir. 2017) 54........................................................54

v

*Kode v. Carlson*, 596 F.3d 608
    612 (9th Cir. 2010) ................................................................ 52

*Lacey v. Maricopa Cty.*,
    693 F.3d 896 (9th Cir. 2012) .............................................. 1

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ..................................... *passim*

*Lewis v. Casey*,
    518 U.S. 343 (1996) ............................................................ 62

*Lowery v. Joffe*,
    143 S. Ct. 107 (2022) ................................................... 2, 45

*In re Lupron Mktg. & Sales Pracs. Litig.*,
    677 F.3d 21 (1st Cir. 2012) ................................................ 41

*Maldonado v. Morales*,
    556 F.3d 1037 (9th Cir. 2009) .................................... 29, 66

*Marshall v. Nat'l Football League*,
    787 F.3d 502 (8th Cir. 2015) .............................................. 41

*McKinney-Drobnis v. Oreshack*,
    16 F.4th 594 (9th Cir. 2021) .............................................. 31

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
    872 F.3d 1094 (10th Cir. 2017) .......................................... 42

*Nachshin v. AOL, Inc.*,
    663 F.3d 1034 (9th Cir. 2011) .................................... *passim*

*In re Netflix Priv. Litig.*,
    2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ................ 48, 58

*In re O'Brien*,
    312 F.3d 1135 (9th Cir. 2002) .......................................... 66

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) .............................................. 42

vi

*Perkins v. Am. Nat'l Ins. Co.*,
  2012 WL 2839788 (M.D. Ga. Jul. 10, 2012) ....................................... 64

*Poertner v. Gillette Co.*,
  618 F. App'x 624 (11th Cir. 2015) ...................................................... 42

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
  944 F.3d 1035 (9th Cir. 2019) ............................................................. 34

*Saucillo v. Peck*,
  25 F.4th 1118 (9th Cir. 2022) .............................................................. 65

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990) ..................................................... *passim*

*Torres v. Oakland Scavenger Co.*,
  487 U.S. 312 (1988) ............................................................................. 33

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................................. 62

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ........................................................................ 62

**State Cases**

*Hill v. Nat'l Collegiate Athletic Ass'n*,
  7 Cal. 4th 1 (1994) .............................................................................. 55

**Rules**

Cir. R. 29–2(a) ........................................................................................ 66

Fed. R. App. P. 28(a)(8) ........................................................................ 66

Fed. R. App. P. 35(c) ..................................................................... 28, 65

Fed. R. Civ. P. 23(e) ...................................................................... *passim*

2788638

**Other Authorities**

4 Newberg and Rubenstein on Class Actions § 13:45
(6th ed. 2024)........................................................................... 34

Wright, Miller & Kane, 7B Fed. Prac. & Proc. Civ. § 1797.5
(3d ed. Nov. 2024 update) ...................................................... 63

2788638

# INTRODUCTION

Appellants are three objectors to a class action settlement that resolved more than five years of hard-fought litigation over claims that Google invaded the privacy of certain Google users by storing their location data.[1]  The settlement was mediated over eighteen months by both a leading practitioner of complex dispute resolution and the Chief Magistrate Judge of the Northern District of California.  The final result: (1) injunctive relief limiting Google's location data practices; and (2) $62 million in non-reversionary *cy pres* relief that will promote data privacy online by funding 21 non-profit organizations in the field.  The settlement left any award of attorneys' fees and costs, which would come out of that fund, to be decided separately by the district court.[2]

By any objective metric, and as the district court found after a

---

[1] Google LLC's parents XXVI Holdings Inc. and Alphabet Inc. are listed on the docket as parties to this appeal, but Plaintiffs omitted them from the operative complaint when it was filed in July 2020.  6-SER-1254.  They are thus no longer parties.  *Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012) (claims not realleged are voluntarily dismissed).

[2] Google took no position in the parties' settlement agreement—and takes no position here—on the propriety of attorneys' fees and costs.  1-ER-7.  This Court's review of the district court's settlement approval order is thus separate from review of its award of those fees and costs.  *In re Easysaver Rewards Litig.*, 906 F.3d 747, 762–63 (9th Cir. 2018).

careful and thorough review, this settlement is fair, reasonable, and adequate. 1-ER-4–34. The district court did not abuse its discretion in finding that it is an appropriate compromise of Plaintiffs' claims. *See In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1110 (9th Cir. 2021) (class action settlement approval orders are evaluated for abuse of discretion, such that this Court "will affirm if the district judge applies the proper legal standard and his findings of fact are not clearly erroneous"), *cert. denied sub nom. Lowery v. Joffe*, 143 S. Ct. 107 (2022).

Appellants disagree. Unlike many objectors, however, they do not claim that the amount of the settlement fund is insufficient. Nor do they meaningfully contend, beyond some passing criticisms in their statement of the case, that the settlement's injunctive-relief terms do not provide direct and substantial consumer value to the class. Instead, the crux of appellants' objection is that its *cy pres* provision is improper. They challenge the validity of *cy pres* relief in general and in this case, and they take issue with both the particular recipients that the district court approved and how the court approved them. Appellants believe it is better to distribute a pittance in monetary relief to class members than it is to fund organizations to promote the class's interests.

2

These are arguments that appellants' counsel has advanced to this Court on behalf of different objectors in several cases over recent years. In that regard, their counsel has been serially unsuccessful. "The Ninth Circuit has expressly rejected nearly all of [their counsel's] arguments regarding *cy pres* settlements." 1-ER-20 (citing *Google St. View*, 21 F.4th at 1113); *see also In re Google Referrer Header Priv. Litig.*, 869 F.3d 737, 741–43 (9th Cir. 2017) (similarly rejecting counsel's argument that *cy pres* relief is invalid), *vacated and remanded on other grounds by Frank v. Gaos*, 586 U.S. 485 (2019); *Easysaver Rewards*, 906 F.3d at 761 (same); *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (same). It is now well-established that *cy pres* relief is "appropriate where the settlement fund is 'non-distributable' because 'the proof of individual claims would be burdensome or distribution of damages costly.'" *Google St. View*, 21 F.4th at 1112–13 (quoting *Google Referrer Header*, 869 F.3d at 741). So long as the *cy pres* recipients bear a "substantial nexus" with the lawsuit, the policy objectives of its underlying claims, and the legal interest of the class, they are proper. *Lane*, 696 F.3d at 821.

Here, the settlement undoubtedly meets this standard. Direct disbursement of the settlement fund—even without providing for ***any***

attorneys' fees or costs—would pay out about twenty-five cents to each of the estimated 247.7 million class members. 1-ER-15. Even if it were desirable to distribute this *de minimis* relief, the cost of doing so would be "exorbitant." *Id.* And even if it were not prohibitively expensive to do so, it is not practically feasible to determine or verify who is a member of the class. 1-ER-20–21. This evidence was uncontested in the district court, and it remains so here. The district court did not clearly err in finding the settlement fund to be "non-distributable." *See* 1-ER-14–16, 19–21 (citing *Google St. View*, 21 F.4th at 1114); *Google Referrer Header*, 869 F.3d at 742; *Lane*, 696 F.3d at 819). Accordingly, *cy pres* relief—the "next best" relief possible—is proper.

Faced with this precedent and these uncontested facts, appellants claim that Federal Rule of Civil Procedure 23(e)(2), as amended in 2018, changed the law and now silently prohibits *cy pres* relief. But Rule 23(e)(2) says no such thing, and appellants' counsel cite no authorities that have adopted this unsupported interpretation. In fact, no such authorities exist. Appellants' theory defies the rule's text and the advisory committee's notes. Indeed, their theory would logically also prohibit all non-monetary class action settlements, a result so absurd

4

that it must be rejected. Appellants offer a laundry list of "public policy" concerns, but none are problems that are present in this case.

Unable to establish that the settlement's *cy pres* relief is invalid, appellants claim that the district court misapplied the legal standard for evaluating a class action settlement. These arguments—also largely predicated on the 2018 amendment to Rule 23(e)(2)—are meritless. Not only did the district court apply the correct legal standard, the district court performed an exemplary settlement approval analysis. 1-ER-8–9 (setting out the relevant settlement approval factors and "heightened fairness inquiry" required for a pre-certification settlement) (discussing *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)).

What is left is appellants' complaint that they find the particular *cy pres* recipients the court approved to be personally objectionable. But these subjective concerns do not supply the standard. Each approved *cy pres* recipient is obligated to use the settlement funds allocated to them to promote online data privacy, and they submitted specific proposals detailing how they would do so. 2-SER-69–365. This provides the "substantial nexus" that the law requires. *See Lane*, 696 F.3d at 821. What's more, the *cy pres* recipients are subject to ongoing supervision to

5

ensure that they spend the funds in compliance with the court's final approval order. 1-ER-25. Appellants try to turn that into an "Article III" issue, AOB 19, but that objection is a baseless misnomer. This Court has long held that supervising a *cy pres* distribution is not only permissible, in some cases it is required. *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308–09 (9th Cir. 1990).

At bottom, what appellants and Google agree on is that federal district courts, when approving, allocating, and administering *cy pres* relief, should not and need not make political decisions. That is why this Court focuses on objective criteria that leave policy judgments to the deliberative bodies that enact the laws that plaintiffs enforce.

The district court did not abuse its discretion in approving the parties' class action settlement—including its *cy pres* provision—as a fair, reasonable, and adequate compromise. This Court should affirm.

## ISSUE PRESENTED FOR REVIEW

Whether the district court abused its discretion in approving the parties' class action settlement—including its *cy pres* provision for the promotion of online data privacy—as fair, reasonable, and adequate.

2788638

## STATEMENT OF THE CASE

To understand why the district court did not abuse its discretion in approving the parties' class action settlement, including its *cy pres* provision, it is helpful to understand Plaintiffs' privacy claims, their weaknesses, and the risk of prolonged litigation they still posed. In reviewing this history, the record makes clear why a *cy pres* provision was the only way for Plaintiffs to secure any monetary relief at all. And it confirms that the district court performed an exemplary analysis of the settlement and thoughtfully rejected appellants' flawed objections.

### A. The district court dismissed the initial consolidated complaint against Google for failing to state a claim.

This consolidated action began as several separate actions filed in the United States District Court for the Northern District of California. *Patacsil v. Google LLC*, filed on August 17, 2018, was the first of these actions. *See* 7-SER-1560–86. At its core, *Patacsil* alleged that Google had incorrectly suggested it was not tracking the locations of mobile devices using a Google service, such as Google Maps or Google Search, when the "Location History" setting was not enabled. 7-SER-1561–62. On that basis, *Patacsil* asserted claims under California's Invasion of Privacy Act ("CIPA"), constitution, and common law. 7-SER-1572–76.

Google moved to dismiss *Patacsil* with prejudice for failing to state a claim on October 22, 2018.  Dkt. No. 32.  Google highlighted several defects in the complaint, including: (1) Plaintiff had agreed to allow Google to "collect information about your location when you use our services"; and (2) his CIPA claim could not apply to Google's software because he could not allege any "electronic tracking device" "attached to a moveable thing," like a GPS-tracking device on a car.  *Id.* at 10–18.

In view of these critical flaws, and rather than oppose Google's motion, Plaintiff voluntarily amended his complaint, and added co-plaintiffs.  *See* 7-SER-1516–26.  Realizing that Google users had in fact consented to location tracking while using Google's services, Plaintiffs' amended complaint changed tack and focused its amended allegations on the theory that Google never said it might ***store*** that data.  *Id.*

In that same period, five similar actions were filed against Google in the same District.  All were consolidated with *Patacsil*.  Dkt. No. 51.  A consolidated complaint was filed in April 2019 that closely tracked the allegations in the amended *Patacsil* complaint.  6-SER-1456–1509.

Google moved to dismiss that complaint on May 28, 2019, and the district court dismissed the action with leave to amend.  6-SER-1437.  It

determined that there was a serious question about whether Plaintiffs "consented to a Privacy Policy 'authorizing the very conduct they complain of,'" thus precluding their claims. 6-SER-1444 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). But resolution of this dispositive issue would be delayed; "[t]his is an issue for the jury." *Id.*

Even so, the complaint still did not state a claim against Google. While the district court did not find it proper to dismiss the entire case on consent grounds, "[i]t is clear that . . . [Plaintiffs] did consent to *some* type of geolocation tracking" given that "consent to geolocation tracking is corollary to the use of a Google service, like Google Maps." 6-SER-1452 (emphasis in original). And they had not alleged facts establishing that Google was continuously and comprehensively tracking and storing their location outside the scope of that consent, as they had conclusorily claimed. 6-SER-1453–55. To the contrary, that claim was "undercut by the[ir] admission that [Google] only tracked and collected data during use of Google services." 6-SER-1453. Even then, it was still "entirely speculative what data [Google] collected." 6-SER-1454. Thus, the court dismissed Plaintiffs' constitutional and common law privacy claims for failing to allege that Google had violated a protected privacy interest,

2788638

but with leave to amend. 6-SER-1455. The court also dismissed their CIPA claim with prejudice because software is not an "electronic tracking device" that falls under the statute. 6-SER-1444–50.

Though Plaintiffs had leave to amend, they instead asked the district court to certify its order for interlocutory appeal. 6-SER-1357–73. That motion laid Plaintiffs' cards out on the table: the district court, by finding that they had failed to allege "comprehensive and continuous tracking" and by extinguishing their CIPA claim as a matter of law, had left their action—as they themselves put it—"drastically impaired" and "drastically lame." 6-SER-1363. The motion was denied. Dkt. No. 126. So, too, was their motion for reconsideration. Dkt. Nos. 129 & 130.

## B.  The district court allowed the amended consolidated complaint to proceed in part, but fatal flaws lurked.

Plaintiffs filed an amended consolidated complaint on July 6, 2020, the fourth complaint filed by Plaintiff Patacsil to that point. 6-SER-1241. This time, in addition to repleading their constitutional and common law invasion-of-privacy claims, they asserted a claim for unjust enrichment or, alternatively, for breach of contract. 6-SER-1301–05.

Google moved to dismiss that amended complaint on August 31, 2020, for again failing to state a claim. The district court agreed that

Plaintiffs could not state a breach-of-contract claim, because they could identify no contractual promise that was breached. 5-SER-1229–30. But the court permitted their non-statutory invasion-of-privacy claims to proceed because they now "include[d] factual allegations sufficient to allege that Google does continuously track users[.]" 5-SER-1219–27. Google disagreed that there were well-pleaded allegations of continuous or comprehensive tracking, but the court found that this was "an inherently factual argument" that could not be resolved at the pleading stage. 5-SER-1223. The court also let Plaintiffs proceed on their claim for unjust enrichment by construing it as a quasi-contract claim for the supposed benefit that Google received when it allegedly collected and stored comprehensive location data without Plaintiffs' consent. 5-SER-1227–29. But that, too, meant Plaintiffs would ultimately need to prove that Google had comprehensively and continuously tracked them. *Id.*

Thus, while the district court let Plaintiffs' amended consolidated complaint proceed in part, it left unresolved a core question: whether Google was in fact comprehensively and continuously tracking mobile Google users, or whether this allegation was smoke and mirrors.

11

2788638

### C. After 26 months of intense discovery, and nearly 18 months of negotiations, the parties settled.

Overlapping with this motion to dismiss briefing, and for a total of twenty-six months, the parties conducted contentious discovery. The parties propounded and responded to written discovery, extensively met and conferred, and engaged in discovery motion practice. 5-SER-971–73. The magistrate judge held frequent discovery conferences and hearings, requiring the parties to appear for weekly and then biweekly status conferences to resolve a litany of contentious disputes. *Id.*

In February 2022, the parties requested and received a stay of discovery to facilitate mediation. 5-SER-973. They first attended mediation before Eric Green, a leading mediator of complex disputes. *Id.* Over the course of three months and three mediation sessions with Mr. Green, the parties reached an agreement on the general terms of a settlement that came in the form of a mediator's proposal. *Id.* But after six months of further negotiation, the parties were unable to agree on certain terms that were necessary to finalize the agreement. *Id.*

At this point, the district court referred the parties to then-Chief Magistrate Judge Joseph C. Spero for a settlement conference. *Id.* The parties met with Judge Spero in January 2023, although they still were

not able to bridge the gaps. *Id.* As a result, litigation resumed. *Id.*

But the parties continued to aggressively negotiate the terms of their settlement, with debates about appropriate injunctive-relief terms running for months. 5-SER-974. The parties exchanged proposals, counterproposals, and numerous drafts of the agreement in consultation with experts. *Id.* Ultimately, in August 2023, nearly eighteen months after starting mediation, the parties signed a settlement agreement. *Id.* As with nearly all settlements, this settlement was a compromise of disputed positions, and Google continued to deny all liability. *Id.*

### D. The settlement includes injunctive relief and a $62 million settlement fund that distributes *cy pres* relief to organizations that promote internet privacy.

The settlement agreement proposed a settlement class of "all natural persons residing in the United States who used one or more mobile devices and whose Location Information was stored by Google while 'Location History' was disabled at any time during the Class Period (January 1, 2014 through the Notice Date)." 5-SER-989. Plaintiffs estimated this included 247.7 million people. 5-SER-975.

The settlement includes two core forms of substantive relief for the class. ***First,*** the parties agreed to a lengthy set of injunctive relief

terms limiting Google's location privacy practices. To begin, Google would confirm that it had removed from its website (and from any app and settings that Google controlled) the statement that "[w]ith Location History off, the places you go are no longer stored," a disclosure at the core of Plaintiffs' case. 5-SER-1103. Google further agreed to keep in place a new privacy policy whereby (a) location information stored vis-à-vis the Location History setting (and another location-related setting) is automatically deleted by default after a period of no more than 18 months when users opt into these settings for the first time and (b) users can set their own shorter auto-delete periods starting at a period of three months (to the extent that users wanted these location settings to be enabled at all). *Id.* Google would also confirm that it does not share users' precise location information collected by those location settings with third parties (except for valid legal reasons or user-initiated actions). 5-SER-1106. Google would provide all users who had these settings enabled with information about how they worked, how to disable them, how to delete any data they had collected, and how to set future data retention limits. 5-SER-1104. Google would publish a "Location Technologies Page" to provide useful information about

14

Google's location practices.  *Id.*  Google would not make any attempts to re-identify location data collected before or during the class period with users without their consent (or for a valid law enforcement purpose).  5-SER-1105.  And finally, Google would include a link to the Location Technologies Page in its annual "Privacy Check-Up" email that it sends to users to confirm their privacy choices, as well as on certain other Google pages concerning location.  5-SER-1106.[3]

**Second,** Google would pay $62 million—less any attorneys' fees and costs, incentive awards, and settlement administration costs—into a non-reversionary settlement fund that would be distributed to one or more *cy pres* recipients approved by the district court.  5-SER-975–78.[4] The settlement specified that the *cy pres* recipients must be non-profit organizations that are approved by the district court after submitting specific funding proposals for promoting online data privacy.  *Id.*

---

[3] As appellants note, this injunctive relief was negotiated in parallel with Google's settlement of similar location history tracking claims by certain state attorneys general.  AOB 14.  But, as the district court held in its approval order, the parties' injunctive-relief terms went beyond the government settlements in several important respects.  1-ER-31.

[4] The parties did not agree that any attorneys' fees and costs were appropriate, and the settlement expressly left any provision for those fees and costs to the separate discretion of the district court.  1-ER-7.

15

**E.    The district court carefully scrutinized the parties' settlement and then granted preliminary approval.**

Five years into the case, Plaintiffs moved for preliminary approval of the parties' settlement.  Dkt. No. 327.  Plaintiffs explained how the injunctive-relief terms were meant to ensure that, in their view, Google was no longer engaged in the unlawful conduct they alleged, while also giving its users greater control over their location data.  *Id.* at 1, 8, 13. This relief provided direct and substantial benefits to the class.  *Id.*

Plaintiffs also explained that *cy pres* relief was the best outcome for monetary relief in this case.  Put simply, paying $62 million to 247.7 million people would result in *de minimis* payments, *id.* at 11–15, and it was uncertain whether further litigation could result in a larger class judgment (or ***any*** favorable judgment at all), given the law and what Plaintiffs had learned about their case in discovery, 5-SER-980.

Further, identifying the class was practically infeasible.  5-SER-961–68.  Among other things, Google had no practically feasible way to determine the identities of all Google users who had the Location History setting disabled and had location data collected.  *Id.*

Accordingly, the parties evaluated and proposed 17 non-profit organizations for the district court to consider as *cy pres* recipients of

16

the settlement fund. 4-SER-685–929. These organizations included well-known institutions with track records in public interest litigation, advocacy, research, and education regarding online data privacy, the core issue in this case. *Id.* After the parties' settlement was publicly announced, four more organizations stepped forward to submit their own proposals to the district court for consideration. *See* 2-SER-72–73.

Each of these organizations submitted a proposal detailing how they would use any settlement funds allocated to them. 2-ER-89–3-ER-372. If approved, each would also be required to file with the district court a biannual report detailing how any funds had been spent during that period and how any remaining funds would be used. 5-SER-992.

The district court held a hearing on October 26, 2023. 4-SER-652–680. It found that the case had been "hard fought" and the settlement was fair, reasonable, and adequate. 4-SER-677. In particular, it found that "one of the great values of the [settlement] is injunctive relief, which is significant," given that Google had agreed to implement limits on its data practices that were "a good benefit for the class." *Id.*

Further, the court found that "[t]he *cy pres* settlement seems to be the appropriate method of settlement in this case, given the size of the

17

class and the . . . cash funds available. Distribution to that size of class would be impossible and meaningless." *Id.*

On November 7, 2023, the court entered its preliminary approval order, setting out these findings and ordering class notice. 3-SER-640–50.

## F. The district court held a final fairness hearing and approved the settlement over appellants' objections, which were the only objections filed.

After class notice was complete, Plaintiffs moved for final settlement approval on March 25, 2024. Dkt. No. 356. Although federal and state governmental officials were notified pursuant to the Class Action Fairness Act ("CAFA"), none objected or appeared. 1-ER-17–18.[5] And out of the estimated 247.7 million class members, only nine people opted out and only three—appellants—objected. 1-ER-18.

Appellants' objection centered exclusively around the proposed *cy pres* relief. They claimed that: (1) the settlement violated Rule 23(e)(2) because it did not distribute monetary relief to the class; (2) it violated

---

[5] The state attorneys general who have filed an amicus brief in support of appellants did not object to the settlement, despite receiving CAFA notice during the preliminary approval process. *See* 5-SER-946–956.

their First Amendment free speech rights by compelling them to give the proceeds of their claims to organizations that they disapproved of; and (3) the *cy pres* recipients had improper "ties" to counsel and Google. 3-ER-395–400. Alternatively, appellants argued that if there is in fact no practicable manner to distribute monetary relief to the class, then certification of a class for settlement is necessarily improper under Rule 23. 3-ER-401–03. In supplemental objections, appellants also claimed that the *cy pres* recipients were inappropriate because they purportedly hold views that appellants disagree with (which were largely unrelated to the data-privacy programs that the award would fund). 1-ER-52–60.

The district court held a final fairness hearing on April 18, 2024. Dkt. No. 360. Appellants argued that district courts have approved class action settlements that distributed even less money *pro rata* to the class, and thus the settlement here, too, is distributable. 1-SER-28. But they did not contest the settlement administrator's declaration averring that distribution to the class would be prohibitively expensive. *See* 1-SER-28–45. Nor did they contest Google's declaration averring that it was practically infeasible to identify the estimated 247.7 million class members. *See id.* Instead, appellants claimed without evidence

that class members could self-identify, and that the number of claims would be tiny. 1-SER-29–30. Plaintiffs responded that even if only 7% of the class submitted a claim, they would still receive only $2, while the remaining 93% would receive no benefit from the fund at all. 1-SER-17–19. Appellants submitted that would be best. 3-ER-390.

The district court granted final approval to the parties' settlement in a detailed, 31-page written order on May 3, 2024. 1-ER-4–34. Viewing the parties' settlement through the lens of Rule 23(e)(2), and applying a "heightened fairness inquiry" that found no signs of collusion whatsoever, the court determined that the parties' settlement is a fair, reasonable, and adequate compromise of Plaintiff's claims. 1-ER-8–9.

In particular, the district court concluded that Plaintiffs faced "significant hurdles" on the merits, including the fact that "Google may prevail at summary judgment by establishing it did not continuously and comprehensively track class members," or that "Google may prevail at class certification" given individualized issues of consent, and that even if Plaintiffs overcame both of those hurdles, there was still "no guarantee of a substantial damages award." 1-ER-12–13. Further, "the amount of the agreed-upon settlement and the injunctive relief provides

meaningful benefits to the Settlement Class and compares favorably to that of other similar class actions." 1-ER-13–14 (collecting cases).

Finally, the district court carefully considered and rejected appellants' objections to the *cy pres* distribution of the settlement fund. The court found that an individual claims process would result in a *de minimis* recovery of less than twenty-five cents per class member that did not justify the "exorbitant" estimated cost of that claims process. 1-ER-14. The court also found that the proposed *cy pres* recipients and their proposals for using the settlements funds "bear[] a substantial nexus to the interests of the Settlement Class Members in the specific areas of data privacy that were raised in this case." 1-ER-16. And in accordance with this Court's precedent, the district court agreed to exercise continuing oversight over the *cy pres* recipients by receiving semiannual reports detailing how they had spent the funds. 1-ER-6.

Appellants now appeal that final approval order and judgment. Certain state attorneys general have filed an amicus brief in support.

## STANDARD OF REVIEW

This Court's "review of the district court's decision to approve a class action settlement is extremely limited." *Hanlon v. Chrysler Corp.*,

150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). This Court will "set aside that determination only upon a strong showing that the district court's decision was a clear abuse of discretion." *Lane*, 696 F.3d at 818 (marks omitted). In other words, this Court "will affirm if the district judge applies the proper legal standard and his findings of fact are not clearly erroneous." *Google St. View*, 21 F.4th at 1110. This standard applies with full force to "a proposed *cy pres* settlement distribution." *Id.* (citing *Nachshin v. AOL, Inc.*, 663 F.3d 1034, 1038 (9th Cir. 2011)).

## SUMMARY OF ARGUMENT

Appellants challenge the district court's final approval of the parties' class action settlement as an abuse of discretion. In doing so, however, they do not contest the district court's determination that the $62 million in monetary relief that Plaintiffs secured is an appropriate amount to compromise their claims against Google. Nor do they claim, apart from some passing criticisms in their statement of the case, that the district court clearly erred in finding the settlement's injunctive relief provides direct and substantial consumer value to the class.

Nor could they. The amount of monetary relief and the injunctive

relief provide a fair, reasonable, and adequate compromise. After over five years of heavily contested litigation, including multiple motions to dismiss that left Plaintiffs with difficult-to-prove claims that were also likely uncertifiable, this settlement is a successful outcome for the class.

Instead, appellants challenge the *cy pres* relief approved by the district court, as their counsel has done in many other cases. At a high level, they contend that: (1) the district court failed to apply the correct standard for evaluating a class action settlement that includes *cy pres* relief; (2) even under the correct standard, the district court abused its discretion in approving *cy pres* relief because it is improper as a matter of law and, in any case, is improper here; (3) even if *cy pres* relief is proper, the district court abused its discretion in approving ***these*** *cy pres* recipients; and (4) the district court exceeded its "Article III power" by agreeing to approve, allocate, and supervise the *cy pres* distribution.

These arguments defy this Court's well-established precedent and, notably, are unsupported in appellants' brief by any authority at all.

***First,*** the district court applied the correct legal standard for evaluating a class action settlement reached before class certification. It considered each of the applicable settlement approval factors set forth

23

in Federal Rule of Civil Procedure 23(e)(2) and conducted a heightened fairness inquiry to look for any "subtle signs" of collusion that raise the risk of unfairness to absent class members. 1-ER-8–19 (discussing Fed. R. Civ. P. 23(e)(2) and *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011)). Appellants' claim that the district court improperly failed to consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," pursuant to Rule 23(e)(2) is wrong. *See* AOB 24–25. There was no "method of distributing relief to the class" requiring a "method of processing class-member claims" for the district court to evaluate because the settlement provides injunctive and *cy pres* relief. In any case, the district court considered—at length—whether any distribution to the class was practically feasible. 1-ER-14–16, 17–22.

For much the same reasons, appellants are also incorrect that the district court applied an improper presumption of settlement validity. *See* AOB 34–36. To make this claim, they point to the district court's finding that the class's overwhelmingly positive reaction to the proposed settlement—only nine opt outs and their own three objections out of an estimated class of 247.7 million—raised a strong presumption that the

settlement terms were favorable to the class. *See* 1-ER-18. This was not error. This Court instructs district courts to consider absent class members' reaction as one of several factors that they should review in order to ensure that a proposed settlement is fair, reasonable, and adequate. *Churchill,* 361 F.3d at 577. All that the district court did here was conclude that this particular *Churchill* factor was presumptively satisfied by the evidence in the record, subject to any rebuttal showing. *See Briseño v. Henderson*, 998 F.3d 1014, 1030 (9th Cir. 2021) (rejecting a similar challenge from appellants' counsel).

**Second,** the district court did not abuse its broad discretion in approving the settlement's *cy pres* provision. As a general matter, it is well established that *cy pres* relief is "appropriate where the settlement fund is 'non-distributable' because 'the proof of individual claims would be burdensome or distribution of damages costly.'" *Google St. View*, 21 F.4th at 1112 (quoting *Google Referrer Header*, 869 F.3d at 741). Appellants' claim that this precedent is no longer good law because Rule 23(e)(2), as amended in 2018, now silently prohibits *cy pres* relief is baseless. Not only does *Google Street View* postdate that amendment, this novel interpretation runs contrary to the rule's plain text and the

25

2788638

advisory committee's notes, and it is not supported by any authority. Indeed, appellants' demand that all class action settlements provide monetary distributions so that the district court can analyze them would absurdly prohibit all non-monetary class action settlements.

Appellants say that *cy pres* relief is improper even under this Court's precedent because the settlement fund is distributable to the class but ignore the uncontested evidence to the contrary. Distributing the $62 million settlement fund to the estimated 247.7-million person class would provide *de minimis* relief at prohibitive cost, not to mention the fact that identifying the class is practically infeasible. 1-ER-14–16. On that record, the district court did not clearly err in finding that the settlement fund is non-distributable. *See Google St. View*, 21 F.4th at 1114–15; *Google Referrer Header*, 869 F.3d at 742. Appellants' claim that the district court was required to order a "claims made" settlement, whereby the public can self-identify as class members, fails just as it failed when their counsel made it in *Google St. View*. *See* AOB 27–28. Put simply, there is no practically feasible way to verify whether such claims are true and valid. *See Google St. View*, 21 F. 4th at 1114.

**Third,** the district court did not abuse its discretion in approving

the parties' proposed *cy pres* recipients. The *cy pres* recipients and their narrowly-tailored funding proposals bear a strong nexus with Plaintiffs' online data privacy claims, their underlying policy objectives, and the class interest. That is precisely what this Court's precedent requires. *See Google St. View*, 21 F.4th at 1109; *Easysaver Rewards*, 906 F.3d at 760. It "do[es] not require . . . that settling parties select a *cy pres* recipient that the court or class members would find ideal." *Lane*, 696 F.3d at 820–21. If a class member still has qualms about a recipient, they can "simply opt out of the class." *Google St. View*, 21 F.4th at 1118–19. Likely recognizing that their complaints are foreclosed by that precedent, appellants simply propose a new standard for this Court to apply. But their proposed standard—which would reject "controversial, polarizing, or political" *cy pres* recipients—is plainly unworkable. *See* AOB 42. Courts are not public opinion pollsters. In any case, only nine class members opted out and only appellants objected, indicating that the recipients are not controversial at all.

Appellants' further complaint that some *cy pres* funding could also benefit people outside of the United States misses the point. "[This] singular focus on geography ignores the touchstone of the inquiry:

27

whether an award bears a 'substantial nexus to the interests of the class members.'" *Easysaver Rewards*, 906 F.3d at 762 (quoting *Lane*, 696 F.3d at 821). In this case, there is no question that they do.

**Finally,** appellants contend that even if the *cy pres* recipients are proper, the district court exceeded its "Article III power" by agreeing to approve, allocate, and supervise the *cy pres* distribution. AOB 43–46. "The court has 'broad discretionary powers in shaping' a *cy pres* award." *Easysaver Rewards*, 906 F.3d at 761 (quoting *Six Mexican Workers*, 904 F.2d at 1308). Indeed, in some cases, supervising a *cy pres* distribution is not only permissible, but required. *Six Mexican Workers*, 904 F.2d at 1307. Article III has nothing to do with this. Appellants do not dispute that Plaintiffs and the class have standing to pursue their claims here. They are merely electing, by contract, to receive some relief indirectly.

At bottom, appellants candidly recognize, just as the district court did, that many of their arguments are foreclosed by precedent. For that reason, appellants appear to seek initial hearing *en banc*, or at least rehearing *en banc* if they are unsuccessful before a panel in the first instance. AOB 46–48. This is procedurally improper. Federal Rule of Appellate Procedure 35(c) requires appellants to submit a separate

petition for hearing *en banc*, which, at the time of this filing, they have not done.  In any case, appellants have failed to properly preserve many of the issues that they raised below.  Passing references without cogent argument in an opening brief are insufficient to raise issues on appeal. *Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009).  Indeed, appellants appear to want to raise some issues that they never raised in the district court for the first time during *en banc* review.  They cannot. These arguments have been forfeited and, as such, they are not before this Court.  *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994).

This Court should affirm the district court's final approval order.

## ARGUMENT

### I.     The district court did not abuse its discretion in approving the parties' settlement as fair, reasonable, and adequate.

The district court correctly followed this Court's well-established precedent in approving the parties' class action settlement, including its *cy pres* provision, as fair, reasonable, and adequate.  This Court may safely reject appellants' arguments otherwise, as it has done before.

#### A.     The district court applied the correct framework for evaluating the parties' settlement under Rule 23(e)(2).

Appellants first claim that the district court applied the incorrect

framework for evaluating the settlement under Rule 23(e), as amended in 2018, by: (a) failing to consider each of the Rule 23(e)(2) factors (AOB 24–25); and (b) improperly presuming that the settlement was valid (AOB 34–36). These arguments are belied by the record, which shows that the district court considered each applicable Rule 23(e)(2) factor under a heightened fairness analysis for pre-certification settlements.

### 1. The district court considered each applicable Rule 23(e)(2) factor in approving the settlement.

Appellants contend that the district court committed legal error by failing to consider the class action settlement approval factors that Rule 23(e)(2) now requires, following its amendment in 2018. AOB 24–25.

This argument has no basis in the record. Appellants are correct that, "[t]o survive appellate review, the district court must show it has explored comprehensively all [Rule 23(e)(2)] factors[.]" *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 782–83 (9th Cir. 2022). But that is exactly what the district court did. In its final approval order, the district court determined that: (1) the class representatives and class counsel had adequately represented the class (1-ER-9); (2) the settlement was negotiated at arm's length, with no evidence of collusion (1-ER-16); (3) the relief provided for the class is adequate, given the

costs, risks, and delay of trial and appeal (1-ER-11–13); and (4) the

settlement awarded only *cy pres* relief and injunctive relief, which by

definition treat all class members equally (1-ER-13–15). This analysis

tracks the applicable Rule 23(e)(2) factors. *See* Fed. R. Civ. P 23(e)(2).

That the district court conducted this analysis under this Court's

longstanding rubric for evaluating a class action settlement—set forth

in *Churchill Village, LLC v. General Electric*—is entirely proper. *See* 1-

ER-8–9 (quoting 361 F.3d at 575). "The amended Rule 23(e) did not

'displace' this court's previous articulation of the relevant factors [in

*Churchill*], and it is still appropriate for district courts to consider these

factors in their holistic assessment of settlement fairness." *McKinney-*

*Drobnis v. Oreshack*, 16 F.4th 594, 609 & n.4 (9th Cir. 2021) (citing

*Churchill*, 361 F.3d at 575, and quoting Fed. R. Civ. P. 23 advisory

committee's note to the 2018 amendment). Rule 23(e)(2) requires only

that district courts "find[] that [the proposed class action settlement] is

fair, reasonable, and adequate after considering" the Rule 23(e)(2)

factors. Fed. R. Civ. P. 23(e)(2). Rule 23(e)(2) does not require that

district courts explicitly map their analysis onto its specific factors.

Appellants contend that the district court failed to consider "the

31

effectiveness of any proposed method of distributing relief to the class."
AOB 24–25 (highlighting Rule 23(e)(2)(C)(ii) as an unexamined factor).
And they say that the failure to do so is a *per se* abuse of discretion. *Id.*
But that particular Rule 23(e)(2) settlement approval factor applies only
if there is "***any*** proposed method of distributing relief to the class,
including the method of processing class-member claims." Fed. R. Civ.
P. 23(e)(2)(C)(ii) (emphasis added). That approval factor does not apply
if a settlement does not propose distributing relief to the class through a
claims process. Plainly, in that circumstance, district courts cannot and
need not consider the efficacy of a method for directly distributing relief
and processing class-member claims where none are proposed.[6]

The Advisory Committee's Notes to the 2018 amendment to Rule
23(e)(2) confirm that this plain-text reading of Rule 23(e)(2)(C)(ii) is
correct: "Measuring the proposed relief ***may*** require evaluation of ***any***
proposed claims process[.]" In using conditional, permissive language,
the Advisory Committee made clear (as does the Rule itself) that this
settlement approval factor is only relevant when a claims process is

---

[6] Google separately addresses appellants' related argument—that
Rule 23(e)(2)(C)(ii) prohibits *cy pres* provisions—below in Section I.B.1.

proposed. *See Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 316 (1988) (stating the advisory committee's views are accorded "weight").

In any case, even if such a requirement existed, the district court did consider—at length—whether the settlement's monetary proceeds were distributable to the class. 1-ER-14–16, 20–23. This was a detailed component of its *cy pres* analysis, and it is the same analysis that would have occurred if the parties had proposed a method for distributing this relief to the class directly through a claims process. What it shows is that there is no practically feasible method for doing so. *Id.* That is why, as discussed below, *cy pres* relief is proper in this case.

### 2. The district court did not improperly apply a presumption that the settlement was valid.

Appellants also contend that the district court committed legal error in evaluating the settlement by applying a "strong presumption of validity" to its terms. AOB 34–36. The district court did no such thing.

Appellants are correct that Rule 23(e)(2), as amended in 2018, requires the parties to prove that the terms of a proposed class action settlement are fair to the class. *Briseño*, 998 F.3d at 1030. Historically, some district courts applied a "presumption of fairness to settlements that were shown to be the product of arms-length negotiation, untainted

33

by collusion[.]" 4 Newberg and Rubenstein on Class Actions § 13:45 (6th ed. 2024). But the 2018 amendment to Rule 23(e)(2) rejected that such a presumption is valid. "Rule 23(e)(2) now identifies 'whether . . . the proposal was negotiated at arm's length' as one of four factors that courts must consider and does not suggest that an affirmative answer to that one question creates a favorable presumption on review of the other three." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 & n.12 (9th Cir. 2019) (quoting Fed. R. Civ. P. 23(e)(2)(B)).

A presumption of fairness is particularly inappropriate when the parties seek approval of a pre-certification class action settlement. In those cases, district courts must apply a "heightened fairness inquiry" in order to identify any "subtle signs" of collusion between the parties that might disadvantage absent class members. *Id.* at 1049 (quoting and discussing the factors in *Bluetooth Headset*, 654 F.3d at 947).

The problem with appellants' argument is that "this is exactly what the district court [did]." *See Briseño*, 998 F.3d at 1030. The district court "explored comprehensively" the applicable Rule 23(e)(2) factors, *see* Section I.A.1, *supra*, and explicitly applied a "heightened fairness inquiry" to the parties' pre-certification settlement agreement.

34

2788638

1-ER-8–9 (citing *Roes, 1–2*, 944 F.3d at 1049). In doing so, the district court scrutinized the settlement for the "subtle signs" of collusion that this Court identified in *Bluetooth Headset*. 1-ER-18–19 (quoting 654 F.3d at 947). And it correctly determined that none existed. To the contrary, the settlement was the result of "hard fought" negotiations before an "experienced mediator" and the then-Chief Magistrate Judge. 1-ER-19. There was no "clear-sailing agreement" that guaranteed a certain amount of attorneys' fees to class counsel. *Id*. And the *cy pres* distribution, as discussed below in detail, was appropriate because the settlement's monetary proceeds were not distributable to the class. 1-ER-10–16. This is precisely what Rule 23(e)(2)'s heightened fairness inquiry requires when evaluating a pre-certification settlement.

Nevertheless, appellants claim that the district court presumed that the parties' settlement was valid. But they are able to do so only by misquoting the district court as applying a "strong presumption of validity" (AOB 34), when the district court never wrote those words.

What the district court actually said is that the extraordinarily small number of opt-outs and objections "raises a strong presumption that the terms of a proposed class settlement action are favorable to the

35

class members." 1-ER-18. This was not error. The court correctly reviewed class members' reaction to the proposed settlement as this Court instructs, *see Churchill*, 361 F.3d at 577, and saw that it was overwhelmingly positive. There were only nine opt outs and three objections out of an estimated 247.7 million class members. 1-ER-18. On this basis, the district court found that this single *Churchill* factor presumptively supported approval (subject to any rebuttal showing), as did each and every other factor on review of the record. 1-ER-11–19.

Thus, instead of presuming that the settlement was valid, the district court determined that the parties had satisfied their burden of showing that the settlement is fair, reasonable, and adequate. That is the opposite of applying a rule of presumption. "A rule of presumption is simply a rule changing one of the burdens of proof, *i.e.,* declaring that the main fact will be inferred or assumed from some other fact until evidence to the contrary is introduced." *Hooks for & on Behalf of Nat'l Lab. Rels. Bd. v. Nexstar Broad., Inc.*, 54 F.4th 1101, 1116 (9th Cir. 2022). The district court did not infer or assume settlement validity; its review of the class's reaction, in conjunction with its review of all of the other *Churchill* factors, collectively proved that the settlement is valid.

36

This Court has rejected this kind of argument from appellants' counsel before. In *Briseño v. Henderson*, the district court stated that, as a matter of judicial policy, settlement was preferable to litigation and that "[t]he Objection fails to persuade the Court that this Settlement Agreement is clearly inadequate." 998 F.3d at 1030–31. Appellants' counsel, who was representing objectors in that case, argued that the district court had improperly presumed that the settlement was valid by implying that objectors had the burden of proving invalidity. This Court disagreed with that characterization of the record. "Though the district court did allude to a presumption of fairness, it confined it to its analysis of one of the [*Churchill*] factors. It did not shift the burden to [the objector]." *Briseño*, 998 F.3d at 1030. The same is true here. The district court did not shift the burden of settlement validity away from the parties and onto appellants. It found only that a single *Churchill* factor was presumptively satisfied by the evidence in the record.

The district court's analysis is thus unlike the analysis that this Court rejected in *Roes, 1–2 v. SFBSC Management. See* 944 F.3d at 1049–50. There, this Court reversed approval of a pre-certification class action settlement where it expressly presumed that the settlement

was reasonable and then failed to identify "numerous problematic aspects of the settlement and subtle signs of implicit collusion." *Id.* (discussing the settlement's "clear sailing agreement" that gave class counsel a fee award larger than the relief given to the class in a case where it was undisputed that a distribution to the class was feasible). *See also Apple Device Performance*, 50 F. 4th at 782–83 (reversing class action settlement approval where the district court explicitly limited its analysis to whether the settlement presented any "obvious deficiencies," given "[t]he involvement of experienced class action counsel"). Here, the district court in no way limited or confined its inquiry in that manner.

## B. The district court properly approved *cy pres* relief.

Turning to the substance of the parties' settlement, appellants raise four challenges to the district court's approval of *cy pres* relief. Appellants claim that the settlement's *cy pres* relief was a *per se* abuse of discretion because: (1) Rule 23(e)(2) prohibits *cy pres* relief following its 2018 amendment (AOB 25–26) and so does "public policy" (AOB 30–34); (2) in any case, the settlement fund was distributable to the class (AOB 26–29); (3) the *cy pres* recipients are improper (AOB 36–43); and (4) the district court has exceeded its "Article III power" by exercising

38

continuing oversight over the *cy pres* distribution to ensure compliance with the terms of its final approval order (AOB 43–46). Each of these arguments is legally baseless and contravenes this Court's precedent.

**1.    Rule 23(e)(2) does not silently prohibit *cy pres* provisions in class action settlement agreements.**

Appellants contend that Federal Rule of Civil Procedure 23(e)(2), as amended in 2018, now silently prohibits *cy pres* relief. AOB 25–26. Because Rule 23(e)(2) requires courts to "consider[]" "the effectiveness of any proposed method of distributing relief to the class" in approving a class action settlement, appellants claim that it would be "absurd" if parties could "short-circuit" this analysis by agreeing to not distribute any monetary relief to the class. *Id.* (quoting Fed. R. 23(e)(2)(C)(ii)). The state attorneys general similarly claim that *cy pres* relief is invalid because it does not provide direct relief to class members in alleged violation of Rule 23(b)(3)'s superiority requirement. Amici Br. 5–8.

These arguments fail under well-settled precedent. This Court has "repeatedly" "reject[ed] the suggestion that a district court may not approve a class-action settlement that provides monetary relief only in the form of *cy pres* payments to third parties." *Google St. View*, 21 F.4th at 1113 (approving such a provision and citing *Google Referrer Header*,

869 F.3d at 741–42, and *Lane*, 696 F.3d at 822). To the contrary, this type of *cy pres* provision is "appropriate where the settlement fund is 'non-distributable' because 'the proof of individual claims would be burdensome or distribution of damages costly.'" *Google Referrer Header*, 869 F.3d at 741–42 (quoting *Lane*, 696 F.3d at 819; *Nachshin*, 663 F.3d at 1038); *accord Six Mexican Workers*, 904 F.2d at 1305. In these limited situations, this Court has "repeatedly recognized" that "a defendant's payment of funds to an appropriate third party" provides the "next best" benefit to class members. *Google St. View*, 21 F.4th at 1116, n.4. (citing *Lane*, 696 F.3d at 819; *Nachshin*, 663 F.3d at 1038).

This Court has similarly "rejected" the "repackage[d]" argument advanced by the state attorneys general that *cy pres* relief violates Rule 23(b)(3) because proof that monetary relief is non-distributable shows that class treatment is not superior to other methods of adjudication. *Id.* at 1115–16. This argument "assumes a critical premise: that it is impossible to provide meaningful relief to a class when there is no feasible way of identifying class members." *Id.* at 1116. "This premise is not supported by [this Court's] case law," which has "repeatedly recognized that class members do benefit—albeit indirectly—from a

2788638

defendant's payment of funds to an appropriate third party." *Id.*

"In declining to 'impose[ ] a categorical ban on a settlement that does not include direct payments to class members," this Court has noted that "other circuits have generally taken a similar approach to ours, approving *cy pres* settlements when they satisfy the appropriate standards for fairness." *Google St. View*, 21 F.4th at 113–14 (quoting *Google Referrer Header*, 869 F.3d at 742). Indeed, every Circuit to have considered *cy pres* relief has said that it can be appropriate. *See In re Lupron Mktg. & Sales Pracs. Litig.*, 677 F.3d 21, 31–34 (1st Cir. 2012), *cert. denied sub nom. Sensing v. Porter*, 568 U.S. 932 (2012); *Hyland v. Navient Corp.*, 48 F.4th 110, 114 (2d Cir. 2022), *cert. denied sub nom. Carson v. Hyland*, 143 S. Ct. 1747 (2023); *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 934 F.3d 316, 326 (3d Cir. 2019); *Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468, 475 (5th Cir. 2011); *Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 676 (7th Cir. 2013); *Marshall v. Nat'l Football League*, 787 F.3d 502, 520–21 (8th Cir. 2015), *cert. denied* 577 U.S. 1139 (2016); *In re Motor Fuel Temperature Sales Pracs. Litig.*, 872 F.3d 1094, 1113–16 (10th Cir. 2017), *cert. denied sub nom. Speedway LLC v. Wilson*, 583 U.S. 1204 (2018); *Poertner v. Gillette Co.*,

41

618 F. App'x 624, 628–31 (11th Cir. 2015), *cert. denied sub nom. Frank v. Poertner*, 577 U.S. 1230 (2016).  There is thus no "circuit split" on the propriety of *cy pres* relief, contrary to appellants' claim.  *See* AOB 24.[7]

The 2018 amendment to Rule 23(e)(2) has done nothing to upset this Court's precedent.  The plain text of the Rule and the Advisory Committee's Notes make clear that settlement approval "may require" district courts to consider a proposed distribution method only if "any" distribution method is proposed that would require "processing class-member claims."  *See* Fed. R. Civ. P. 23(e)(2)(C)(ii); Fed. R. Civ. P. 23(e)(2) advisory committee's notes to the 2018 amendment.  There is no basis to conclude that this unsurprising requirement—that district courts consider how the parties propose to distribute relief to class members through a claims process, to the extent that they propose doing so—is a silent prohibition on *cy pres* relief.  Appellants cite no

---

[7] Appellants' authorities hold only that *cy pres* relief is improper where distributions to the class are feasible, just as this Court holds.  *See In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1063–66 (8th Cir. 2015) (rejecting *cy pres* distribution only because it was "clearly feasible" to make a distribution to the class); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 784 (7th Cir. 2014) (same); *Klier*, 658 F.3d at 478 (rejecting residual *cy pres* distribution because the settlement agreement prohibited it, and noting no split with "our sister circuits" on the issue of *cy pres* relief).

2788638

authority that adopts their interpretation of Rule 23(e)(2).[8]  Indeed, *Google Street View* postdates the 2018 amendment, as do the published decisions from the Second and Third Circuits cited above that approve non-residual *cy pres* relief in class action settlements.  *See* 21 F.4th at 1113; *see also Hyland*, 48 F.4th at 114; *Google Cookie*, 934 F.3d at 326.

To be sure, appellants' novel interpretation of Rule 23(e)(2)(C)(ii) would pose an insurmountable problem for class action settlements that propose providing only injunctive and/or declaratory relief.  *See* Fed. R. Civ. P. 23(b)(2) (authorizing injunctive relief and declaratory relief class actions).  Non-monetary class actions certified under Rule 23(b)(2) are subject to the same settlement approval factors set out in Rule 23(e)(2) as monetary settlements certified under Rule 23(b)(3).  Fed. R. Civ. P. 23(e)(2) (requiring district courts to apply Rule 23(e)(2) in all proposed class action settlements that "would bind class members"); *see also Crawford v. Honig*, 37 F.3d 485, 487 & n.2 (9th Cir. 1994) (explaining

---

[8] The authorities that appellants do cite are simply inapposite.  Those cases concerned the propriety of awarding attorneys' fees and did not consider *cy pres* relief at all, let alone in view of Rule 23(e)(2)(C)(ii).  *See* AOB 19–20 (citing *Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015); *Roes, 1–2*, 944 F.3d at 1052–55; *Briseño*, 998 F.3d 1014, 1026 & n.3)).

43

that injunctive-relief class judgments are binding on class members).

Thus, if Rule 23(e)(2) prohibited class action settlements that do not distribute monetary relief to the class, it would not only prohibit *cy pres* relief, but also those providing only injunctive or declaratory relief. Interpretations of the Federal Rules that "eviscerate" other provisions of the Federal Rules, like this one, are improper. *See Atchison, Topeka & Santa Fe Ry. Co. v. Hercules Inc.*, 146 F.3d 1071, 1073 (9th Cir. 1998).

Indeed, appellants' interpretation leads to further absurdities. Rule 23(e)(2)(C) uses the same conditional language ("any") in two other settlement approval factors, requiring district courts to consider "the terms of ***any*** proposed award of attorney's fees, including timing of payment" and "***any*** [side] agreement required to be identified under Rule 23(e)(3)[.]" Fed. R. Civ. P. 23(e)(2)(C)(iii), (iv) (emphases added). If appellants' logic held, these factors would require settling parties to propose a fee award and to have a side agreement. That is not so.

This Court should thus reject appellants' unsupported, unsound argument that Rule 23(e)(2) is now a silent prohibition on *cy pres* relief.

Appellants' "public policy" arguments cannot change this outcome. *See* AOB 30–34. While a handful of minority opinions have inquired as

44

to whether *cy pres* relief is appropriate, none have ever been made law.
To the contrary, some of the issues they have raised, like whether *cy pres* relief benefits the class, have been repeatedly rejected. Others, such as whether class counsel has betrayed the class to its own benefit, or whether the *cy pres* relief indirectly benefits the defendant, have not been raised by appellants in this appeal because they do not exist here. In any case, the Supreme Court recently had the opportunity to hear all of these arguments from appellants' counsel in the wake of this Court's decision affirming *cy pres* relief in *Google Street View*. But instead, it denied his petition for a writ of certiorari. *Lowery*, 143 S. Ct. 107.

> **2.   The district court correctly determined that *cy pres* relief is proper here because the settlement fund cannot be feasibly distributed to the class.**

Appellants further contend that even if *cy pres* settlements are proper under this Court's precedent, the district court erred in finding that *cy pres* relief is proper here because, in their view, the monetary proceeds of the settlement are distributable to the class. AOB 26–29. The state attorneys general claim the same. Amici Br. 10–12. But the uncontested evidence in this case shows that a monetary distribution to the class would be *de minimis*, prohibitively expensive, and infeasible.

These are precisely the conditions that make *cy pres* relief appropriate.

In this Court, it is well-established that a class action settlement is "non-distributable"—and thus *cy pres* relief is appropriate—where "the proof of individual claims would be burdensome or distribution of damages costly." *Google St. View*, 21 F.4th at 1112–13 (quoting *Lane*, 696 F.3d at 819); *accord Google Referrer Header*, 869 F.3d at 741; *Nachshin*, 663 F.3d at 1038; *Six Mexican Workers*, 904 F.2d at 1305. To make this determination, this Court has looked to the average payment that each class member would receive if they submitted a claim, taking into account the cost of verifying claims and distributing the funds. *See, e.g.*, *Google Referrer Header*, 869 F.3d at 742; *Lane*, 696 F.3d at 817–18. It has also considered whether identifying the members of the class is practically feasible. *See, e.g.*, *Google St. View*, 21 F.4th at 1115; *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1129 (9th Cir. 2017).

Under that framework, it is clear that the monetary proceeds of the parties' settlement are not distributable to the class in this case. Even if the class members could be identified, distributing monetary proceeds directly to them would result in an average payment of about twenty-five cents. 1-ER-14–16, 17–22. And that's before one takes into

46

account the attorneys' fees, class representative incentive awards, and administrative costs provided, which would reduce the payment to just seventeen cents per class member. *See id.* This Court has upheld *cy pres* distributions in cases that found much larger average payments to be non-distributable. *See Lane*, 696 F.3d at 817–18, 820–21 (affirming *cy pres* approval where average recovery would be about $1.80); *see also Easysaver Rewards*, 906 F.3d 747 (same for average residual payment of about $2.30). Appellants do not contest this economic reality. *See* AOB 15. Nor do the state attorneys general. *See* Amici Br. at 10–12 (discussing *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 941 (N.D. Cal. 2013) (discussing the district court's previous rejection of proposed *cy pres* relief where class members would have received about $10 each).

Further, the cost of distributing this *de minimis* relief to the class would be prohibitively expensive and drastically decrease the amount each claimant would receive. The claims administrator estimated that it would cost $1.9 million to pay out only 2.5 million claimants, which is about 1% of the class. 3-SER-376. If there were 17 million claimants, less than 7% of the class, the cost would skyrocket to $8.2 million. *Id.* Extrapolating these estimates outwards, the administrative cost of a

47

monetary distribution to the entire estimated 247.7 million person class would likely exhaust the entire settlement fund. *See id.* Appellants and amici do not contest these estimates of administrative cost either. *Cy pres* relief is especially appropriate in these circumstances. *In re Netflix Priv. Litig.*, No. 5:11-CV-00379 EJD, 2013 WL 1120801, at *7 (N.D. Cal. Mar. 18, 2013) (finding monetary proceeds non-distributable where it "would likely prove to be nullified by distribution costs").

Even if it were economically feasible to distribute the settlement fund to the class, appellants and amici also fail to grapple with the fact that there is no practically feasible method for identifying the class. *See* 5-SER-989 (defining the class as "all natural persons residing in the United States who used one or more mobile devices and whose Location Information was stored by Google while 'Location History' was disabled at any time during the Class Period"). That is because Google has no practically feasible method for identifying, among other things, all users whose relevant "Location History" setting was "disabled" during the class period and "whose location information was stored." 5-SER-961–68. "Google's data-collection practices and systems make it infeasible to identify the individuals who fit this class definition." 5-SER-962. This

48

is precisely the kind of practical infeasibility that this Court found to warrant *cy pres* relief in *Google Street View*. *See* 21 F.4th at 1115.

Appellants' only response to this uncontested record is to contend that some courts have distributed smaller payments in the past and that proves *a fortiori* that this settlement is also distributable. AOB 26. This misunderstands the legal standard that this Court applies when evaluating whether a settlement's monetary proceeds are distributable. The standard does not ask whether a distribution is impossible; it asks whether it is too burdensome to establish proof of individual claims or too costly to distribute the settlement to the class. *Google St. View*, 21 F.4th at 1112–13; *Google Referrer Header*, 869 F.3d at 741; *Lane*, 696 F.3d at 819; *Nachshin*, 663 F.3d at 1038; *Six Mexican Workers*, 904 F.2d at 1305. That is what the uncontested record shows here. That some courts have approved distributions of smaller payments does not set a floor that all courts must subsequently follow in a race to the bottom. Nor does it make a distribution appropriate here, given the practical infeasibility of identifying the estimated 247.7 million person class.

As a last resort, appellants suggest that the district court was required to order a claims process in which members of the public self-

identify as class members, with the hope and expectation that only a vanishingly small number of people would submit claims. AOB 26. Their theory is that a distribution to some class members is always better than a *cy pres* distribution, even if there is no practically feasible way to verify those self-identifying class members are in the class.

But this Court has rejected this demand from appellants' counsel before, as the district court correctly noted when it rejected his demand here. "[Appellants' counsel] cites no authority indicating that a district court must consider only whether settlement funds are distributable to 'some' of a class, nor does he explain what proportion of a class would satisfy his proposed '*some* class members' test." 1-ER-20–21 (quoting *Google St. View*, 21 F. 4th at 1114) (emphasis in original)). To the contrary, the question is "whether it is feasible to distribute the fund to the class <u>as a whole</u>." *In re Google LLC St. View Elec. Commc'ns Litig.*, 611 F. Supp. 3d 872, 892 (N.D. Cal. 2020) (underlining in original). Indeed, "there is something perverse in asking Class Counsel to reach a settlement that only works if there is a small claims rate." *Id.* at 893.

In any case, and just as in *Google Street View*, "self-identification would be pure speculation," given that no class member (or even Google)

could determine with practical feasibility whether Google had collected and stored their location data as alleged. *See* 21 F.4th at 1115. And just as in *Google Street View*, "any meaningful forensic verification of [those self-identified] claims would be prohibitively costly and time-consuming." *See id.* Accordingly, just as in *Google Street View*, the district court correctly held that this claims process would fail. *See id.*

This is what distinguishes the claims-made settlement approved in *Google Referrer Header* that appellants and amici repeatedly tout as proof that the settlement fund in this case is distributable to the class. That settlement class included: "All Persons in the United States who submitted a search query to Google and clicked on a search result at any time during the period commencing on October 25, 2006, up to and including September 30, 2013." Case No. 5:10-cv-04809, Dkt. No. 179 at 2 (N.D. Cal. May 30, 2023) (amended approval order). Class members could self-identify to submit a claim in that case; it is comparatively easy to know if one has run a Google search and clicked on a result.

In any event, even if it were feasible to identify class members in this case, *cy pres* relief is a matter of broad equitable discretion, and "the fact that there are other conceivable methods of distribution does

51

not mean that the district court abused its discretion by declining to adopt them." *Google Referrer Header* (citing *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (*per curiam*) (holding that "[t]he abuse of discretion standard requires us to uphold a district court determination that falls within a broad range of permissible conclusions"). Appellants need to do much more than propose potential alternative resolutions; they must demonstrate that the district court abused its discretion here by failing to apply the proper settlement approval standard or clearly erring in finding the facts underlying approval. They have not done so.

### 3. The *cy pres* recipients were correctly approved.

Appellants next contend that even if *cy pres* relief is proper, the district court abused its discretion in approving the parties' proposed *cy pres* recipients because, in appellants' view, the proposals for spending funds they receive are imperfectly tailored or distasteful. AOB 36–43. The state attorneys general make similar arguments. Amici Br. 8–10. These concerns have little connection with the actual funding proposals that the district court approved, and many are simply irrelevant to this Court's objective standard for evaluating *cy pres* recipients. The *cy pres* recipients and their proposals bear a strong connection with Plaintiffs'

52

online data privacy claims, their underlying policy objectives, and the class interest. That is what this Court's precedent correctly requires. The district court acted well within its discretion in approving them.

This Court has long made clear that the *cy pres* doctrine does not permit district courts to make or approve charitable donations on behalf of the class that have no connection to their claims, no matter how well intentioned. "When selection of *cy pres* beneficiaries is not tethered to the nature of the lawsuit and the interests of the silent class members, the selection process may answer to the whims and self interests of the parties, their counsel, or the court." *Nachshin*, 663 F.3d at 1038–39. Not only do unrelated charitable gifts fail to provide any indirect benefit to the class, they "may create the appearance of impropriety." *Id.*

That is why this Court has adopted a clear, objective standard to ensure that proposed *cy pres* recipients will benefit the class. *Cy pres* recipients must have a "substantial nexus" with the lawsuit, the policy objectives of the underlying claims, and the legal interest of the class. *See Lane*, 696 F.3d at 821. This is arguably a more stringent standard than the American Law Institute has adopted. *See* Principles of the Law of Aggregate Litig. § 3.07(c) (Am. L. Inst. 2010) ("The court, when

53

feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class.").

Applying this objective standard, this Court finds that district courts have abused their discretion in approving *cy pres* recipients when they clearly lack connection to the plaintiff's class claims. *E.g., Koby v. ARS Nat'l Servs.*, Inc., 846 F.3d 1071, 1080 (9th Cir. 2017) (rejecting *cy pres* recipients where there was "no showing that the work performed by [a local charity for war veterans] would protect consumers from unfair debt collection practices"); *Dennis v. Kellogg Co.*, 697 F.3d 858, 866 (9th Cir. 2012) (rejecting *cy pres* recipients that would "feed[] the indigent" because that has "little or nothing to do with" the plaintiff's false advertising claims about cereal nutrition); *Nachshin*, 663 F.3d at 1040 (rejecting the Legal Aid Foundation of Los Angeles, the Boys and Girls Clubs of Santa Monica and Los Angeles, and the Federal Judicial Center Foundation as *cy pres* recipients because those entities do not "have anything to do with the objectives of the underlying statutes on which Plaintiffs base their [online false advertising] claims"). None of these *cy pres* recipients were capable of passing even a cursory review.

The *cy pres* recipients approved here, however, bear a direct and

strong nexus with Plaintiffs' online data privacy claims. Plaintiffs

alleged that Google improperly tracked and stored their locations when

online, and that this violated their privacy rights under the California

Constitution and its common law. *See Hill v. Nat'l Collegiate Athletic

Ass'n*, 7 Cal. 4th 1, 17–18 (1994) (discussing how California law shields

the public's interest in maintaining control over sensitive information).

    In view of Plaintiffs' claims, the objectives of California privacy

law, and the class's interest in controlling their data online, the parties

proposed *cy pres* recipients to help safeguard online data privacy. They

include well-known institutions with track records in cutting-edge

public interest research and education on online data privacy, like the

Berkman Klein Center for Internet & Society at Harvard University,

the Internet Policy Research Initiative at the Massachusetts Institute of

Technology, the Information Law Institute at New York University, the

Information Society Project at Yale Law School, and the Center on Law

and Information Policy at Fordham University. 2-SER-69–365.

    The proposed *cy pres* recipients also include: a non-profit news

organization that breaks news on internet privacy issues and employs

trained technologists to conduct independent research on that subject

(The Markup); the world's preeminent archive of internet records that allows researches and educators to conduct internet privacy research (Internet Archive); public interest research and consumer advocacy organizations that focus on consumer privacy rights and issues (the Speech, Privacy, and Technology Project at the American Civil Liberties Union, the Technology and Civil Liberties Program at the American Civil Liberties Union of Northern California, the Center for Democracy and Technology, Connect Safely, the Electronic Frontier Foundation, and FPF Education & Innovation Foundation, and Privacy Rights Clearinghouse); individual researchers whose work will advance the public's understanding of privacy rights and protections (the Data & Society Research Institute); and the Rose Foundation for Communities and the Environment, which would fund smaller organizations that have a substantial nexus with online data privacy. *Id.*

Each recipient submitted narrowly tailored proposals for spending any funds it may receive that focus exclusively on online data privacy. *Id.*; *cf. Six Mexican Workers*, 904 F.2d at 1307 (noting with disapproval that *cy pres* "funds have not been earmarked for any specific projects"). These proposals put appellants' concerns to bed.

For example, MIT's Internet Policy Research Initiative proposes to use any funding that it receives to: (1) create a new web protocol for sharing personal data in a traceable, accountable fashion; (2) conduct user experience studies that examine consumer online behaviors and motivations; and (3) educate computer science students about online data privacy. 2-SER-262–76. The ACLU Foundation of Northern California's Technology and Civil Liberties Program proposes to: (1) fund ongoing and future online data privacy litigation under California law; (2) create public awareness about online privacy issues through community conferences; and (3) educate the public about how private data is commonly collected and used online. 2-SER-88–101. And the Center for Democracy & Technology proposed to "expand [its] Privacy & Data Program to better protect consumers' privacy through legislation, regulation, and improved company practices." 2-SER-115–26.

All of the proposals are like this. Accordingly, not only do the approved *cy pres* recipients share a direct and substantial nexus with Plaintiffs' online data privacy claims as organizations, it is difficult to imagine funding proposals that have a more substantial nexus. The district court plainly exercised proper discretion in approving them.

This Court's precedent confirms that is true.  *See Google Street View*, 21 F.4th at 1109 (approving *cy pres* recipients in internet privacy class action where they "commit[ted] to use the funds to promote the protection of Internet privacy"); *Easysaver Rewards*, 906 F.3d at 760 (same where recipients committed "to support scholarship in the area of internet privacy and data security"); *Fraley v. Batman*, 638 F. App'x 594, 597 (9th Cir. 2016) (same because "[t]he recipient organizations focus on consumer protection, research, education regarding online privacy . . . the very issues raised in plaintiffs' complaint"); *see also Netflix*, 2013 WL 1120801, at *7 (same because recipients were "leading consumer and privacy advocacy groups and academic institutions" promoting "outreach and education programs, litigation and public advocacy, development of privacy-protecting tools, and other methods").

Indeed, this Court (and others) have previously approved several of the very same *cy pres* recipients approved here for the very same purpose: promoting online data privacy.  *See, e.g.*, *Google St. View*, 21 F.4th at 1109, 1119–20 (approving MIT's Internet Policy Research Initiative, the ACLU, and the Rose Foundation); *see also* 2-ER-91, 107, 122, 130, 141–42, 169, 180, 188, 211–12, 222, 233, 272, 301, 337–39,

349–50 (listing cases where the *cy pres* recipients were approved).

Given the clear connection that each of the *cy pres* recipients has with the promotion of online data privacy, appellants are forced to point to ***ideas*** in their funding proposals with which they take issue, make collateral attacks on the character of the organizations, or claim that groups that will benefit are geographically "too remote." AOB 37–38.

As a general matter, this Court "do[es] not require as part of [its *cy pres*] doctrine that settling parties select a *cy pres* recipient that the court or class members would find ideal." *Lane*, 696 F.3d at 820–21. That appellants and amici do not like that some recipients also support causes like women's rights, gay rights, or racial diversity has little to do with the actual proposals that the district court approved. *See* AOB 37–40; Amici Br. 8–9. In any case, class members were not forced to support the work that the recipients in this case were approved to do— they had the option to "simply opt out of the class" and preserve their individual damages claims. *Google St. View*, 21 F.4th at 1118–19.

Appellants' concern that some *cy pres* funds might also be used to benefit people residing outside the United States is similarly misguided. AOB 36–38. "[This] singular focus on geography ignores the touchstone

59

of the inquiry: whether an award bears a 'substantial nexus to the interests of the class members.'" *Easysaver Rewards*, 906 F.3d at 762 (quoting *Lane*, 696 F.3d at 821, and citing *Lupron*, 677 F.3d at 36) ("It is not the location of the recipient which is key; it is whether the projects funded will provide 'next best' relief to the class."). Where, "the [*cy pres*] award funds research that is directly responsive to the issues underlying this litigation," as here, "the physical location of the beneficiaries is not an overriding consideration." *See id.* Indeed, as one *cy pres* recipient aptly explained in its proposal, internet privacy issues "transcend national borders," and thus internet privacy research will inevitably involve and benefit the global internet public. 2-SER-210.

Faced with the reality that their challenge to the *cy pres* recipients is foreclosed by this Court's precedent, appellants simply propose their own standard that they believe would disqualify the *cy pres* recipients. This standard—which would require courts to reject any entity that is "controversial, polarizing, or political"—is plainly unworkable. AOB 42. There is no way for courts to administer a subjective standard like this. Courts cannot determine whether an organization might be found by some class member to be "controversial, polarizing, or political."

60

Indeed, it is highly unlikely that **any** organization could satisfy this standard. That is why this Court employs an objective standard of evaluation. In any case, only nine people out of the estimated 247.7 million class members opted out of the settlement and only appellants objected, strongly suggesting that the carefully proposed and court-approved *cy pres* recipients are not controversial at all. *See* 1-ER-18.

### 4. District courts are authorized to approve, allocate, and supervise *cy pres* distributions.

Appellants' last challenge to *cy pres* relief is that the district court exceeded its "Article III power" by agreeing to approve, allocate, and supervise the *cy pres* distribution. AOB 43–46. This misunderstands Article III, and runs contrary to this Court's well-established precedent.

As an initial matter, Article III of the United States Constitution has little to do with the judicial power to order a *cy pres* distribution in a class action settlement. Article III "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. Const, art. III, § 2). Appellants have not argued that Plaintiffs and the class do not have standing such

61

that the federal courts have no subject matter jurisdiction here.

Instead, appellants contort a comment from Justice Roberts's concurrence in *Tyson Foods, Inc. v. Bouaphakeo*—that class actions cannot provide monetary relief to uninjured class members because they lack Article III standing—to mean that uninjured third parties cannot receive *cy pres* funds. *See* AOB 43–44 (citing 136 S. Ct. 1036, 1053 (2016)). This confuses standing with the propriety of a remedy. Uninjured persons cannot be damages class members in federal court because they have no claim to adjudicate. That is an Article III issue. *See Lewis v. Casey*, 518 U.S. 343, 349 (1996). *Cy pres* relief, on the other hand, is a remedy for injured class members that pays out the monetary proceeds of their claims to uninjured third parties for class members' indirect benefit. *Nachshin*, 663 F.3d at 1038–39. In that situation, allegedly injured class members stand before the federal courts, and there is no Article III issue. The class is simply electing, as a matter of contract, to have their monetary proceeds distributed to a third party. Under this Court's precedent, that is entirely proper.

Appellants' real argument is that district courts do not have the authority to select *cy pres* recipients, allocate funding among them, and

62

2788638

supervise its expenditure. But this Court has held that the opposite is true. District courts ***must*** consider and approve *cy pres* recipients and, as needed, the resulting distribution may be "supervised by the court or a court appointed master to ensure that the funds are distributed in accordance with the goals of the remedy." *Six Mexican Workers*, 904 F.2d at 1308–09 (citing *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179, 185 (2d Cir. 1987) ("[T]he district court must . . . designate and supervise, perhaps through a special master, the specific programs that will consume the settlement proceeds."); *see also Lane,* 696 F.3d at 818 (noting without raising concern that the district court "maintained jurisdiction over implementation of the settlement [including *cy pres*]").

Commentators agree. "The district court has broad supervisory powers with respect to the administration and allocation of settlement funds, and the appellate court will disturb the scheme adopted by the district court only upon showing an abuse of discretion." Wright, Miller & Kane, 7B Fed. Prac. & Proc. Civ. § 1797.5 (3d ed. Nov. 2024 update) (collecting cases). It is true that Rule 23(e) "does not require the court to retain continuing jurisdiction once the agreement has been approved to ensure that it is enforced appropriately," but "[t]he court can exercise

its discretion to retain [that] jurisdiction[.]" *Id.* (collecting cases).

Indeed, appellants' own authorities show courts have this power. *See In re Compact Disc Minim. Advertised Price Antitrust Litig.*, 236 F.R.D. 48, 49–53 (D. Me. 2006) (discussing the district court's approval and close supervision of a *cy pres* settlement distribution); *Perkins v. Am. Nat'l Ins. Co.*, 3:05-cv-100 CDL, 2012 WL 2839788, at *5–6 (M.D. Ga. Jul. 10, 2012) (same); *see also Keepseagle v. Perdue*, 856 F.3d 1039, 1050 (D.C. Cir. 2017) (affirming residual *cy pres* distribution).[9]

In a last-ditch effort to make some showing of error, appellants say that the district court failed to address this issue, which they say is an "independent reason" for reversal. AOB 46. But they did not make this objection to the district court, even though they knew the parties' settlement agreement asked the district court to approve, allocate, and supervise the *cy pres* distribution. *See* 3-ER-373 (objection); 2-ER-52 (supplemental objection). Thus, contrary to providing a legal basis for reversal, as appellants contend, this Court should decline to reach this

---

[9] Appellants' other authorities are inapposite because they do not even concern *cy pres* relief, let alone address this specific issue. *See* AOB 45 (discussing the limits of the judicial power to implement comprehensive remedial schemes in gerrymandering, climate, and education cases).

64

2788638

issue as forfeited. *Saucillo v. Peck*, 25 F.4th 1118, 1129 (9th Cir. 2022) ("Generally, an objector to a class action settlement must raise an issue before the district court if he or she wishes to preserve it for appeal," unless it "arise[s] for the first time in the district court's final order.").

## II. Appellants' request for hearing *en banc* is procedurally improper and fails to preserve their unraised arguments.

Recognizing that many of their arguments below are foreclosed by precedent, appellants appear to request an initial hearing *en banc* to reconsider that law. AOB 46–48. So do the state attorneys general in their amici brief. Amici Br. 3. This request is procedurally improper and fails to preserve the arguments that are unraised in their brief.

To request an initial hearing *en banc*, appellants must submit a petition (separate from their opening brief) on or before the deadline for the answering brief. Fed. R. App. P. 35(c). At the time of this filing, appellants have not filed any separate petition for initial hearing *en banc*, and thus their request is procedurally improper.[10] To the extent

---

[10] The state attorneys general's parallel request is similarly improper. Amici are "permitted to file" a brief in support of hearing or rehearing *en banc* only "when the Court is considering a petition for panel or en banc rehearing or when the Court has granted rehearing." Cir. R. 29–2(a). But, as just discussed, appellants have filed no such petition.

2788638

that appellants are requesting rehearing *en banc*, that is premature. Either way, this Court should decline to entertain appellants' request. *See In re O'Brien*, 312 F.3d 1135, 1137 (9th Cir. 2002) (stating that the Federal Rules of Appellate Procedure are "not optional suggestions").

Perhaps more importantly, appellants have failed to preserve many of the arguments that they raised in the district court that they may intend to raise for *en banc* review because they are not "argued specifically and distinctly in [their] opening brief." *See Greenwood*, 28 F.3d at 977. To raise an argument on appeal, and thus preserve it for future review, an appellant must "present a specific, cogent argument for [] consideration." *Id.*; *see also* Fed. R. App. P. 28(a)(8) (an opening brief "must contain appellant's contentions and the reasons for them"). "Arguments made in passing and inadequately briefed are waived." *See Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009).

Appellants have thus failed to preserve for future review several arguments that are vaguely identified in passing in their opening brief. *See generally* AOB, Section IV. Namely, appellants claim to preserve "the legal arguments raised by Justice Thomas in his dissent [in *Gaos*] but precluded by existing Ninth Circuit law," AOB 47 (citing 139 S. Ct.

at 1046–47), the multiple "concerns" raised in "Judge Bade's concurrence" in *Google Street View*, AOB 47–48 (citing 21 F.4th at 1123), and "the First Amendment and Rules Enabling Act arguments rejected by [*Google Street View*]." AOB 47–48. Those bare statements— "made in passing" without "specific, cogent argument"—are insufficient to preserve those arguments on appeal, including for future review. Without setting out the specific content of those arguments, how they were treated by the district court, and the basis for further review, appellants appear to believe they can simply bypass panel review and argue them for the first time in a petition for rehearing *en banc*. They cannot. This Court should hold all of these arguments abandoned.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Dated: December 16, 2024

/s/ *Benjamin Berkowitz*
BENJAMIN BERKOWITZ
THOMAS E. GORMAN
NICHOLAS D. MARAIS
IAN KANIG

67

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24 – 3387

I am the attorney or self-represented party.

**This brief contains** | 13,978 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/Benjamin Berkowitz | **Date** | December 16, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**     *Rev. 12/01/22*