NO. 24-3387

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

*In re*: GOOGLE LOCATION HISTORY LITIGATION

NAPOLEON PATACSIL, *et al.*,
*Plaintiffs-Appellees,*

JOHN ANDREN, MATTHEW LILLEY, JOSEPH S. ST. JOHN,
*Objectors-Appellants,*

v.

GOOGLE LLC, *et al.*,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California at San Jose
No. 5:18-cv-5062-EJD, District Judge Edward J. Davila

Reply Brief of Appellants Andren, Lilley, and St. John

HAMILTON LINCOLN LAW CENTER
CENTER FOR CLASS ACTION FAIRNESS
Theodore H. Frank
Anna St. John
1629 K Street NW, Suite 300
Washington, D.C. 20006
(703) 203-3848
ted.frank@hlli.org
*Attorneys for Objectors-Appellants*

# Table of Contents

Table of Contents ........................................................................................ ii

Table of Authorities ................................................................................. iii

Summary of Argument ............................................................................. 1

Argument .................................................................................................... 3

I.     The district court's reversible error of failing to apply Rule 23(e)(2) is not saved by the appellees' misinterpretation of Circuit precedent and the rule. ........ 3

    A.    The district court legally erred by failing to perform the analysis Rule 23(e)(2) requires. ..................................................... 3

    B.    Rule 23(e)(2)(C)(ii)'s plain language requires a court to reject this settlement. ......................................................................... 7

    C.    Google does not dispute and plaintiffs offer little rebuttal to the many public-policy reasons to emphasize class counsel's obligation to effectively distribute class settlement funds. .......................................... 13

    D.    The district court also committed reversible legal error by contradicting Rule 23(e)(2) in incorrectly applying "a strong presumption" of fairness. ......................................... 17

II.    Many of the *cy pres* recipients should be disqualified as flunking Ninth Circuit standards. ............................................................... 18

III.   The settlement and approval order unconstitutionally exceed the judiciary's Article III power. .............................................................. 25

IV.   *En banc* review is appropriate to overturn decisions that would otherwise permit approval of settlements without marginal consideration to class members or settlements where class counsel uses *cy pres* to engage in self-dealing. ............................................................... 28

Conclusion ................................................................................................ 29

Certificate of Compliance with Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1 ........ 31

Certificate of Service .............................................................................. 32

# Table of Authorities

<u>Cases</u>

*Amchem Prods., Inc., v. Windsor,*
    521 U.S. 591 (1997) ...................................................................................... 24

*In re Apple Inc. Device Performance Litig.,*
    50 F.4th 769 (9th Cir. 2022) ....................................................... 4, 17, 18

*In re Baby Products Antitrust Litig.,*
    708 F.3d 163 (3d Cir. 2013) ........................................................................ 5

*In re Bluetooth Headset Prod. Liab. Litig.,*
    654 F.3d 935 (9th Cir. 2011) ....................................................................... 4

*Briseño v. Henderson,*
    996 F.3d 1014 (9th Cir. 2021) ........................................ 3, 4, 16, 17, 18, 24, 25

*Brudenell v. Elwes,*
    102 Eng. Rep. 171 (1801) ......................................................................... 21

*Burnell v. Swift Transp. Co,*
    2020 WL 12990454, 2020 U.S. Dist. LEXIS 261892
    (C.D. Cal. Jan. 9, 2020) ........................................................................... 17

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ..................................................................... 20

*Carnegie v. Household Int'l, Inc.,*
    376 F.3d 656 (7th Cir. 2004) ..................................................................... 24

*In re Carrier IQ, Inc., Consumer Privacy Litig.,*
    2016 WL 4474366 (N.D. Cal. Aug. 25, 2016) ...................................... 10

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
    236 F.R.D. 48 (D. Me. 2006) ................................................................... 27

*Dennis v. Kellogg Co.,*
    697 F.3d 858 (9th Cir. 2012) ........................................................ 20, 22, 25

*Evans v. Jeff D.,*
    475 U.S. 717 (1986) .................................................................................. 28

*In re Facebook Biometric Info. Privacy Litigation,*
522 F. Supp. 3d 617 (N.D. Cal. 2021) ........................................................9

*In re Facebook Consumer Privacy User Profile Litig.,*
No. 18-md-02843 (N.D. Cal.) ....................................................................9

*Frank v. Gaos,*
139 S. Ct. 1041 (2019) ............................................................................. 13

*In re Google Buzz Privacy Litig.,*
2011 WL 7460099 (N.D. Cal. Jun. 2, 2011) ........................................... 16

*In re Google Inc. Street View Elec. Comm. Litig.,*
21 F.4th 1102 (9th Cir. 2021) .................................... 2, 7, 8, 11, 13, 25

*In re Google Referrer Header Privacy Litig.,*
869 F.3d 737 (9th Cir. 2017),
*vacated on other grounds, Frank v. Gaos,*
139 S. Ct. 1041 (2019) ............................................................................. 14

*In re Google Referrer Header Privacy Litig.,*
2023 WL 6812545, 2023 U.S. Dist. LEXIS 185442
(N.D. Cal. Oct. 16, 2023) ....................................................................... 11

*Hamer v. Neighborhood Hous. Servs.,*
583 U.S. 17 (2017) ................................................................................... 19

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998) ................................................................ 28

*Hill v. NCAA,*
7 Cal. 4th 1 (1994) .................................................................................. 20

*Hughes v. Kore of Indiana Enter., Inc.,*
731 F.3d 672 (7th Cir. 2013) .................................................................. 15

*Janus v. AFSCME, Council 31,*
138 S. Ct. 2448 (2018) ............................................................................. 24

*Keepseagle v. Perdue,*
856 F.3d 1039 (D.C. Cir. 2017) .............................................................. 27

*Koby v. ARS Nat'l Servs., Inc.,*
846 F.3d 1071 (9th Cir. 2017) ........................................................... 6, 20

*Lacey v. Maricopa Cty.*,
    693 F.3d 896 (9th Cir. 2012) ................................................................. 20

*Lane v. Facebook*,
    696 F.3d 811 (9th Cir. 2012) .............................................................. 7, 8

*Marek v. Lane*,
    571 U.S. 1003, 134 S.Ct. 8 (2013) ..................................................... 13

*McKinney-Drobnis v. Oreshack*,
    16 F.4th 594 (9th Cir. 2021) .............................................................. 4, 5

*Mirfasihi v. Fleet Mortg. Corp.*,
    356 F.3d 781 (7th Cir. 2004) ............................................................... 15

*Molski v. Gleich*,
    318 F.3d 937 (9th Cir. 2003) ............................................................... 28

*Nachshin v. AOL, LLC*,
    663 F.3d 1034 (9th Cir. 2011) ........................................................ 18, 25

*Nelson v. Adams USA, Inc.*,
    529 U.S. 460 (2000) .......................................................................... 25

*In re Netflix Priv. Litig.*,
    No. 5:11-CV-00379, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ................. 16

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ............................................................... 15

*Perkins v. American National Ins. Co.*,
    2012 WL 2839788, 2012 U.S. Dist. LEXIS 95039
    (M.D. Ga. July 10, 2012) .................................................................... 27

*Redman v. RadioShack Corp.*,
    768 F.3d 622 (7th Cir. 2014) ............................................................... 16

*Roes 1-2 v. SFBSC Mgmt., LLC*,
    944 F.3d 1035 (9th Cir. 2019) ............................................................. 17

*Saucillo v. Peck*,
    25 F.4th 1118 (9th Cir. 2022) ............................................................. 17

*Six (6) Mexican Workers v. Ariz. Citrus Growers,*
    904 F.2d 1301 (9th Cir. 1990) ............................................................ 18, 26

*Tyson Foods Inc. v. Bouaphakeo,*
    136 S. Ct. 1036 (2016) ............................................................................ 21

*Williams v. Reckitt Benckiser LLC,*
    65 F.4th 1243 (11th Cir. 2023) ................................................................ 6


Rules, Statutes, and Constitutional Provisions

Fed. R. Civ. Proc. 23 ........................................................................... 5, 11, 18

Fed. R. Civ. Proc. 23(b)(3) ........................................................................ 25

Fed. R. Civ. Proc. 23(e) ........................................................................ 7, 15

Fed. R. Civ. Proc. 23(e)(2) ................................................................. 1, 3, 4, 17

Fed. R. Civ. Proc. 23(e)(2)(C) ............................................................ 3, 5, 6, 7

Fed. R. Civ. Proc. 23(e)(2)(C)(ii) ...................................................... 4, 5, 7, 12

Fed. R. Civ. Proc. 23(e)(2)(C)(iii) ............................................................. 12

Fed. R. Civ. Proc. 23(e)(2)(C)(iv) ............................................................. 12

Fed. R. Civ. Proc. 23(e)(3) ...................................................................... 12

U.S. Const., Art. III ........................................................................ 25, 27, 28


Other Authorities

Bassett, Debra Lyn,
    *Class Action Silence,*
    94 BOSTON U. L. REV. 1781, 1799 (2014) ............................................... 16

Bowman, Karlyn,
    *How Popular is DEI?,*
    Forbes (Feb. 3, 2025) ............................................................................. 1

Chasin, Chris J.,
  *Modernizing Class Action Cy Pres Through Democratic Inputs*,
  163 U. PENN. L. REV. 1463 (2015) .......................................................... 14

Clarey, Brendan,
  *Poll: Voters think schools should inform parents about gender changes*,
  The Center Square (Nov. 26, 2023) ..........................................................1

Kidd, Jeremy & Whitehead, Chas,
  *Saving Class Members from Counsel*,
  58 SAN DIEGO L. REV. 579 (2021) .......................................................... 29

Malone, Kenny,
  *NPR's 'Planet Money' team looks into the prevalence of class action settlements*,
  NPR (Aug. 9, 2024) ................................................................................ 10

Notes of Advisory Committee
  on 2018 Amendment to Rule 23 ..................................................... 4, 5, 6

Redish, Martin H. *et al.*,
  *Cy Pres Relief & the Pathologies of the Modern Class Action:*
  *A Normative and Empirical Analysis*,
  62 FLA. L. REV. 617 (2010) ......................................................................7

Smith, D. Brooks,
  *Class Action and Aggregate Litigation: A Comparative International Analysis*,
  124 PENN ST. L. REV. 303 (2020) .......................................................... 21

## Summary of Argument

The district court relied on a fictional view of the possibility of distributing the settlement fund to the class to approve an all-*cy pres* settlement that paid $0 of the $62 million settlement fund to the class. Instead, the district court selected nonprofit organizations and institutions favored by the parties that perform work that a substantial portion (and perhaps a majority)[1] of the class would not wish to support because of fundamental moral, ethical, or ideological disagreement. The conflict with the class is exacerbated by the fact that many recipients are ones that counsel to the parties have previously represented; serve on the board of; or are alumni of.

Appellees cannot show that the district court applied Rule 23(e)(2) and, in particular, the (C)(ii) factor examining the effectiveness of the distribution of relief. The settlement fails under the rule because the settlement distributed $0 to the class even though the Andren Objector appellants presented undisputed evidence that distribution of money directly to the class was feasible through a claims process, as several other settlements with smaller fund-to-class size ratios have repeatedly demonstrated. The district court committed further reversible legal error by applying a "strong

---

[1] For example, a January 2025 *The Economist*/YouGov poll found a 45-40 plurality in support of ending DEI programs. Karlyn Bowman, *How Popular is DEI?*, Forbes (Feb. 3, 2025). Two thirds of voters back measures requiring parental notification of changes in a minor student's preferred gender. Brendan Clarey, *Poll: Voters think schools should inform parents about gender changes*, The Center Square (Nov. 26, 2023).

presumption" of fairness—a finding that appellees ineffectively try to minimize as only a small part of the court's analysis. *See* Section I.

Even if the settlement could be approved, the court selected *cy pres* recipients that should have been rejected under the "substantial nexus" test. Appellees again do not deny but instead try to minimize the radical work that many recipients engage in and intend to fund with the *cy pres*, as well as the conflicts among the parties, their counsel, and the recipients. They focus on the *other* privacy-related work that these organizations do. These efforts are insufficient. And regardless, appellees cannot show that the district court's approval was guided by the objectives of the underlying claims or the interests of the absent class members. *See* Section II.

As to the propriety of having courts act as grant makers with millions of dollars in *cy pres*, appellees again have little substantive response. They do not provide any contrary authority showing such a role is appropriate. Nor do they dispute that such a role creates conflicts of interest; that courts lack the experience and expertise to perform this role; and that courts must exercise their limited judicial power to provide relief to injured parties. *See* Section III.

These reasons should be enough to require reversal. No binding precedent precludes it. But should the Court disagree and feel bound to affirm, it can signal that this case is ripe for *en banc* review, as Judge Bade did in *In re Google Inc. Street View Electronic Communications. See* 21 F.4th 1102, 1122-25 (9th Cir. 2021). If existing precedent requires affirmance of approval of a settlement that pays $0 to the class while allowing judges and attorneys to dole out millions of dollars to their favorite causes against the interests of the class, the case raises vital questions that deserves attention from the

Court sitting *en banc*. The Andren Objectors fully preserved all relevant legal issues, and, of course, are willing to petition to support such review.

The Court should vacate and reverse the settlement approval. In the alternative, it should call for *en banc* review.

## Argument

### I. The district court's reversible error of failing to apply Rule 23(e)(2) is not saved by the appellees' misinterpretation of Circuit precedent and the rule.

Appellees don't dispute that the law required the district court to look at the "economic reality" of the settlement in analyzing "the effectiveness of any proposed method of distributing relief to the class" under Rule 23(e)(2)(C) and Ninth Circuit precedent. *See* PB23-24; DB47.[2] But they sell short Circuit precedent requiring district courts to apply Rule 23(e)(2)(C) and attempt to narrow the provision into oblivion despite its legally-required, common-sense application here. DB42-43 & n8.

### A. The district court legally erred by failing to perform the analysis Rule 23(e)(2) requires.

Neither appellee refutes that in *Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021), this Court held that district courts must consider the factors added to Rule 23(e)(2)(C) by the 2018 amendments in addition to the existing factors that precedent already required courts to consider when analyzing whether a class-action settlement is fair, reasonable, and adequate. *See* PB21 ("Rule 23(e) factors supplement"

---

[2] "OB" refers to the Andren Objectors' Opening Brief; "PB" refers to plaintiffs' brief; and "DB" refers to defendant Google's brief.

existing approval factors); DB33. *Briseño* is consistent with the Notes of the Advisory Committee that accompanied the amendment: "The goal" of the "amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Nor do appellees refute that "[t]o survive appellate review, the district court must show it has explored comprehensively all [Rule 23(e)(2)] factors." *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769 (9th Cir. 2022) (quoted at DB30); *accord McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 609 (9th Cir. 2021) (rejecting settling defendant's argument that failure to account for certain Rule 23(e) factors could be offset by looking at other factors).

With this law established, appellees instead offer only unavailing excuses for the district court's failure to follow it. Plaintiffs sidestep the issue by arguing that it was sufficient for the district court to apply the "standards for fairness and effectiveness since long before the Rule 23(e) 2018 amendments" for settlements with a *cy pres* component. PB21. Effectively, Plaintiffs request a *more lenient* standard of review for settlement containing a *more controversial* form of relief. Google meanwhile unsuccessfully tries to shoehorn the district court's analysis into the (e)(2)(C) factors—but ultimately admits (DB31) that the court improperly conducted its analysis only under the "longstanding rubric" of the *Churchill Village* factors. And none of those factors include the (e)(2)(C)(ii) factor scrutinizing the effectiveness of the proposed method of distributing relief. Furthermore, "adequately considering the *Churchill* factors is insufficient if the district court failed to adequately address the *Bluetooth* factors."

*McKinney-Drobnis*, 16 F.4th at 609. Both appellees' arguments thus implicitly acknowledge that the district court overlooked (e)(2)(C). This was reversible error.

Google next takes the unsupported position that the (e)(2)(C)(ii) factor—"the effectiveness of any proposed method of distributing relief to the class"—only applies when the proposed distribution method "would require 'processing class-member claims.'" DB42. This upside-down position, like plaintiffs', would privilege *cy pres* relief over direct class relief. *Contra*, *e.g.*, *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013) ("Class members are not indifferent to whether funds are distributed to them or to *cy pres* recipients, and class counsel should not be either."). Such a limitation would swallow the rule: It would be absurd if parties could avoid scrutiny of how effectively the class received relief simply by paying nothing to the class or excluding a claims process from the means of distribution. Appellees fail to grapple with this absurdity. Under Google's interpretation of the rule, a district court would be fee to overlook any form of distribution that made it impossible rather than merely difficult for class members to recover.

The text and precedent also require the district court to analyze the settlement under (e)(2)(C)(ii). The Notes of the Advisory Committee state that "the effectiveness of *any* proposed method of distributing relief to the class" is a "central concern," and the 2018 amendment was intended to focus courts on this "core concern," regardless of what form that the relief takes.[3] Nothing in Rule 23 excludes *cy pres* from the types

---

[3] Plaintiffs argue that (e)(2)(C)(ii) would not apply to injunctive relief because it would "automatically 'flunk' the inquiry," but they never explain why a court would be unable to scrutinize whether the injunctive relief was effective as to the class consistent

of relief subject to its requirements, and appellees cite no authority for a contrary interpretation. Instead, appellees recognize that *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243 (11th Cir. 2023), involved a settlement in which injunctive relief "formed a substantial part of the benefits of the settlement," yet the district court still ordered that on remand "the district court should consider the impact of Congress' 2018 amendments to Rule 23(e)(2)(C) on its analysis." *Id.* at 1261. Both the text of the rule itself and the Notes of the Advisory Committee Notes expressly note that the factor could "include" or will "often" require scrutiny of the "claims process." *See* Notes of Advisory Committee to 2018 Amendment ("The relief that the settlement is expected to provide to class members is a central concern. Measuring the proposed relief may require evaluation of any proposed claims process…."). In other words, in settlements that have a pecuniary fund, a court must analyze the claims process, but obviously any analysis of the claims *process* will not be necessary in settlements that do not have such a fund. Thus, while this Court has not had occasion to apply Rule 23(e)(2)(C) factors to a *cy pres* settlement that paid $0 to the class, existing precedent shows that those factors apply equally to such settlements, including the one here.

---

with that factor. *See* PB25. This Circuit has required such an inquiry into the effectualness of settlement injunctive relief even before the 2018 amendments. *See, e.g., Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1079-80 (9th Cir. 2017). Here, the court did not find injunctive relief alone sufficient to warrant approval, nor could it. *See* OB14.

## B. Rule 23(e)(2)(C)(ii)'s plain language requires a court to reject this settlement.

Plaintiffs rely on two mischaracterizations for their argument in support of affirmance despite the plain language of Rule 23(e)(2)(C)(ii). First, they characterize the court's ruling as a "factual finding that the settlement fund is nondistributable," and Google asserts this finding is a substitute for considering the (e)(2)(C)(ii) factor. DB33. Second, they set up a strawman argument that the Andren Objectors are arguing to "nullify decades of jurisprudence on *cy pres* distributions."[4]

The Andren Objectors directly addressed this Circuit's jurisprudence on *cy pres* in their opening brief. They acknowledged that this Circuit approved all-*cy pres* settlements in *Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012), and *Google Street View* and they reserved their arguments that those cases were wrongly decided on multiple grounds. *See* OB22; OB46-48. But we also distinguished those settlements from the one here, in large part because they were approved before the 2018 Rule 23(e) amendments and involved class identification hurdles not present here.[5] Given the different

---

[4] The second point is particularly ironic as class action *cy pres* has no weighty history; it dates to a student comment in the 1970s. Redish, Martin H. et al., *Cy Pres Relief & the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617, 631 (2010). Class action *cy pres* is a rebranding of the discredited doctrine of fluid recovery. *See id.* at 661-64.

[5] While *Google Street View* postdates the 2018 amendment, the Ninth Circuit did not reach the Rule 23(e)(2)(C) factors in that case after affirming a finding that there was no evidence that anyone could show an individual was a member of the class. 21 F.4th at 1113-14 (9th Cir. 2021). No such finding was made here.

settlements and the change in the law, the district court legally erred in failing to reject the settlement here.

Google's attempt to reframe this case as similar to *Google Street View* because it supposedly is not technologically feasible to identify class members fails. In *Google Street View*, class membership turned on whether Google had collected certain information about class members that neither the settlement administrator nor class members could ascertain for themselves. So difficult was the problem that, after Google disputed named plaintiffs' standing, the district court appointed a special master to investigate whether plaintiffs' WiFi networks that were not password-protected or encrypted had transmitted "payload" data at the exact moment that a Street View vehicle happened to pass by. 21 F.4th at 1108-09. This process took years, required examining years-old personal WiFi routers, and the results were *still* inconclusive. *Id.* Google fought that issue tooth-and-nail throughout the litigation for years. Here, in contrast, Google did not dispute that the class representatives were class members or that the three Andren Objectors are class members. In further contrast, class members can determine their status as class members based on the "Location History" settings that they personally set or declined to change from the default for their Google account and make that affirmation during the claims process. Indeed, the entire crux of the lawsuit is that Google collected location data from users who had the Location History setting disabled and users are readily able to determine this setting.

*Lane* is not comparable on the distributability question because the *Lane* objectors "conceded" that monetary payments to the class were "infeasible." 696 F.3d at 821. Here, the Andren Objectors made no such concession and instead demonstrated

that other cases with smaller funds-to-class member ratios have successfully distributed money directly to class members through a claims process in which claimants self-identify. 2-ER-77-80. Contrary to appellees' assertion, the district court did not make any factual findings about feasibility with a claims process and offered only pithy remarks in an oral ruling that a direct distribution could be "be excessive, cumbersome." 1-ER-40. While the district court also noted that a 1% claims rate would cost $1.9 million in administrative costs, the $62 million fund could absorb that cost and still effectively distribute money directly to the claimants, and the district court made no finding to the contrary. 1-ER-15. Applying such a 1% claims rate—common in consumer class actions, and subtracting $1.9 million from a fund of $42 million (net fees and costs), each of the 2.5 million claimants would receive over $15—a reasonable recovery in the context of consumer class actions and certainly better than nothing. The parties make no argument that $15 is "de minimis." (Doing so would imply that nearly every consumer class-action settlement in this circuit could be legally converted to all-*cy pres*.) Google's argument that the cost of distributing relief would be "prohibitively expensive and dramatically decrease the amount each claimant would receive" is belied by actual math and ignores the reality that even a payment reduced by the friction of administrative costs is better than $0.

Plaintiffs cite the 22% claims rate of *In re Facebook Biometric Info. Privacy Litigation*, 522 F. Supp. 3d 617, 622 (N.D. Cal. 2021), to suggest that the claims rate here could be as robust.[6] But that case involved direct notice to a class of users with the very personal

---

[6] Plaintiffs also cite *In re Facebook Consumer Privacy User Profile Litig.*, No. 18-md-02843, Dkt. 327 at 14 (N.D. Cal.) (PB23) as supposedly having a 7% claims rate. The

injury of having Facebook store digital scans of their face, and, crucially, it offered each class member over $300. As Andren demonstrated to the district court, in low-value, non-direct notice settlements such as the present one, including in cases involving a class of hundreds of millions of Google users, single-digit claims rates are the norm. OB27-28; *contra* PB24 (incorrectly asserting that Andren "provide[s] no reason" to find a low claims rate); *see generally* Kenny Malone, *NPR's 'Planet Money' team looks into the prevalence of class action settlements*, NPR (Aug. 9, 2024), https://www.npr.org/2024/08/09/nx-s1-5065674/nprs-planet-money-team-looks-into-the-prevalence-of-class-action-settlements (observing law professor Jerry Maatman's "tank-of-gas rule": class members more often take the trouble to submit a claim "if the amount is more than a tank of gas").

Appellees repeat a fictional twenty-five-cent-per-class-member recovery figure, but they never rebut Andren's evidence showing that the median claims rate of a claims-made class-action settlement without direct notice is less than 1%. *In re Carrier iQ, Inc., Consumer Privacy Litig.*, No. 12-md-02330-EMC, 2016 WL 4474366, at *4 (N.D. Cal. Aug. 25, 2016) (citing authorities). By the reasoning of the district court and appellees, the parties to every consumer class action could negotiate settlements that are paid as *cy pres* to their hand-picked third parties rather than the injured class members. Yet they cite no case in which an appellate court has even implied that if some class members

---

cited document is a First Case Management Statement that shows no such claim rate. In any event, such a claims rate is simply not the norm and would be due to the historic and well-publicized nature and other features of the settlement not present here.

fail to make claims, then it would be unfair to directly compensate *any* class members. Why would it be? Every class member has the equal opportunity to submit a claim. Such a holding would usurp the class-action system, allowing powerful defendants and trial attorneys to direct billions of dollars into their preferred nonprofits.

Once Andren demonstrated feasibility, Rule 23 and Circuit precedent foreclosed approval of the settlement because it paid the entire fund to *cy pres* rather than the class. Google itself admits that multiple cases in multiple circuits hold that "*cy pres* relief is improper where distributions to the class are feasible, just as this Court holds." DB42 n.7 (citing cases). More generally, appellees do not dispute that the Ninth Circuit has not addressed the 2018 amendment that emphasizes evaluating the effectiveness of distribution of relief to the class in the context of a *cy pres* class-action settlement. The amendment reinforces the law that even Google acknowledges: If distribution is feasible, then *cy pres* relief is improper.

Appellees simply cannot rebut the uncontested evidence that many settlements have directly paid smaller funds to more class members. *See, e.g.*, OB26 (referencing *In re Google Referrer Header Litigation*, 2023 WL 6812545, 2023 U.S. Dist. LEXIS 185442 (N.D. Cal. Oct. 16, 2023), which distributed a fund less than half the size of $62 million to a class of hundreds of millions of Google users who self-identified through a claims process). Indeed, *Google Street View* retreaded the vacated 2017 *Google Referrer* decision's approach to feasibility without the benefit of seeing the amended *Google Referrer* settlement that conclusively demonstrated direct class payments were feasible. *See In re Google Referrer*, No. 10-cv-04809, Dkt. 165 (N.D. Cal. Jan. 4, 2023) (moving for preliminary approval of the revised settlement, about a year after *Street View* was

decided). And appellees cannot cite any Ninth Circuit decision holding that a *cy pres* settlement need not comply with Rule 23(e)(2)(C)(ii), which applies to all class-action settlements.

Finally, both appellees draw strawman caricatures of Andren's argument as it relates to Rule 23(e)(2)(C)(ii) more broadly. While appellees try to reframe Andren's appeal as requiring a broad pronouncement on how the subsection would foreclose injunctive and declaratory relief, it does nothing of the sort. First, while the subsection does apply to all class actions, Andren never argues that the subsection forecloses any settlement that doesn't pay monetary relief to the class or even that every settlement have a method of distributing relief.[7] The effectiveness of the distribution of injunctive or declaratory relief might involve scrutiny of how that relief applies to all class members or another form of review that this Court need not decide today. The narrow question raised by his appeal is whether Rule 23(e)(2)(C)(ii) required the district court to consider that the settlement fund could have been effectively distributed directly to the class as cash and, if so, hold that the settlement did not pass (e)(2)(C)(ii) when the

---

[7] In a hard-to-follow tangent, Google suggests (DB44) that Andren's argument that a court must analyze a monetary distribution to third parties rather than to the class under (e)(2)(C)(ii) requires this court to hold that every settlement has a "proposed method of distributing relief," which in turn requires this court to hold that every settlement has a "proposed award of attorney's fees" and a side agreement that must be identified under Rule 23(e)(3). This is wrong. When a settlement has a monetary fund, as here, then a court must analyze the settlement under (e)(2)(C)(ii). If there is a claims process, then the court would also consider that in its analysis. If there is a proposed fee award or a side agreement, then the court would analyze those as well. Fed. R. Civ. Proc. 23(e)(2)(C)(iii), (iv).

fund instead was paid to uninvolved third parties. That the district court ignored the mountain of evidence that distribution to the class was feasible was reversible error.

**C.  Google does not dispute and plaintiffs offer little rebuttal to the many public-policy reasons to emphasize class counsel's obligation to effectively distribute class settlement funds.**

The appellees cannot rebut the "fundamental concerns" with *cy pres* that Chief Justice Roberts, Justice Thomas, Judge Bade, and many other judges have detailed. *See, e.g.*, *Marek v. Lane*, 134 S. Ct. 8, 9 (2013) (Roberts, C.J., respecting denial of certiorari); *Frank v. Gaos*, 586 U.S. 485 (Thomas, J., dissenting); *Google Street View*, 21 F.4th at 1122 (Bade, J., concurring).

In particular, plaintiffs argue that a manipulable standard for non-distributability offers protection when it instead puts the class at the mercy of the settling parties rather than the rule of law. Plaintiffs argue on the one hand that class counsel are not incentivized to pursue their political preferences by negotiating settlements with *cy pres* awards because such awards are "only permitted where funds are non-distributable" and meet the nexus requirements. But, debasing this argument, they also contend that any settlement fund is non-distributable if the fund cannot pay a significant amount to every class member, even when the overwhelming majority of class actions do not compensate most class members a significant amount. Plaintiffs would thus create endless opportunities for *cy pres*. PB26. Plaintiffs then nitpick the Andren Objectors' citations by looking for examples of "oversized checks." But those sources convey the precise public-policy point that Andren made: class counsel have a self-interest in pursing *cy pres* both because it allows them to advertise their supposed public service

and to direct funds to recipients of their choosing—all while having their compensation connected to the size and not the success of the *cy pres* awards. Chris J. Chasin, *Modernizing Class Action Cy Pres Through Democratic Inputs*, 163 U. Pa. L. Rev. 1463, 1479 (2015). Yes, Virginia, attorneys promote themselves with oversized *cy pres* check ceremonies.



Judge Wallace voiced similar concerns and "propose[d] that the burden should be on class counsel to show through sworn testimony, in an on-the-record hearing, that the prior affiliation played no role in the negotiations, that other institutions were sincerely considered, and that the participant's alma mater [or other affiliated recipient] is the proper *cy pres* recipient." *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 749 (9th Cir. 2017) (Wallace, J., concurring in part and dissenting in part). That level of inquiry did not happen here. Rather, the settling parties conducted outreach to recipients of their choosing and did not sufficiently justify their choice of several of their alma maters and organizations on which they are board members. 4-ER-606-607. And while there might not be a recipient directly controlled by Google, the settlement

does direct *cy pres* to entities that Google has donated to and that have Google employees on their boards—raising the same specter that *cy pres* works against class interests. OB12-13.

Plaintiffs again miss the mark in claiming that Judge Posner backtracked on his view that "[t]here is no indirect benefit to the class from the defendant's giving money to someone else," expressed in *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004). The case they cite, *Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672 (7th Cir. 2013), has nothing to do with Rule 23(e). *Hughes* involved a federal statute setting defendant's maximum liability to the class at $10,000, so the defendant did not oppose plaintiff's class certification motion and Rule 23(f) appeal. *Id.* at 674. *Hughes* involved no compromise at all on class relief, attorneys' fees, or otherwise. *Hughes*'s sole holding in an *ex parte* case was that the district court did "not provide adequate grounds" in decertifying the class and remanded to redecide the certification decision. *Id.* at 678. One year later, the same circuit decided *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), with Judge Posner writing to preclude using *cy pres* to inflate settlement value, and holding that the settlement should have distributed $1.1 million of *cy pres* to 12 million class members. Given plaintiffs' assertion that "[n]obody disputes that the very best use of a settlement fund, where feasible, is benefitting the class members directly," then the funds should have been directly distributed to the class. PB29 (internal quotation marks omitted).

Plaintiffs' rebuttal to the policy concern that some *cy pres* recipients have a political valence offensive to class members is remarkably weak. They don't dispute the highly polarizing nature of many recipients here. Their suggestion that only "an objector

or two" in a class of over 200 million people disagree with the recipients is, frankly, offensive to the intelligence of this Court. PB30. "Ascribing any meaning to silence in response to publication notice is untenable." Debra Lyn Bassett, *Class Action Silence*, 94 BOSTON U. L. REV. 1781, 1799 (2014). *Accord Redman v. RadioShack Corp.*, 768 F.3d 622, 628 (7th Cir. 2014) (Posner, J.).

Tens of millions of people oppose the polarizing and radical work undertaken by many recipients here, including work that supports some of the most divisive subjects in American politics such as abortion access and DEI. If the substantial nexus test cannot safeguard the use of class members' funds against supporting work the class opposes, then the test should be replaced with more stringent protections for class members.

Finally, Plaintiffs don't dispute the facts of *In re Google Buzz Privacy Litigation*, No. C 10-00672, 2011 WL 7460099 (N.D. Cal. June 2, 2011). They are wrong that no court has ever cited it to support *cy pres*; in fact, the district court below did so. 1-ER-15 (citing *Google Buzz* with the parenthetical "(approving *cy pres*-only settlement)"); *see also In re Netflix Priv. Litig.*, No. 5:11-CV-00379, 2013 WL 1120801, at *7 (N.D. Cal. Mar. 18, 2013) (Davila, J.). Raising the potential for similar conflicts of interest here, the district court in fact did have unlimited discretion to distribute funds to favored nonprofits and alma maters, and approved an ideologically imbalanced set of recipients that proudly promoted their intent to use the money to support unpopular left-wing causes.

**D.** **The district court also committed reversible legal error by contradicting Rule 23(e)(2) in incorrectly applying "a strong presumption" of fairness.**

Consistent with *Briseño* and several other Ninth Circuit cases since the 2018 amendments, the district court not only should have rejected a presumption of settlement fairness but also should have started with a presumption of settlement *invalidity*. 998 F.3d at 1030; *Apple Inc. Device Perf. Litig.*, 50 F.4th at 782-83 (following *Roes, 1-2 v. SFBSC Mgmt. LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019) and *Saucillo v. Peck*, 25 F.4th 1118, 1130-33 (9th Cir. 2022)). Google admits that "the 2018 amendment to Rule 23(e)(2) rejected that such a presumption [of fairness] is valid." DB33-34. But Google is simply wrong that the district court rejected that presumption here. And neither appellee asserts that the court applied a presumption of invalidity as precedent requires.

Appellees tiptoe around the district court's "strong presumption" of fairness (1-ER-18) by emphasizing that the court expressed this view in its discussion of the factor "reaction of class members to proposed settlement." DB35; PB31. But they cannot avoid the court's unambiguous statement: "The absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." 1-ER-18. Indeed, the settlement approval that *Saucillo* reversed used identical language. *See Burnell v. Swift Transp. Co*, 2020 WL 12990454, 2020 U.S. Dist. LEXIS 261892, *14 (C.D. Cal. Jan. 9, 2020). The Andren Objectors' acknowledge that their closing quotation mark should have been after "strong presumption," rather than "strong presumption of validity," but the typo is immaterial to the argument or what the district court did.

The incorrect presumption infiltrated the court's analysis. In the paragraph that immediately followed, the court found that "all the applicable factors weigh in favor of finding that the Settlement Agreement is fair and reasonable." 1-ER-18. Appellees don't dispute that the number of objections standing alone, without consideration of the quality of objection or issues raised, is not a meaningful indication of settlement fairness. *Cf. Briseño*, 996 F.3d 1014 (one objector at fairness hearing). The court's use of this factor to apply a presumption in favor of settlement approval is thus even worse. Nor do appellees offer any reason that the court's review for "subtle signs" of collusion (PB27) now required for all settlements, should absolve the court's application of the wrong legal standard, as this analysis might find a reason to reject a settlement but would not overcome a presumption of invalidity without more compelling findings. Application of the wrong standard of law is reversible error, and settlement approval therefore should be reversed. *See Apple Inc. Device Perf. Litig.*, 50 F.4th at 776.

## II. Many of the *cy pres* recipients should be disqualified as flunking Ninth Circuit standards.

Appellees do not dispute that the "substantial nexus" test—applied in addition to the Rule 23 standards—requires courts to analyze whether a *cy pres* award is "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members," *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011), and must not benefit a group "too remote from the plaintiff class," *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 2022); *see* 1-ER-16 and PB14 (stating test). The district court misapplied that test here, resulting in its award of six- and seven-

figure sums to improper *cy pres* recipients who do not meet this Court's standards or serve the interests of the class members.

First, appellees' argument that the Andren Objectors waived their arguments that many of the *cy pres* recipients were improper under the substantial nexus test fails.[8] The Andren Objectors objected extensively to all the *cy pres* recipients for several reasons. *E.g.*, 2-ER-55-56; 2-ER-71-76. No one disputes that the issue on appeal is whether the district court legally erred in its application of the substantial nexus test to the *cy pres* recipients. For this Court to rule on this issue, the Andren Objectors need not detail every instance in which that district court's erroneous application resulted in *cy pres* funds going to organizations that should have been rejected. Rather, Andren properly described, with supporting details and record citations, the legal error: The district court approved "blatant mismatches" between the recipients and the class, OB36-37; skipped over how the recipients were consistent with "the interests of the silent class members," OB38; failed to "address how the recipients' work furthered the objectives" of the underlying claims, OB39; and failed even to give a "reasoned response to their complaints about racial discrimination, anti-Semitism, and mismatch of intended grant goals with the interest of the class," OB43. Andren's brief noted that the examples of these errors that he described were just that—examples. *See* OB38 ("The Andren Objectors identified these *and other* mismatches to the district court, but the district

---

[8] They really mean "forfeited," not "waived." "The terms…though often used interchangeably by jurists and litigants—are not synonymous. Forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right." *Hamer v. Neighborhood Hous. Servs.*, 583 U.S. 17, 20 n.1 (2017).

court gave them little to no consideration."); OB39 ("The one-sided ideological work that extends beyond location tracking *includes* the following: …." (emphasis added)). If this Court reverses, the district court would follow its guidance on the proper application of the test on remand as to each of the proposed recipients. The Andren Objectors' detailed arguments are not a "single sentence" or a "bare assertion." *California v. Azar*, 911 F.3d 558, 573 n.1 (9th Cir. 2018). They are well more than the "minimal" assertions that are "sufficient to preserve" interrelated issues. *Lacey v. Maricopa Cty.*, 693 F.3d 896, 934 n.19 (9th Cir. 2012) (*en banc*). And they are far from the sort of "[a]rguments made in passing and inadequately briefed" that appellees look to argue waiver. *See* PB34-35 (citing inapposite cases).

Second, there is no dispute among the parties that a court may not approve a *cy pres* recipient if it lacks a connection to the classes' claims in the case or to the interests of the class. Yet appellees' efforts to tie the *cy pres* recipients here to the interests of the class and their claims in support of the district court's order fall short.

Neither appellee disputes that the district court failed to address how the recipients' work furthered the objectives of the specific claims at issue in the case at the time of settlement—intrusion upon seclusion, violation of the California Constitution's right to privacy, and unjust enrichment. Google argues that the recipients furthered the "objectives of California privacy law," but the single case they cite on this issue only generically discusses the law and is unrelated to Andren's *cy pres* objections. DB55 (citing *Hill v. NCAA*, 7 Cal. 4th 1, 17-18 (1994)). (Nothing in *Hill* mentions racial justice or support for attorneys' *alma maters*.) This lack of nexus alone constitutes legal error that warrants reversal. *Dennis v. Kellogg Co.*, 697 F.3d 858, 869 (9th Cir. 2012) (reversing for

lack of assurance that *cy pres* recipients bore any nexus to the "class or their false advertising claims"); *Koby*, 846 F.3d at 1080 (reversing due to "no showing that the work performed by" the proposed recipient would further the objective of the FDCPA).

The court's failure to apply the proper scrutiny resulted in approval of *cy pres* recipients whose work does not further the interests of the class or their underlying claims. Google again seeks to minimize the problem as merely a question of "distasteful[ness]" to the Andren Objectors or "imperfect[] tailor[ing]," DB52, and asserting that the Court's longstanding precedent requiring a geographic match is just a suggestion in the privacy context, DB60. But the incompatibility problem is fundamental to the legal order and preventing *cy pres* from "run[ning] wild." D. Brooks Smith, *Class Action and Aggregate Litigation: A Comparative International Analysis*, 124 PENN ST. L. REV. 303, 339 (2020) (quoting *Brudenell v. Elwes*, 102 Eng. Rep. 171, 174 (1801)). It doesn't matter how "well known" (DB55 (regarding centers at Harvard, MIT, NYU, Yale, and Fordham)) an organization is if it is so misaligned with the class's interests that it is being investigated for well-publicized Title VI violations against Jews (who, of course, are included in the class), is the alma mater of those responsible for choosing the initial slate of recipients without serious inquiry by the court into why they were chosen to avoid conflicts of interest, or proposes to spend the funds on narrow purposes that do not benefit the class—or such broad purposes that the entire world supposedly benefits. Awarding *cy pres* in such conditions is not only contrary to the substantial nexus test but also at odds with the purpose of class actions and the judicial system more broadly to provide relief to claimants. *See Tyson Foods Inc. v. Bouaplakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, J., concurring).

Appellees spend pages upon pages detailing the privacy-related work that the *cy pres* recipients undertake. But the Andren Objectors have never argued that no recipient engages in any worthwhile or publicly beneficial internet- and privacy-related work. Many if not most do. The problem is that the work they intend to fund with the class members' money is not targeted to the class; or they engage in extremely polarizing work on only one side of the ideological spectrum against the interests of millions of class members who have deeply held moral and ethical objections to that work. OB18. From appellees' telling, one might believe that the chosen recipients are the only possible ones, and the fact that they have disqualifying mismatches with the class and engage in work that class members would *never* support with their own funds if given the choice should be overlooked just because some of their work involves privacy issues. But we know that isn't true.

One of the flaws in appellees' attempts to rehabilitate the *cy pres* recipients despite the polarizing nature of their work is failure to recognize the fungible nature of funds. *Cf. Dennis*, 697 F.3d at 868 (asking whether the defendant's *cy pres* contribution would supplemental or simply supplant its existing donations). For example, *even if* the ACLU Foundation's SPT Project, to which the district court sent $6 million (1-ER-34), promised to use those funds only for "ongoing and robust internet privacy and security work," that excluded abortion or other ideological work, the $6 million frees up funds in ACLU's organizational budget that it can direct to work that a majority of the class opposes. The same is true for many other recipients, including, for example, for Yale Law School's Information Society Project, which also hosts a Program for the Study of Reproductive Justice. *See* PB49. (And if the ACLU would not spend any of this fungible

money on privacy absent *cy pres*, despite its enormous budget, it suggests the *cy pres* grant is not being wisely targeted.)

More troubling, however, is that even the specific work that the recipients proposed for the *cy pres* awards does not align with the class's interests. Appellees do not, and cannot dispute that the ACLU Foundation of Northern California, as just one example, proposes to use the funds to engage in polarizing work anathema to large swaths of the class. *See, e.g.*, 2-ER-95. While Google not-so-subtly insinuates that class members who don't support this work are bigots, smug *ad hominem* has never had a place in a brief before this Court. *See* DB59 (mischaracterizing recipients' work supporting racial discrimination and hiding "gender-affirming care" from parents as "women's rights, gay rights, or racial diversity"). That courts in *other* cases, involving different proposals, approved some of the recipients in the past is irrelevant to their propriety in *this* case. The Andren Objectors did not forfeit their objection here by failing to object in earlier cases in which they weren't class members.

Plaintiffs' characterize the Andren Objectors' concerns as "cherry-picked" from the proposals, but appellees cannot and do not dispute that Andren's objections are drawn from the very materials submitted by the recipients to the court. Even in one of their examples, MIT, plaintiffs must acknowledge that it is "computer science undergraduates at MIT and other universities around the world, as well as privacy engineers," 2-ER-280, who are intended beneficiaries of the *cy pres* funds, with zero obligation or expectation that they will, in turn, help the U.S.-based class. Plaintiffs also are forced to acknowledge that Fordham proposed using *cy pres* funds to benefit "populations in the Global South," as well as school children, resorting to arguments

that educating anyone anywhere about internet privacy somehow benefits the U.S.-based class of Google users. This standard proposes to hollow out the substantial nexus test to the point of meaninglessness. While the district court did award less than requested to Fordham, Andren is unaware of any record evidence indicating that Fordham will not use any funds for the Global South program described in its proposal. Plaintiffs also admit that recipients will in fact use *cy pres* funds specifically to "advance[] reproductive and LGBTQ rights and … emphasize implications for immigrant communities." PB48. The district court analyzed none of these concerns, which go directly to the substantial nexus analysis.

Contrary to Google's flippant suggestion (DB59), opting out was neither practical nor legally required. The deadline for opting out was before the court had decided which organizations should receive funding and in what amount. *See* 3-ER-442 (opt-out deadline was March 4, 2024); 1-ER-4 (final approval order was May 3, 2024). With this argument, appellees are improperly attempting to condition class members' right to participate in the action on their acquiescence in compelled donations and in the loss of their rights. *Janus v. AFSCME, Council 31*, 585 U.S. 878, 930 (2018). This is not a true opt-out but a Hobson's choice, particularly given the "problem that small recoveries do not provide the incentives for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (internal quotation marks omitted); *cf. also Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("only a lunatic or fanatic sues for $30"). It's also telling that appellees would suggest opting out when, had class counsel acted consistent with their fiduciary duties to the class, they would have recommended opt-out to every class

member because they would have received exactly the same benefits as class members without releasing their claims. *Google Street View*, 21 F.4th at 1124 (Bade, J., concurring) (noting this incoherence of all-*cy pres* class-action settlements). The availability of an opt out under Rule 23(b)(3) has never prevented this Court from reversing approval of an abusive settlement. *E.g.*, *Nachshin*, 663 F.3d 1034; *Dennis*, 697 F.3d 858; *Briseño*, 996 F.3d 1014.

## III. The settlement and approval order unconstitutionally exceed the judiciary's Article III power.

Appellees again attempt to sidestep the merits of the Andren Objectors' argument that the district court exceeded its Article III power by wrongly contending that the issue is forfeited because Andren did not raise it below. But the Andren Objectors specifically objected to the role of the judiciary in selecting *cy pres* recipients, deciding which of the recipients should be approved, and determining how much each recipient would receive, as well as the overall opaque and improper process rife with potential abuses. *See* 3-ER-100-101. Although "the lower court [was] fairly put on notice as to the substance of the issue," neither appellee disputes that the district court failed to address this issue. *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469 (2000). On that ground alone, the Court may reverse. *Dennis*, 697 F.3d at 864.

On the merits, appellees offer no relevant support for the power of the judiciary to act as a grant administrator handing out funds that constitute class members' damages to third parties uninvolved in the case. Appellees do not dispute that this power creates immense conflicts of interest for the judges; that the judicial role is limited

to providing relief to claimants who have suffered or will imminently suffer, actual harm; or that the judiciary is ill-equipped to act as grant administrators. *See* OB43-46.

Instead, appellees downplay the district court's role in the *cy pres* abuse here. The court's involvement is far more extensive than mere approval of the settlement and the *cy pres* recipients or even "distribution of a common fund to appropriate recipients," as they claim. PB55-56; DB62-63. The court made policy choices regarding which organizations deserved millions of dollars and eagerly installed itself as monitor of how those organizations use the money. Appellees' meager defense falls flat.

The only case plaintiffs cite in support of their argument is *Six Mexican Workers*, 904 F.2d 1301, but that case does not help them. *Six Mexican Workers* rejected *cy pres* of residual, unclaimed damages, and the court recognized the controversial nature of *cy pres* even when courts do not decide which third parties to fund, and by how much. Google also cited *Six Mexican Workers* for the argument that district courts may supervise a *cy pres* to "'ensure that the funds are distributed in accordance with the goals of the remedy.'" DB63 (quoting 904 F.2d at 1308-09). But this Court rejected the district court's approval of *cy pres* because, as here, "there [was] no reasonable certainty that any [class] member will be benefited" and the district court did not properly determine "what remedy will best effectuate the goals of [the statute] and the interests of the silent class member." *Id.* at 1308-09. The court even suggested that the district court consider escheat of the funds in place of a *cy pres* distribution.

On the issue of a district court's oversight function, *Six Mexican Workers'* suggestion of court supervision (904 F.2d at 1309) did not consider the scenario where a district court would also be acting to pick and choose the level of funding of dozens

of organizations. Nor did this Court consider the conflicts of interest that creates when a court is deciding whether to approve a settlement giving it that power; nor the constitutional implications for Article III. The drive-by *dicta*, made in passing on questions no one presented, does not bind this Court on the questions of first impression Andren does present.

Likewise, the cases Google cites (DB63-64) as supposedly showing that courts have the sort of grantmaking and ongoing monitoring power exercised by the district court do nothing of the sort. And they involve residual funds and district courts that sought to minimize judicial involvement because of the extra-Article III nature of the process. In *In re Compact Disc. Minim. Advertised Price Antitrust Litig.*, 236 F.R.D. 48 (D. Me. 2006), the district court went to great lengths to "avoid making additional 'grants,' as well as avoid any continuing monitoring in upcoming years" because "[f]ederal judges are not generally equipped to be charitable foundations: we are not accountable to boards or members for funding decisions we make; we are not accustomed to deciding whether certain nonprofit entities are more 'deserving' or limited funds than others; and we do not have the institutional resources and competencies to monitor that 'grantees' abide by the conditions we or the settlement agreements set." Similarly, in *Perkins v. American National Ins. Co.*, 2012 WL 2839788, 2012 U.S. Dist. LEXIS 95039, at *5-*8 (M.D. Ga. July 10, 2012), the court emphasized efforts to prioritize direct compensation to class members, the residual nature of the fund, and that *cy pres* was a process "far removed from traditional Article III functions." Finally, *Keepseagle v. Perdue* repeatedly emphasized the narrow and limited nature of a district court's authority to accept or reject a settlement, rather than any freewheeling authority over settlement funds or *cy*

*pres* distributions. 856 F.3d 1039, 1050 (D.C. Cir. 2017). The settling parties pushed the district court—however willingly—into the role of settlement blue penciler and policymaker on the class's behalf. Both this Court and the Supreme Court have already rejected that role for district courts, even when presiding over class actions. *E.g.*, *Molski v. Gleich*, 318 F.3d 937, 946 (9th Cir. 2023) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) and *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986)). *Cy pres* ought not receive special status.

The district court's activities as to the *cy pres* process exceeded its Article III authority, and reversal of its settlement approval is appropriate.

**IV.** ***En banc* review is appropriate to overturn decisions that would otherwise permit approval of settlements without marginal consideration to class members or settlements where class counsel uses *cy pres* to engage in self-dealing.**

The settlement thus fails for the reasons presented above. But if the Court believes that certain *cy pres* decisions of this Circuit override the other precedents requiring reversal or the questions of first impression Andren presents, the case is appropriate for *en banc* review. Appellants will file any petition for such review as appropriate and rebut meritless arguments by appellees that any issues were not preserved. But the Court can also call or signal support for such review. The few cases cited by appellees on this issue have case-specific problems not present here and do not foreclose *en banc* review. Contrary to appellees' view, ensuring that class members are protected against the self-interest and conflicts inherent to the class-action-settlement process and that they recover the damages due to them, is a "question of exceptional

importance" that warrants resolution by the Court sitting *en banc*. This Circuit's more permissive approach has "led to increased forum shopping"; nearly half of federal decisions involving *cy pres* originate in the Ninth Circuit. Jeremy Kidd & Chas Whitehead, *Saving Class Members from Counsel*, 58 SAN DIEGO L. REV. 579, 600-04 & n.173 (2021).

## Conclusion

This Court should vacate and reverse this settlement approval. At a minimum, remand is required to review the settlement under the appropriate legal standard and to give a reasoned response to substantive objections. And at a minimum, many of the *cy pres* recipients are inappropriate under existing Ninth Circuit law.

In the alternative, the Court should grant *en banc* review to end its idiosyncratic treatment of fundamentally unfair *cy pres* settlements.

Dated: February 5, 2025               Respectfully submitted,

*/s/ Anna St. John*
Theodore H. Frank
Anna St. John
HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1629 K St., NW, Suite 300
Washington, DC 20006
Telephone: (703) 203-3848
ted.frank@hlli.org
anna.stjohn@hlli.org

*Attorneys for Objectors-Appellants*

## Certificate of Compliance
## with Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 8,278 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as permitted by Cir. R. 32-2(b). *See* Form 8 (attached).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Garamond font.

Executed on February 5, 2025.

*/s/ Anna St. John*
Anna St. John

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-3387

I am the attorney or self-represented party.

**This brief contains** 8,278 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

⦿ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☑ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Anna St. John **Date** 2/5/2025

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

**Certificate of Service**

I hereby certify that on February 5, 2025, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which will provide notification of such filing to all who are ECF-registered filers.

*/s/ Anna St. John*
Anna St. John